# THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STATE FARM MUT. AUTO. INS. CO., et al.** : | |
| **Plaintiff** : | |
| : | |
| **v.** : | |
| : | |
| **LEONID STAVROPOLSKIY, et al.** : | **CASE NO: 15-cv-5929** |
| **Defendant** : | |

## RESPONDENT EMIL KHANUKOV'S BRIEF IN SUPPORT OF RESPONDENT'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER

Dated: July 14, 2017

/s/ Samuel Fishman, Esquire
Samuel Fishman, Esquire (I.D. No.: 78452)
Law Offices of Samuel Fishman, P.C.
11450 Bustleton Avenue
Philadelphia, PA 19116
Telephone: 215-464-4600
Facsimile: 215-464-4600
Attorney for Respondent Emil Khanukov

## THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STATE FARM MUT. AUTO. INS. CO., et al.** : | |
| **Plaintiff** : | |
| : | |
| **v.** : | |
| : | |
| **LEONID STAVROPOLSKIY, et al.** : | **CASE NO: 15-cv-5929** |
| **Defendant** : | |

## BRIEF IN SUPPORT OF RESPONDENT EMIL KHANUKOV'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER

Respondent Emil Khanukov hereby files this Memorandum of Law in Support of his Motion to Quash Subpoena and for a Protective Order. A Copy of Plaintiff's Subpoena directed to Emil Khanukov is attached hereto as Exhibit 'A'.

**A.  A NON-PARTY RECIPIENT OF A SUBPOENA IS ENTITLED TO SEEK PROTECTION FROM SAID SUBPOENA UNDER FEDERAL RULES OF CIVIL PROCEDURE 26 AND 45**

The recipient of a federal subpoena is entitled to seek protection from said subpoena under the provisions of Federal Rules of Civil Procedure 26 and 45. In re Mushroom Direct Purchaser Antritrust Litig., 2012 WL 298480, at *3 (E.D. Pa. Jan. 31, 2012). This can be done through methods including a Motion to Quash the offending subpoena.

The manner of which a Motion to Quash is to be heard was described in Arthur Frank, M.D., Ph.D, v. Honeywell International Inc. where the Honorable Gerald J. Pappert of the Eastern District of Pennsylvania stated that:

> "'The serve-and-volley of the federal discovery rules govern the resolution of a motion to quash." In re Domestic Drywall Antitrust Litig., 300 F.R.D. 234, 239 (E.D. Pa. 2014) (citing Mycogen Plant Sci., Inc. v. Monsanto Co., 164 F.R.D. 623, 625 (E.D. Pa. 1996)). The subpoenaing party must first show that its requests are relevant to its claims or defenses, within the meaning of Rule 26(b)(1). Id. (citing Mycogen, 164 F.R.D. at 625-26). Next, the subpoenaed nonparty must

show that disclosure of the information is protected under Rule 45(d)(3). Id. (citing <u>Mycogen</u>, 164 F.R.D. at 626).

2015 U.S. Dist. LEXIS 106453, *12 (E.D.Pa. 2015). A courtesy copy of <u>Frank</u> is attached hereto as Exhibit 'B'.

In this matter, it means that the Plaintiff will first need to make the appropriate showing that the subpoena request is relevant. Furthermore, relevance alone does not make the subpoena proper. "[E]ven if the information sought is relevant, discovery is not allowed where no need is shown." <u>Id</u>. (citations omitted). Only after the Plaintiff has satisfied its burden, does the subpoenaed party need to show that the disclosure is protected. Plaintiff has made no such showing at this juncture.

## B.     NON-PARTY RESPONDENT EMIL KHANUKOV CHALLEGES THE SUBPOENA AS DEFECTIVE ON ITS FACE

Before proceeding to a discussion of relevancy, Respondent first challenges the subpoena itself and Plaintiff's alleged service thereof as deficient. For the following reasons, the subpoena issued by Plaintiff is deficient on its face and must be quashed.

     *i.*      *The subject subpoena is defective on its face as plaintiff failed to set forth the matters upon which the subpoenee's testimony is required*

Plaintiff has issued a subpoena to Emil Khanukov, a legal assistant with the Law Offices of Samuel Fishman, seeking his testimony in the above captioned matter.[1] Plaintiff has not provided any description or limitation on the information that is to be inquired into at the

---

[1] It should be noted that at no time has the Law Offices of Samuel Fishman or Emil Khanukov ever provided legal services to the Defendants. The Law Offices of Samuel Fishman, P.C., has never represented any of the Defendants in a First Party Benefits/PIP lawsuit. The Law Offices of Samuel Fishman, P.C. has nothing to do with the billing practices of any of the defendants.

deposition.[2]  This failure to define the matters at issue forces undersigned counsel to file the instant Motion to Quash.

        *ii.*      *The subpoena on its face appears to attempt to subpoena Emil Khanukov in such a way that it would avoid tipping off the Law Offices of Samuel Fishman to its issuance. Furthermore, service of the subpoena is also defective on its face*

Interestingly, after the Law Offices of Samuel Fishman disclosed Emil Khanukov's name in response to a subpoena and informed Plaintiff of his status as a legal assistant at the Law Offices of Samuel Fishman, instead of notifying the Law Offices of Samuel Fishman of their intent to subpoena Mr. Khanukov, Plaintiff issued a subpoena and attempted to have it served upon Mr. Khanukov covertly at addresses not associated with the Law Offices of Samuel Fishman.  First, Plaintiff attempted service upon Mr. Khanukov's parents at an address for which Emil Khanukov does not reside and has never resided.  Second, the Plaintiff left the Subpoena at a business in which Emil Khanukov does not maintain an ownership interest and that he does not occupy as a regular place of business.  While the subject office did notify Emil Khanukov that a document was left there for him, service upon Mr. Khaunkov remains deficient as a matter of law.  See Fed. R. Civ. P. 5.

The issue that perplexes undersigned counsel is: why did Plaintiff choose to try and serve Mr. Khanukov at his parent's house and a business that he does not have an ownership interest in, rather than attempting service at the Law Offices of Samuel Fishman where he is known to be a legal assistant?  It is submitted herein, that this was likely done in order to avoid notifying the Law Offices of Samuel Fishman that Plaintiff was attempting to depose a legal assistant from their office.

---

[2] It is noted that Plaintiff has now filed a Motion to Compel the Deposition of Emil Khanukov.  Said motion appears to indicate that it will restrict inquiry at the deposition to whether there is a referral relationship between Mr. Khanukov and any of the Defendants.  Plaintiff, however, did not provide any such restriction in the subpoena itself.

This is first corroborated by the timing of the subpoena. The subpoena was allegedly served June 30, 2017 noting a deposition date of July 6, 2017. This left only 2 business days between the improper service and the date of deposition. Furthermore, Plaintiff is well aware that the Law Offices of Samuel Fishman is raising privilege defenses to the disclosure of any information regarding the representation of its present and former clients. In response to the subpoena issued upon the Law Offices of Samuel Fishman, said office responded by raising proper privilege objections to disclosure of client files. This is the same subpoena response in which Emil Khanukov's full name was disclosed to Plaintiff. It is therefore believed that the reason for Plaintiff's purposeful failure to serve Mr. Khanukov at the Law Offices of Samuel Fishman was in hope that he would attend and testify without alerting undersigned counsel so that Plaintiff could obtain information that is privileged.

Plaintiff's subpoena must be stricken for lack of proper service.

## C.  THE INFORMATION SOUGHT BY PLAINTIFF IS IRRELEVANT UNDER THE CASES CITED IN PLAINTIFF'S OWN BRIEF

Plaintiff attempts to incorporate his prior briefs to this Honorable Court herein to support the relevancy of Emil Khanukov's deposition. Upon examination of the cases set forth therein, Plaintiff's attempt to cherry pick facts from the cases cited in support of its position are at best disconcerting. The cases cited do not support the requested deposition of Emil Khanukov. As a matter of fact, under the cases cited by Plaintiff, Emil Khanukov's testimony is irrelevant as a matter of law. [3]

---

[3] It is believed that part of Plaintiff's argument is that this Honorable Court already issued an Order on this subject. This is denied by Respondent as the Order, as read by undersigned counsel, did not include a request for a witness deposition of non-party legal assistant Emil Khanukov. Furthermore, neither undersigned Counsel, not respondent himself were given notice of the motion or subpoena. Therefore, no opportunity to contest same was given prior to this juncture.

###### i. *Crable v. State Farm*

In one instance, Plaintiff cites <u>Crable v. State Farm Mut. Auto. Ins. Co.</u>, 5:10-cv-402-Oc-37TBS (M.D. Fl., Nov. 14, 2011) without any context whatsoever. A courtesy copy of the <u>Crable</u> decision is attached hereto as Exhibit 'C'.[4]

First, the <u>Crable</u> case was tried under the law of Florida, which is not the same as the instant matter. This would apply for everything from the Rules of Evidence to the Rules of Professional Conduct. The holdings of this case are simply not relevant here.

Second, <u>Crable</u> is not a RICO claim. <u>Id</u>. As a matter of fact, is a uninsured/underinsured motorist case in which State Farm is a Defendant. <u>Id</u>. Third, in <u>Crable</u> there was a plethora of evidence to suggest that an actual relationship existed between the Plaintiff's former attorney (Morgan and Morgan) and the doctor's office. <u>Id</u>. In said case, there was evidence that showed that Morgan and Morgan had paid the doctor's office "approximately $2,955,786.74" over the preceding three years.[5] <u>Id</u>. at 2. There was also evidence that Morgan and Morgan had an arrangement with the medical center by which they would send all patients with a disc bulge to the to the medical center, that the medical center would then perform surgery on the client, that the medical center would bill the full amount of the bills to Morgan and Morgan, and that the medical center would only expect half of the invoiced amount to be repaid. <u>Id</u>. at 2. There was also evidence that the medical center was provided with the third-party liability limits, the date of third-party demand and the date upon which payment to the medical center could be expected. <u>Id</u>. at 2. In addition, there was an express allegation that the Doctor himself physically went to Morgan and Morgan, met with the attorneys, and worked out the arrangement.

---

[4] References to pages of <u>Crable</u> will be directed to the specific page of the Exhibit.
[5] This information was learned in another case referred to as the "Montanez Case".

Finally, the Court crafted a limited Order with respect to the facts at issue. The only information that Morgan and Morgan was required to be disclosed was, the "(1) the Vendor Check History or provide an affidavit from a competent witness that the document does not exist. If it did exist sometime in the past then the affidavit shall address what happened to the information, and (2) the invoices from Deuk Spine to Morgan & Morgan for treatment of the 176 clients already identified by Morgan & Morgan in the answers to interrogatories in the Montanez case." Id. at 5-6. Undersigned Counsel can hereby certify to the Court that a "Vendor Check History" does not exist and that the Law Offices of Samuel Fishman has **never** itself retained the Defendants to provide independent medical evaluations, or any other services, to any of its clients. Therefore, there would be no invoices that were the responsibility of the Law Offices of Samuel Fishman to pay.

ii.    *State Farm v. Physiomatrix*

This is again a case that is highly distinguishable from the case at bar. The main distinguishing factor is spelled out in the reason why the discovery was permitted.

The Court in the Physiomatrix case stated that "State Farm's complaint alleges a limited scheme where the critical relationships are (1) the alleged referral relationships between the firms and Defendants and (2) Defendants' relationships with their patients." State Farm Mutual Automobile Insurance Company v. Physiomatrix, Inc., et al., No. 12-cv-11500 at pg. 16 (E.D. Mich. Nov. 26, 2013). A courtesy copy of the docked Order is attached hereto as Exhibit 'D'.

Furthermore, in citing to United States v. Boone, 628 F.3d 927, 935 (7th Cir. 2010), the Physiomatrix Court noted that "'the definition of the scheme itself is a limiting principle' of what constitutes relevant evidence, 'in that only evidence of the same scheme as opposed to a related

or distinct scheme, is admissible'". Id., at pg. 16. The scheme presented in the <u>Physiomatrix</u> case by State Farm is simply not the same as the one set forth in the instant matter.

In <u>Physiomatrix</u>, State Farm, **in its own complaint,** explicitly set forth evidence of a quid pro quo relationship between the medical provider defendants and attorneys. Specifically, the Complaint alleges, in pertinent parts, that:

> 6. The Clinic Defendants and Prescribing Physicians submitted to State Farm hundreds of bills and related documentation that are the product of the Predetermined Protocol that Defendants designed and carried out for examining, diagnosing, and treating all patients of the Clinics for as long as possible, whether they need it or not. Defendants did not design the Predetermined Protocol to legitimately examine, diagnose, and provide medically necessary services that were designed to address the unique needs of the individual patients. Instead, the Predetermined Protocol was designed and carried out to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) **inflate the value of personal injury claims in order to curry favor with a small group of personal injury attorneys ("PI Attorneys") with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships.**

> [. . .]

> 8. As a result of the Predetermined Protocol: (a) patients are not legitimately examined, diagnosed, and appropriately treated for conditions they may have; (b) patients are subjected to a predetermined laundry list of treatments for conditions that they may not have; and (c) **PI attorneys with whom Defendants appear to have substantial *quid pro quo* cross-referral relationships** use Defendants' fraudulent bills and related documentation to present inflated uninsured motorist claims ("UM Claims") against State Farm and bodily injury claims ("BI Claims") against at-fault drivers.

> [. . .]

> 16. Defendant Physiomatrix is a Michigan corporation, with its principal place of business at 15841 W. Warren Avenue, in Detroit, Michigan. From approximately October 2007 through the present, Physiomatrix has knowingly submitted, and caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C. These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the purported medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients'

No-Fault Benefits; and (b) inflate the value of personal injury claims in order to **curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships**.

[. . .]

17. Defendant Genex is a Michigan corporation, with its principal place of business at 4953 Schaefer, in Dearborn, Michigan. From at least September 2009 through the present, Genex has knowingly submitted, and caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C. These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the purported medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims **in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships**.

[. . .]

21. In the foregoing roles, Khanafer has knowingly coordinated and controlled the implementation of the Predetermined Protocol for patients of the Clinics. From at least October 2007 through the present, Khanafer, through Genex and Physiomatrix, has knowingly submitted, or caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C. These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the purported medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims **in order to curry favor with PI attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships**.

[. . .]

24. In the foregoing roles, Kazan has knowingly coordinated and controlled the implementation of the Predetermined Protocol for patients of the Clinics. From at least October 2007 through the present, Kazan has knowingly submitted, or caused to be submitted, hundreds of fraudulent bills and related documentation to State Farm in the claims described in the charts attached hereto as Exhibits 1-A through 1-C. These bills were fraudulent in that they represented that the services described on the bills were actually rendered and were based on the purported

medical necessity of such services when, in fact, the services either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims **in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial quid pro quo cross-referral relationships**.

[. . .]

**C. Relationships Between Defendants, PI Attorneys and Referring Doctors.**

37. **The success of Defendants' scheme depends heavily upon *quid pro quo* crossreferral relationships with PI Attorneys who represent patients in connection with BI Claims and UM Claims**. Specifically, the PI Attorneys are motivated to refer patients to Defendants because the PI Attorneys can rely upon Defendants' Predetermined Protocol to (a) establish an "objective manifestation" of serious impairment of body function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of the patients and their other clients, and (b) inflate the value of the BI Claims and UM Claims. This, in turn, increases the amounts of the contingency fees available to the PI Attorneys through the BI Claims and UM Claims. At the same time, Defendants are motivated to refer patients to the PI Attorneys and provide them with fraudulent bills and reports to curry favor with and induce more patient referrals from the PI Attorneys.

38. To illustrate, from 2007 to the present, at least 61 patients for whom the Clinics submitted bills to State Farm – or 59% of the patients who were represented by an attorney – were represented by attorney Michael Morse, who frequently represents individuals in UM or BI Claims. In addition, from 2009 to the present, 21 patients – or 19% of patients who were represented by an attorney – were represented by the law firm Weiner & Associates.

[. . .]

49. As described next, patients were not legitimately examined, diagnosed, or treated for their individual conditions. Instead, they were subjected to a Predetermined Protocol in which the Prescribing Doctors examine the patients to support predetermined prescriptions for physical therapy, and the Clinics purport to provide the same treatment to all patients on every visit for as long as possible, regardless of their unique conditions, needs, and progress, or lack thereof. Furthermore, the documentation of the examinations, diagnoses, and treatment submitted by the Prescribing Physicians and Clinics is fraudulent because the pervasive patterns in the documentation are not credible, and the documentation reflects services that either were not performed or were performed pursuant to the Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the

value of personal injury claims **in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial quid pro quo cross-referral relationships**.

[. . .]

**E. Defendants' Scheme And Fraudulent Predetermined Protocol**

[. . .]

60.  Dr. Abu Farha's cursory examinations, as well as the pervasive patterns in his findings, diagnoses, and prescriptions, are designed to enable the Clinics to continue to bill for physical therapy that is not performed or is performed pursuant to a Predetermined Protocol, and to inflate the value of personal injury claims **in order to curry favor with PI Attorneys with whom the defendants have *quid pro quo* relationships**.

[. . .]

93.  By purporting to provide this combination of treatments, the Clinic Defendants are able to take advantage of the patient's No-Fault Benefits, and to inflate the value of BI Claims and UM Claims to curry favor with the PI Attorneys **with whom Defendants have *quid pro quo* cross-referral relationships.**

[. . .]

96.  Defendants are obligated legally and ethically to act honestly and with integrity. Yet, Defendants submit or caused to be submitted, medical records and bills that are fraudulent in that they represent that the services described on the bills and records were actually rendered and were submitted based on purported medical necessity when, in fact, they either were not performed or were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims **in order to curry favor with PI Attorneys with whom the Clinics' owners appear to have substantial *quid pro quo* cross-referral relationships**.

A courtesy copy of the Physiomatrix Complaint is attached hereto as Exhibit 'E'.

What is absolutely clear from the Complaint in Physiomatrix is that State Farm **defined** the scope of the scheme to include substantial quid pro quo relationships between the providers and the attorneys at issue.  The phrase is seen over and over again throughout the Physiomatrix

Complaint and State Farm even went as far as to explicitly state that at Paragraph 37 that "[t]he success of Defendants' scheme depends heavily upon *quid pro quo* crossreferral relationships with PI Attorneys who represent patients in connection with BI Claims and UM Claims." It is also of note that the Plaintiff even set forth specific statistics in the Complaint itself to demonstrate the quid pro quo relationship. See Paragraph 38 of <u>Physiomatrix</u> Complaint annexed hereto as Exhibit 'E'. Furthermore, the actual entities that were subpoenaed in <u>Physiomatrix</u> were the same entities listed in the Complaint. Compare Exhibit 'D' pgs. 11-23 with Paragraph 38 of <u>Physiomatrix</u> Complaint annexed hereto as Exhibit 'E'

This is a crucial distinction because in the matter before this Court, Plaintiff did not allege that a referral relationship between any attorneys and the Defendants was a necessary part of the alleged scheme. See Plaintiff's Amended Complaint [Doc. 20]. As a matter of fact, the word referral only occurs once in the entire Complaint filed in the instant matter. In Paragraph 74 of Plaintiff's Amended Complaint "The Defendants' goal in submitting these false Chiropractic Records to personal injury attorneys is to inflate the value of these claims and to encourage further referrals from personal injury attorneys." [Doc. 20] This is **completely** different from the allegations in <u>Physiomatrix</u>. In <u>Physiomatrix</u>, the scheme included substantial quid pro quo cross-referral relationships. Here, Plaintiff's allegations is merely that the Defendants hoped that if they gave good reports that they may get some additional referrals. This is simply not the same thing. There are absolutely no allegations that attorney referrals actually occurred or that they are part of the alleged scheme.

In addition, when State Farm in the instant matter defined the scheme, State Farm did **not** include referrals with attorneys as part of the scheme. Plaintiff set forth the "scheme" in Paragraphs 3 and 5 when State Farm stated that:

3. The scheme to defraud includes, among other fraudulent conduct: (1) failing to legitimately examine patients to evaluate the true nature and severity of their injuries, if any; (2) creating patient records that falsely document predetermined findings, diagnoses, and conditions across multiple regions of the spine for nearly every patient; and (3) providing the same treatment for nearly every patient, which consists of a combination of passive modalities at nearly every visit, typically including electrical stimulation, mechanical traction, and chiropractic manipulations, and ultrasound or hydrobed/aquatic therapy on many other sessions. This laundry list of passive modalities is provided for nearly every patient, regardless of the patients' presenting symptoms and medical needs, and continues mostly unaltered, regardless of the patients' response (or lack thereof) during treatment.

5. The Defendants also took active steps to conceal their fraudulent scheme by abusing the "WritePad" computer program to automatically "randomize" the findings in their Chiropractic Records and conceal that the Chiropractors were not legitimately evaluating and treating patients' individual symptoms and needs but, instead, were simply copying purported physical examination findings from visit to visit.

[Doc. 20]

Nowhere in this description are referrals with attorneys made part of the scheme. Further, and perhaps even more importantly, State Farm actually has a section in its Amended Complaint in which it defines the alleged scheme in detail:

**B. The Scheme To Defraud**

27. This Amended Complaint is brought by State Farm to recover damages from the Defendants, who defrauded State Farm by creating and submitting false and misleading chiropractic bills and supporting documentation, including Initial Examination Notes and Daily Visit Notes purporting to document subsequent chiropractic evaluations, and Reexaminations ("Chiropractic Records").

28. The Chiropractic Records misrepresent the patients' complaints and document false physical examination findings, diagnoses, and prognoses. The Chiropractic Records collectively reveal pervasive patterns that are not credible across the patient population, and instead demonstrate an intentional effort to fabricate documentation in an attempt to justify continued treatment of the patients and induce payments from third-party payors like State Farm.

29. As described in greater detail below, the fraud scheme begins with false Initial Examinations in which the Chiropractors purport, among other things, to conduct an "Objective" spinal examination, where they uniformly purport to find

moderate-to-severe joint dysfunctions, pain, and muscle spasms across multiple regions of the spine. Based upon their predetermined "Objective" spinal examinations, the Chiropractors then provide a laundry list of fraudulent diagnoses that typically cover the entire region of the spine (cervical, thoracic, and lumbar) for the vast majority of the patients. *See* Ex. A (documenting moderate-to-severe symptoms, spasms and diagnoses on a patient-by-patient basis).

30. After the initial visit, the Chiropractors then create fraudulent Daily Visit Notes for each subsequent visit in which they represent purported findings from "Objective" spinal examinations that they purportedly conduct at each treatment session. Like the Initial Examinations, the Daily Visit Notes almost always identify moderate-to-severe joint dysfunctions, pain, and muscle spasms across numerous specific spinal regions - often in ten or more vertebrae. Incredibly, the "findings" in each of the Daily Visit Notes are almost always *identical* to the joint dysfunction, pain, and spasm findings found on the Initial Examination, and continue virtually unaltered until the next Re-examination. To the extent any new findings for the "Objective" spinal examination are made at a Re-examination, the Chiropractors simply copy these identical findings for virtually every subsequent Daily Visit Note physical examination. Thus, the pattern of copying the findings across Daily Visit Notes continues from one Re-Examination until the next Reexamination, indicating that the Chiropractors are not conducting any legitimate physical examinations at all. *See* Ex. A (documenting copied findings on a patient-by-patient basis).

31. Based on these fraudulent "Objective" spinal examinations and diagnoses, the patients are also subjected to predetermined treatment ("Chiropractic Treatment") that is not uniquely tailored to each individual patient or for the medical benefit of the individual patient. The predetermined treatment primarily consists of electrical stimulation, mechanical traction, and chiropractic manipulations on nearly every visit, as well as ultrasound or hydro bed/aquatic therapy at many other sessions, and continues mostly unaltered, regardless of the patients' response (or lack thereof) during treatment. The Chiropractors also purport to conduct therapeutic exercises with the patients on some of the visits, but do not document the therapeutic exercises they purportedly provide in the Daily Visit Notes nor provide any documentation to suggest that any such exercises are therapeutically appropriate and tailored to the patients' needs.

32. As described further below, the Chiropractors took active steps to conceal their fraudulent examinations by abusing the "WritePad" computer program to "randomize" certain phrases in their Daily Visit Notes to conceal that they were not legitimately evaluating and treating patients' individual symptoms and needs but, instead, were simply copying physical examination findings from visit to visit. According to its advertising, WritePad markets a randomization feature that automatically changes the verbiage used to describe identical findings so that "if you have six patients in one day with the same ailment, and the exam for each

patient might be the same, the notes and report generated by WritePad will have different phrasing and verbiage." The Defendants' abuse of WritePad was nothing more than an attempt to create the fraudulent pretext that the Chiropractors were conducting legitimate spinal examinations, when they were not.

33. Although many of the misrepresentations in the Chiropractic Records were personally made by Stavropolskiy and Wang, when they personally saw patients and created the Chiropractic Records *(See* Ex. A), the Defendants also employed other chiropractors who then made the misrepresentations in the Chiropractic Records at Stavropolskiy and Wang's direction, and pursuant to the fraud scheme that they had implemented.

34. This scheme was implemented and carried out by the Defendants for the personal financial benefit of Stavropolskiy and Wang, who are the sole owners and shareholders/members of Eastern Approach and Aquatic Therapy.

35. At all times relevant hereto, the Defendants' fraudulent Chiropractic Records have been, and continue to be, used to induce payments from State Farm for services and treatments purportedly appropriately provided by the Defendants.

36. State Farm justifiably relied upon those submissions, and State Farm paid the bills thereby conferring a financial benefit upon the Defendants.

[Doc. 20]

Again, not once is the word referral even found. In Paragraph 34, State Farm even expressly

limited the beneficiaries of the alleged scheme to Leonard Stavropolskiy and Joseph Wang.

The fact is, even under the case cited by Plaintiff itself, that the Plaintiff is limited strictly

to discovery on the scheme that it set forth, and not an attempt to seek discovery on a related or

distinct scheme. As cited earlier, the Court in Physiomatrix in citing to United States v. Boone,

628 F.3d 927, 935 (7th Cir. 2010) noted that "'the definition of the scheme itself is a limiting

principle' of what constitutes relevant evidence, 'in that only evidence of the same scheme as

opposed to a related or distinct scheme, is admissible'". Physiomatrix, at pg. 16. Furthermore,

as this Honorable District noted in McCurdy v. Wedgewood Capital Management Inc., "[t]he

Supreme Court has recognized that the breadth of the RICO language encourages attempts to

turn business disputes into federal racketeering charges ... thus the risk that a party will attempt

to use discovery to conduct a 'fishing expedition' is a significant concern". 1998 WL 964185 at

*11 (quoting *PMC v. Ferro Corporation,* 131 F.R.D. 184, 186 (C.D.Cal.1990)).

The scheme presented in the <u>Physiomatrix</u> case by State Farm is simply not the same as

the one set forth in the instant matter. The scheme in the instant matter did not include a referral

relationship between any attorney and the Defendants as an essential element. Plaintiff herein is

constrained in discovery to the scheme that it itself alleged in Plaintiff's Amended Complaint.

Plaintiff's subpoena must be quashed as beyond the scope of the boundaries of the scheme set

forth in Plaintiff's Amended Complaint.

> ### iii.    State Farm v. Warren

The <u>Warren</u> case cited by Plaintiff suffers from the identical defect as the <u>Physiomatrix</u>

case. State Farm Mutual Automobile Insurance Company v. Warren Chiropractic & Rehab

Clinic, P.C., et al, 4:14-CV-11521 (E.D. Mich., May 11, 2016). A courtesy copy of the docketed

Order is attached hereto as Exhibit 'F'. Namely, the scheme in <u>Warren</u> was actually alleged to

include the quid pro quo referral relationships that are absent in the instant Amended Complaint.

In pertinent parts, the <u>Warren</u> Complaint alleges that:

> 4. The patients are not legitimately evaluated and diagnosed and the treatments
> are not changed based on purported reexaminations, diagnostic tests, or for any
> other reason. The Predetermined Protocol was not designed to legitimately
> examine, diagnose, and provide medically necessary services to address the
> unique needs of the individual patients. Instead, the Predetermined Protocol was
> designed and carried out to: (a) enrich defendants by maximizing their collection
> of the patients' No-Fault Benefits; and (b) **inflate the value of bodily injury
> ("BI") and/or uninsured motorist ("UM") claims <u>to curry favor with a group
> of personal injury attorneys ("PI Attorneys") with whom Warren appears to
> have substantial *quid pro quo* cross-referral relationships</u>**.
>
> [. . .]
>
> 18. Warren Chiropractic & Rehab Clinic P.C. is a Michigan corporation, with its
> principal place of business at 19201 W. Warren, in Detroit, Michigan. From at
> least 2005 through the present, Warren has knowingly submitted, and caused to be

submitted, hundreds of bills and related documentation that were fraudulent to State Farm in the claims described, in part, in the chart attached hereto as Ex. 1. Each and every bill described in Ex. 1 was fraudulent in that the services described in the bills and related documentation were purportedly medically necessary when, in fact, the services either were not performed or were not medically necessary and were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) **inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the defendants have substantial *quid pro quo* cross-referral relationship**.

[. . .]

## C. Relationships Between Defendants and PI Attorneys

29. The success of defendants' scheme depends heavily upon *quid pro quo* cross-referral relationships with PI Attorneys who represent patients in connection with BI Claims and UM Claims. Specifically, the PI Attorneys are motivated to refer patients to the defendants because the PI Attorneys can rely upon the Predetermined Protocol to (a) establish an "objective manifestation" of serious impairment of body function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of the patients and their other clients, and (b) inflate the value of the BI Claims and UM Claims. This, in turn, increases the amounts of the contingency fees available to the PI Attorneys through the BI Claims and UM Claims. At the same time, defendants are motivated to refer patients to the PI Attorneys and provide them with bills and reports to curry favor with and induce more patient referrals from the PI Attorneys.

30. To illustrate, more than 80% of the Warren patients in Ex. 1 were represented by an attorney in connection with their treatment at Warren. Within the last four years, almost two thirds out of these patients were represented by one of only three law firms: Lobb & Associates; Weiner & Associates; and Haas & Goldstein, P.C. (which also has represented and/or currently represents John Mufarreh, Gover, George Mufarreh and Sharon Smith).

[. . .]

41. As described next, patients at Warren are not appropriately examined, diagnosed, or treated for their individual conditions. Instead, they are subjected to a Predetermined Protocol in which John Mufarreh, Gover, and other chiropractors at Warren examine the patients to support predetermined diagnoses and treatment plans, which are the same Predetermined Protocol for all patients. The Predetermined Protocol was not designed for the medical benefit of the patients, but to: (a) enrich defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) **inflate the value of personal injury claims in order to**

**curry favor with PI Attorneys with whom the defendants have a substantial *quid pro quo* cross-referral relationship**.

## E.  Defendants' Scheme And Fraudulent Predetermined Protocol

### 1.  Solicitation

42. To procure patients for their scheme, the defendants employ and use runners, cappers, and steerers with the intent to obtain patients and to fraudulently obtain their No-Fault benefits from State Farm, in violation of MCL 500.4503(h) and (i). This is an important aspect of the scheme because patients are the lifeblood of the scheme both for the defendants and for the PI Attorneys with whom Warren has cross-referral relationships.

43. Specifically, patients are often referred to Warren by either (a) their attorney, (b) an "investigator" who is employed by an attorney to solicit clients by identifying individuals who were involved in automobile accidents, recruiting them as clients, and steering them to Warren, or (c) are directly contacted by Warren.  Patients who treated at Warren have testified that shortly after their automobile accidents, they received unsolicited calls from individuals working with the PI Attorneys and/or Warren, at least one of whom falsely identified herself as working for State Farm. The patients are told that a car will pick them up and take them to Warren for evaluation and treatment and that the costs will be covered by insurance. For example:

> "One patient testified that an individual named "Susan" called unsolicited. When the patient asked how Susan got the patient's number, Susan explained that she got the patient's number from an accident database they keep and then told the patient to go to Warren Chiropractic. A car from Priority Transport then picked the patient up and drove the patient to Warren. The patient stated that he/she could drive, but that Warren provided transportation as a "convenience" to the patient through Priority Transport (which Priority then billed to State Farm as a medical necessity).

> "A second patient testified that an individual calling himself an "advocate" called unsolicited and said that the patient could get medical help and money from the car accident the patient was in. The "advocate" came to the patient's house and eventually sent the patient to Warren Chiropractic who arranged for the patient's transportation. The patient said they were not given a choice as to where to treat or what transportation company to use.

> "Another patient similarly testified that she got an unsolicited call from "Sue" after an automobile accident, and was told that Sue worked for another person named Ed White. Sue implied that she was with State Farm

and directed the patient to treat at Warren. In depositions, John Mufarreh himself has acknowledged that he has a good friend named Ed White who is a private investigator and that he has a receptionist who goes by Sue (although that receptionist has denied participating in any solicitation).

In addition to patient testimony, John Mufarreh himself has also admitted during a deposition that if he "happens" to know someone was injured in an automobile accident, he "sometimes" calls them himself and tells car accident victims about his "services."

44. John Mufarreh has also testified multiple times to having relationships with various PI Attorneys and has acknowledged that their clients form a "basis" for his patients at Warren. In fact, John Mufarreh and Gover have themselves been represented by one of the same PI attorney firms that also represent many of the Warren patients.

45. The defendants and PI Attorneys prey upon and profit from automobile accident victims by encouraging and steering them to seek treatment at Warren, regardless of their individualized medical situation or whether they even need treatment.

[ . . . ]

72. The Predetermined Protocol is not designed to benefit patients, but to enable the defendants to exploit the patients' No-Fault Benefits, and to inflate the value of their BI Claims and UM Claims **to curry favor with the PI Attorneys with whom defendants have *quid pro quo* cross-referral relationships**.

[. . .]

79. Defendants are obligated legally and ethically to act honestly and with integrity. Yet, defendants submit or caused to be submitted, bills and related documentation that are fraudulent in that they represent that the services were medically necessary when, in fact, they either were not performed or were not medically necessary and were performed pursuant to a Predetermined Protocol that was designed to: (a) enrich defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) **inflate the value of personal injury claims in order to curry favor with PI Attorneys with whom the defendants have a substantial *quid pro quo* cross-referral relationship**.

A courtesy copy of Plaintiff's Complaint in Warren is annexed hereto as Exhibit 'G'.

As can be seen in the cited Paragraphs, State Farm in the <u>Warren</u> matter pled the quid pro quo referral relationships as an integral part of the scheme. Furthermore, State Farm actually

pled that the other entities were in on the scheme. This is why the discovery was permitted in Warren and why the Warren Court could rely on Physiomatrix in rendering the subject decision. Warren, at pg. 9 (stating that "However, while the alleged scheme in Physiomatrix was similar to the case at bar, it was not identical. In that case, the "boundary of relevance" extended only to information relevant to an alleged "quid pro quo" relationship between the defendant medical care providers and the personal injury law firms; there was no real link alleged between the referral services and the scheme. Id. Here, Plaintiff alleges that these other entities are in on the scheme, in that they referred callers directly to the medical care providers allegedly in league with the same law firms to which the patients were referred." (citations omitted).)

Plaintiff herein did not allege a quid pro quo referral relationship as being part of the scheme in its Amended Complaint. [Doc. 20]. As cited earlier, the Court in Physiomatrix in citing to United States v. Boone, 628 F.3d 927, 935 (7th Cir. 2010) noted that "'the definition of the scheme itself is a limiting principle' of what constitutes relevant evidence, 'in that only evidence of the same scheme as opposed to a related or distinct scheme, is admissible'". Physiomatrix, at pg. 16. Furthermore, as this Honorable District noted in McCurdy v. Wedgewood Capital Management Inc., "[t]he Supreme Court has recognized that the breadth of the RICO language encourages attempts to turn business disputes into federal racketeering charges ... thus the risk that a party will attempt to use discovery to conduct a 'fishing expedition' is a significant concern". 1998 WL 964185 at *11 (quoting PMC v. Ferro Corporation, 131 F.R.D. 184, 186 (C.D.Cal.1990)).

Plaintiff's attempt to seek discovery on an alleged scheme not pled in Plaintiff's Amended Complaint is contrary to law and must be denied.

This case again fails for the same fatal defect set forth in the analysis of <u>Physiomatrix</u> and <u>Warren</u>.    <u>Allstate Insurance Company v. Nassiri</u>, 2:08-cv-369 (D. Nev., June 23, 2011).    A courtesy copy of the <u>Nassiri</u> decision is annexed hereto as Exhibit 'H'.    In <u>Nassiri</u>, the Complaint clearly alleges the non-party subpoenee as being a part of the scheme that is alleged.    The <u>Nassiri</u> Complaint explicitly states that:

> 24. The claimants sent to Dr. Nassiri at Advanced Accident were referred by local plaintiffs' personal injury lawyers for treatment and care associated with motor vehicle    accidents against Allstate's insureds.  A chief referral source for Defendants was  attorney Adam Kutner.

> 25. On other instances, if the claimant did not have an attorney, then Defendants would make referrals to local attorneys, like Adam Kutner.

A courtesy copy of the <u>Nassiri</u> Complaint is annexed hereto as Exhibit 'I'.

The subject Order compelled the deposition of Adam Kutner only.  See Exhibit 'H'.  The Order confirming the Magistrate's initial Order explicitly states that "[t]he complaint specifically contends that an overwhelming number of these patients were referred to the defendants from personal injury attorney Adam S. Kutner, or were referred to Mr. Kutner by the defendants." Nassiri, at pg. 1, lns 22-24.   The fact is, just like the Orders set forth in <u>Physiomatrix</u> and <u>Warren</u>, the referral itself was made a part of the scheme that was alleged in the Complaint.

In the instant matter before this Honorable Court, Plaintiff did not allege a quid pro quo referral relationship as being part of the scheme in its Amended Complaint nor did Plaintiff allege a referral relationship with the Law Offices of Samuel Fishman.

Plaintiff's attempt to seek discovery on an alleged scheme not pled in Plaintiff's Amended Complaint is contrary to law and must be denied.

**D. THE SUBJECT SUBPOENA IS CHALLENGED AS IT INFRINGES UPON THE PRIVILEGES OF LAW OFFICES OF SAMUEL FISHMAN'S PRESENT AND FORMER CLIENTS**

Notwithstanding the fact that Plaintiff's Subpoena and service thereof is defective on its face, along with the fact that Plaintiff has not made the requisite showing of relevance and need, undersigned counsel is required to raise an objection to the subpoena based upon the privileges and confidentiality rights of the Law Offices of Samuel Fishman's present and former clients. As stated herein, the Rules of Professional Conduct impute the duties of Attorney Samuel Fishman to his entire staff and the rights and privileges of the Law Offices of Samuel Fishman's present and former clients extend to information held by Emil Khanukov.

      *i.*     *The Eastern District of Pennsylvania has Adopted the Pennsylvania Rules of Professional Conduct as the Applicable Rules of Attorney Conduct*

The Eastern District of Pennsylvania has adopted the "Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania". E.D.Pa. Local Civil 83.6 (Rule IV(B))). In this case, the applicable Rules are, therefore, the Pennsylvania Rules of Professional Conduct. As such, the privileges set forth therein apply to the instant case.

      *ii.*    *Pennsylvania Rule of Professional Conduct 5.3 Assigns the Same Ethical Responsibilities to the Firm's Non-Lawyer Assistants as it does to the Lawyers Themselves*

Rule 5.3(b) requires that "a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer". Further, the comment thereto states that "Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer must give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, **particularly regarding the obligation not to disclose information relating to representation of the client**, and should be

responsible for their work product." (emphasis added). It is without doubt that the ethical responsibility to not disclose information related to the representation of a client extends to a non-lawyer associated with a firm.

### iii. Plaintiff is aware that Emil Khanukov has Provided Legal Assistant Services to the Law Offices of Samuel Fishman and that the Rules of Professional Conduct Extend to Emil Khanukov

During the pendency of the above captioned matter, a subpoena was issued to the Law Offices of Samuel Fishman, P.C. In said subpoena, Plaintiff, State Farm, requested "Employment records for Emil who works for or worked for your law firm." The Law Offices of Samuel Fishman issued appropriate objections, however, noted without waiving same that "a person named Emil Khanukov has provided legal assistant services to [the Law Offices of Samuel Fishman]."

As such, Plaintiff State Farm was aware that "Emil" provided legal services for the Law Offices of Samuel Fishman and the Law Offices of Samuel Fishman confirmed that his full name is Emil Khanukov. Plaintiff is aware that the Rules of Professional Conduct extend to Emil Khanukov.

### iv. Emil Khanukov does not have any Contracts with the Defendants

As set forth in the Affidavit of Emil Khanukov, Mr. Khanukov has no business relationship with any of the defendants, contractual or otherwise. See Exhibit 'J'. Mr. Khanukov has never been employed by Defendants, has never received remuneration from any Defendant, and has never provided remuneration to any of the Defendants. See Exhibit 'J'. The only communications between Emil Khanukov and any of the Defendants have been in relation to clients represented by the Law Offices of Samuel Fishman. See Exhibit 'J'.

As such, if the deposition was designed to obtain information from Emil Khanukov as to whether he has a business relationship with the defendants, the answer is conclusively provided under oath through the attached affidavit.[6]

> v.      *Any Testimony Sought from Emil Khanukov would be Privileged and Said Privilege has not Been Waived by the Law Offices Of Samuel Fishman's Present or Former Clients*

Federal Rule of Civil Procedure 45(d)(3)(A)(iii) requires that a Court quash a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies".  With regard to the instant matter, all communications between Emil Khanukov and the Defendants would be in relation to a client of the Law Offices of Samuel Fishman.  The privilege of the Law Offices of Samuel Fishman's current and former clients belongs to the client and cannot be waived by Mr. Khanukov.  As such, privilege prevents Emil Khanukov from testifying in this matter and mandates that Plaintiff's subpoena be quashed.

Federal Rule of Civil Procedure 45(d)(3)(A)(iii) states that:

(A) When Required.  On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

> [. . .]

> (iii) requires disclosure of privileged or other protected matter if no exception or waiver applies.

Furthermore, there is no doubt that undersigned counsel is required to raise objections to protect the interests of his present and former clients.  The Rules of Professional Conduct expressly require undersigned counsel to file the instant motion to protect the rights of all of his present and former clients implicated by Plaintiff's improper subpoena.  Specifically, Comment 21 to Pennsylvania Rule of Professional Conduct 1.6 states that:

---

[6] It is not admitted that this information is relevant.  The affidavit is simply being provided in a good faith attempt to remedy any issues that Plaintiff may have.

(21) A lawyer may be ordered to reveal information relating to the representation of a client by a court or by another tribunal or governmental entity claiming authority pursuant to other law to compel the disclosure. **Absent informed consent of the client to do otherwise, the lawyer should assert on behalf of the client all nonfrivolous claims that the order is not authorized by other law or that the information sought is protected against disclosure by the attorney-client privilege or other applicable law. In the event of an adverse ruling, the lawyer must consult with the client about the possibility of appeal to the extent required by Rule 1.4.**

(emphasis added).

Undersigned Counsel does not have informed consent to release any information in the instant case regarding any of his prior or former clients. As such, undersigned counsel has no choice but to prospectively set forth the instant motion on behalf of his unnamed present and former clients.

It is also clear that the Rules of Professional Conduct recognize that a non-attorney has not received legal training and is inherently less equipped to understand the intricacies of the ethical rules. Pa.R.C.P. 5.3, comment (2). He also is ill-equipped to understand the confines of the attorney-client privilege, work product doctrine, Rule 1.6, and other privilege doctrines sufficient to permit him to be deposed about the Law Offices of Samuel Fishman's present or former clients. This is especially true given that the Law Offices of Samuel Fishman's present or former clients are not parties to the above captioned action and are not properly before this Honorable Court.

Furthermore, the Law Offices of Samuel Fishman's present and former clients would have absolutely no expectation that Emil Khanukov (or any employee of the Law Offices of Samuel Fishman) would divulge said client's confidential information in relation to a civil RICO suit against a medical facility that Plaintiff is presumably alleging engaged in fraudulent billing schemes. Furthermore, since the Law Offices of Samuel Fishman cannot discern the intent of

the subpoena request by Plaintiff, it would be further improper for the Law Offices of Samuel Fishman to divulge information lest Plaintiff somehow turn it around to subject Law Offices of Samuel Fishman's present and/or former clients to potential civil or criminal liability.[7]

As discussed herein, any information related to the representation of the Law Offices of Samuel Fishman's present and former clients falls under Federal Rule of Civil Procedure 45(d)(3)(A)(iii) thereby mandating that the subject subpoena be quashed.

> vi.    *Emil Khanukov, the Law Offices Of Samuel Fishman, and the Law Offices Of Samuel Fishman's Present and Former Clients are Nonparties to this Action and Entitled to Greater Degree of Protection from Subpoena*

Undersigned counsel is unaware of the precise reason for summoning Emil Khanukov for deposition testimony, however, due to the perceived nature of the underlying case, it is assumed that this is somehow tied to the treatment by Defendants of clients who were represented by the Law Offices of Samuel Fishman.[8] Emil Khanukov, the Law Offices of Samuel Fishman, and any present or former client of the Law Offices of Samuel Fishman would qualify as nonparties to the instant case.

This court recently found in Arthur Frank, M.D., Ph.D. v. Honeywell International Inc., 15-mc-00172, that:

> "a 'court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on a non-party.' In re Domestic Drywall, 300 F.R.D. at 239 (quotation omitted); accord Frank Brunckhorst Co. v. Ihm, No. 12-mc-0217, 2012 WL 5250399, at *5 (E.D. Pa. Oct. 23, 2012) ("In the case of nonparty deponents, courts recognize that '[d]iscovery should be more limited to protect nonparty deponents from harassment,

---

[7] While undersigned counsel has no reason to believe that any of his present or former clients engaged in any wrongdoing, the fact remains that this is a civil RICO case filed by a law firm that is known to prosecute said claims and by an insurance company that is also likely to pursue said claims. It is certainly at least possible that Plaintiff may attempt to initiate action against a present and/or former client of the Law Offices of Samuel Fishman should it learn any information that it believes so warrants a claim. This makes testimony from any staff of the Law Offices of Samuel Fishman that much more problematic, especially in light of the fact that the present and/or former clients will not be given the right to consent to disclosure or to obtain appropriate counsel to further protect their interests.

[8] Again, through its Motion to Compel, Plaintiff appears to restrict the areas of inquiry at the deposition to whether a referral relationship exists between Emil Khanukov and Defendants.

inconvenience or disclosure of confidential documents.'"); <u>Grider v. Keystone Health Plan Cent., Inc.</u>, No. 05-mc- 40, 2005 WL 2030456, at *7 (M.D. Pa. July 28, 2005) ("[I]n cases where a non-party is the subject of discovery requests, courts may impose broader restrictions, particularly where a nonparty is requested to produce documents of another non-party.").

2015 U.S. Dist. LEXIS 106453 at *12-13.

In this matter, Plaintiff is seeking the disclosure of confidential information related to the representation of prior and former clients by the Law Offices of Samuel Fishman and it's legal assistant Emil Khanukov. This, similar to a document request, is effectively seeking to have Emil Khanukov testify about the confidential representation of present and former clients who are each non-parties to the instant action.[9] As such, a broad restriction upon the testimony of Emil Khanukov is warranted.

Here, where the only testimony that could possibly be sought is that of Emil Khanukov regarding present and former clients of the Law Offices of Samuel Fishman, the broadest restriction of all is warranted: namely a quashing of Plaintiff's Subpoena.

vii.   Mr. Khanukov is Prevented from Testifying due to the Privilege and Confidentiality Rights of the Law Offices of Samuel Fishman's Prior and Current Clients

Various privileges prevent Mr. Khanukov from testifying regarding the present and former clients of the Law Offices of Samuel Fishman. These include, but are not limited to, the attorney client privilege, work product doctrine, and confidentiality.[10]

---

[9] There is no doubt that all information related to the representation of any client by the Law Offices of Samuel Fishman and its employees is confidential. See Pa. R.P.C. 1.6 and 5.3.
[10] It must be noted that the subject subpoena does not make a request for documents to be produced. The subpoenaed party herein would also object to the production of records and reserves the right to file additional motions if so required in the future.

a.   The attorney-client privilege prevents Emil Khanukov from testifying regarding communications between the Law Offices of Samuel Fishman and any of its present or former clients

The attorney-client privilege is one of the oldest recognized privileges for confidential communications.  Swidler & Berlin v. United States, 524 U.S. 399 (U.S. 1998) (citing Upjohn Co. v. United States, 449 U.S. 383, 389, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981); Hunt v. Blackburn, 128 U.S. 464, 470, 32 L. Ed. 488, 9 S. Ct. 125 (1888)).

The Third Circuit has held that:

The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Grand Jury Investigation, 599 F.2d 1224, 1233 (3d Cir. 1979).

Furthermore, it has been recognized that the privilege is intended to encourage full and frank communication between attorneys and their clients regarding embarrassing or legally damaging information because clients can expect that such information will be protected from disclosure.  See Upjohn, 449 U.S. at 389.  See also, Gillard v. AIG Ins. Co., 2011 Pa. LEXIS 393, at *40 (Pa. Feb. 23, 2011) (holding that "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice.")).

Since Plaintiff has failed to state in its subpoena the areas upon which Emil Khanukov is requested to testify, undersigned counsel and Mr. Khanukov must assume that certain topics may

infringe upon this privilege and thereby asserts same to protect the present and former clients of the Law Offices of Samuel Fishman.

> b. The work product doctrine prevents Emil Khanukov from testifying regarding communications between the Law Offices of Samuel Fishman and any of its present or former clients

Likewise, the work product doctrine also serves as a bar to Mr. Khanukov testifying regarding the Law Offices of Samuel Fishman's present and former clients. Federal Rule of Civil Procedure 26(b)(3) recognizes the work product doctrine in that:

> a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or buy or for that other party's representatives (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Furthermore, the Pennsylvania Rules of Civil Procedure recognize the work product doctrine as well in that the Pennsylvania Rules of Civil Procedure state that "discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories."[11]

Since Plaintiff has failed to state in its subpoena the areas upon which Emil Khanukov is requested to testify, undersigned counsel and Mr. Khanukov must assume that certain topics may

---

[11] It is important to note that the privilege is recognized both in Pennsylvania law and Federal law because, at present, the Law Offices of Samuel Fishman does not have any clients currently with cases filed in Federal Court. As such, disclosure of work product involving current clients would have a prejudicial effect on their cases which are subject to jurisdiction in the Commonwealth of Pennsylvania Court system. As such, it is respectfully submitted that any disclosure that impinges upon the client's right to try their case under the Federal Rules or the Commonweath Rules should be adhered to by this Honorable Court.

infringe upon this privilege and thereby asserts same to protect the present and former clients of the Law Offices of Samuel Fishman.

          c.    <u>The representation of any of the Law Offices of Samuel Fishman's past or present clients is confidential pusuant to Pennsylvania Rule of Professional Conduct 1.6. As the subject clients are not parties to this action, have not been notified, and have not provided informed consent, Emil Khanukov is not permitted to reveal information related to their representation.</u>

Pennsylvania Rule of Professional Conduct 1.6 states that "[a] lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c)." As stated, supra, Pa. R.P.C. 5.3 imputes the confidentiality responsibility to Emil Khanukov.

Furthermore, the continuing obligation to clients is specifically stated in Rule 1.6(d), which states that "[t]he duty not to reveal information relating to representation of a client continues after the client-lawyer relationship has terminated."[12] This information relating to the representation of a client includes, inter alia, each of the Law Offices of Samuel Fishman's past and present clients' medical treatment history. Here, there is no client waiver that would authorize Emil Khanukov, to release any information regarding present or former clients of the Law Offices of Samuel Fishman.

It must further be noted, that Pennsylvania has generally taken an enlarged approach to Rule 1.6 in comparison to that taken under the Model Rules of Professional Conduct. See Pa. R.P.C. 1.6, Code of Prof. Resp. Comparison (stating that "[t]he principle of confidentiality is

---

[12] Comment [4] to Rule 1.6 takes it a step further by stating that: "[p]aragraph (a) prohibits a lawyer from revealing information relating to the representation of a client. This prohibition also applies to disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person. A lawyer's use of a hypothetical to discuss issues relating to the representation is permissible so long as there is no reasonable likelihood that the listener will be able to ascertain the identity of the client or the situation involved."

enlarged in several respects and narrowed in a few respects compared with the corresponding provisions of the Code."). Specifically on point in this case, the comparison under Rule 1.6 states that:

> the confidentiality requirement applies to all information about a client "relating to representation." Under the [Model] Code, DR 4-101, the requirement applies only to information governed by the attorney-client privilege and to information "gained in" the professional relationship that "the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Rule 1.6 thus imposes confidentiality on information relating to the representation even if it is acquired before or after the relationship existed. It does not require the client to indicate information that is to be confidential, or permit the lawyer to speculate whether particular information might be embarrassing or detrimental. Furthermore, this definition avoids the constricted definition of "confidence" that appears in some decisions."

Pa. R.P.C. 1.6, Code of Prof. Resp, Comparison (citing Allegaert v. Perot, 434 F.Supp. 790 (S.D.N.Y. 1977); Moritz v. Medical Protective Co., 428 F.Supp. 865 (W.D.Wis. 1977); City of Wichita v. Chapman, 521 P.2d 589 (Kan. 1974)).

As such, the Pennsylvania Rules of Professional Conduct have been specifically drafted so that an attorney is not permitted to speculate on whether the client will find the information to be embarrassing or detrimental. See Pa. R.P.C. 1.6; Pa. R.P.C. 1.6, Code of Prof. Resp. Comparison. Further, the attorney is not permitted to unilaterally waive the client's rights. Id. The current and/or former clients of the Law Offices of Samuel Fishman, who are not parties to the underlying case and do not fall within the jurisdiction of this Court, cannot be compelled to waive their confidentiality rights via subpoena served upon Emil Khanukov. Disclosure by Mr. Khanukov of information related to clients who are not parties to the instant case would in no way be "impliedly authorized in order to carry out the representation" of said clients and is strictly prohibited under Rule 1.6. Mr. Khanukov as a legal assistant to the Law Offices of

Samuel Fishman cannot be compelled to breach Rule 1.6 and testify regarding clients represented by the Law Offices of Samuel Fishman.

The Rules of Professional Conduct are professional rules upon which an attorney takes an oath to act ethically and uphold. State Farm does not and cannot suggest that Rule 1.6 is not applicable to this matter as Rule 1.6 specifically prohibits the release of any "information relating to representation of a client unless the client gives informed consent . . ." There is no doubt that permitting Mr. Khanukov to testify regarding the representation of present and former clients without regard for the requisite informed consent required by Rule 1.6 would be a breach of undersigned counsel's ethical duty to his present and former clients.

        d.     <u>Testimony regarding present and former clients medical treatment and history could also infringe upon the rights of the non-party present and former clients of the Law Offices of Samuel Fishman</u>

Nearly universally, the federal and state legislatures have mandated a strict zone of privacy over a patient's personally identifiable medical records and information. Specific provisions have often been made to protect against the disclosure of conditions such as HIV, AIDS, mental health issues as well as access to drug and alcohol treatment records. As will be discussed below, the Pennsylvania legislature has evidenced a strong desire to protect against disclosure of these types of "hyper-sensitive" information. While it is admitted that the following provisions may not be directly applicable to attorneys, it is our position that the Court should view these provisions as the Pennsylvania legislature seeking strong restrictions over the production of information related to the above identified hyper-sensitive medical records or information. The release of hyper-sensitive medical records or information is in no way relevant to the present case. This Honorable Court must protect the Law Offices of Samuel Fishman's

present and former clients from potential ramifications of the unnecessary release of the subject information.

## I.    HIV/AIDS

Under the Confidentiality of HIV-related Information Act, 35 P.S. § 7607, "[n]o person or employee, or agent of such person, who obtains confidential HIV-related information in the course of providing any health or social service or pursuant to a release of confidential HIV-related information under subsection (c) may disclose or be compelled to disclose the information, except to the following persons . . ."

If Emil Khanukov is in possession of knowledge that a particular patient has tested positive for HIV and/or AIDS, it would be extremely prejudicial and seem directly in conflict with the intent of the statute for Mr. Khanukov to be forced to turn said information over to State Farm.  Forcing him to do so could cause severe ramifications such as embarrassment and/or humiliation to said persons for the disclosure of information which is completely irrelevant to the underlying matter.

Permitting Mr. Khanukov to testify creates an unnecessary risk to the present and former clients of the Law Offices of Samuel Fishman that information regarding this condition may be inadvertently released without the informed consent of the subject client thereby irreparably damaging said present or former client.

## II.    Mental Health

Under 50 P.S. 7111:

(a) All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:

(1) those engaged in providing treatment for the person;

(2) the county administrator, pursuant to section 110;

(3) a court in the course of legal proceedings authorized by this act; and

(4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.

Here, State Farm has not qualified itself as an entity permitted to obtain mental health records of persons by and through a legal proceeding authorized by the Mental Health Act codified under the Mental Health Procedures Act. 50 P.S. 7101, et. seq. It is clear from the Mental Health Procedures Act that the Pennsylvania legislature has taken great care to ensure the privacy of mental health records. Notwithstanding the applicability of the specific rule to Mr. Khanukov, there is no relevance to the mental health status of a particular person not a party to the instant case.

Permitting Mr. Khanukov to testify creates an unnecessary risk to the present and former clients of the Law Offices of Samuel Fishman that information regarding this condition may be inadvertently released without the informed consent of the subject client thereby irreparably damaging said present or former client.

### III.    Drug and Alcohol Abuse

Under the Pennsylvania Drug and Alcohol Abuse Control Act, 71 P.S. § 1690.101, et. seq., the disclosure of treatment records relating to drug and alcohol abuse are highly regulated. In pertinent part, 71 P.S. § 1690.108 states that:

(b) All patient records (including all records relating to any commitment proceeding) prepared or obtained pursuant to this act, and all information contained therein, shall remain confidential, and may be disclosed only with the patient's consent and only (i) to medical personnel exclusively for purposes of diagnosis and treatment of the patient or (ii) to government or other officials exclusively for the purpose of obtaining benefits due the patient as a result of his drug or alcohol abuse or drug or alcohol dependence except that in emergency medical situations where the patient's life is in immediate jeopardy, patient

records may be released without the patient's consent to proper medical authorities solely for the purpose of providing medical treatment to the patient. Disclosure may be made for purposes unrelated to such treatment or benefits only upon an order of a court of common pleas after application showing good cause therefor. In determining whether there is good cause for disclosure, the court shall weigh the need for the information sought to be disclosed against the possible harm of disclosure to the person to whom such information pertains, the physician-patient relationship, and to the treatment services, and may condition disclosure of the information upon any appropriate safeguards. No such records or information may be used to initiate or substantiate criminal charges against a patient under any circumstances.

(c) All patient records and all information contained therein relating to drug or alcohol abuse or drug or alcohol dependence prepared or obtained by a private practitioner, hospital, clinic, drug rehabilitation or drug treatment center shall remain confidential and may be disclosed only with the patient's consent and only (i) to medical personnel exclusively for purposes of diagnosis and treatment of the patient or (ii) to government or other officials exclusively for the purpose of obtaining benefits due the patient as a result of his drug or alcohol abuse or drug or alcohol dependence except that in emergency medical situations where the patient's life is in immediate jeopardy, patient records may be released without the patient's consent to proper medical authorities solely for the purpose of providing medical treatment to the patient.

Permitting Mr. Khanukov to testify creates an unnecessary risk to the present and former clients of the Law Offices of Samuel Fishman that information regarding this condition may be inadvertently released without the informed consent of the subject client thereby irreparably damaging said present or former client.

## IV.    Health Care Facilities Act

The Health Care Facilities Act, codified under Title 28 of the Pennsylvania Code in multiple sections reinforces the private nature of a patient's medical records.   These provisions include:

- "(4) A patient has the right to have all records pertaining to his medical care treated as confidential except as otherwise provided by law or third-party contractual arrangements." 28 Pa. Code § 103.22.

- "[r]ecords shall be treated as confidential. Only authorized personnel shall have access to the records. The written authorization of the patient shall be presented and then

maintained in the original record as authority for release of medical information outside the ASF." <u>28</u> Pa. Code 563.9

While, admittedly, these specific sections do not likely apply directly to Mr. Khanukov in this case, the Code section supports the exceedingly high degree of confidentiality afforded to medical records. This again supports the necessity of quashing Plaintiff's Subpoena.

## V.    HIPAA

Under HIPAA law and regulations, medical providers are restricted from turning over personally identifiable medical records, even under a valid subpoena, unless certain standards are met.[13]    Specifically, under 45 CFR 164.512(e)(1)(ii)(A) and (B), disclosure pursuant to a subpoena that is not accompanied by an order of court or tribunal, is allowed only when the medical provider has received "satisfactory assurance" that the individual who is the subject of the request has been notified of the request or that reasonable efforts have been made to secure a protective order.

In the present matter the subject "satisfactory assurance" standard has not been met by State Farm.  In order to meet the standard of satisfactory assurance for a covered medical provider to disclose the records, the provider would need to receive:

> . . . a written statement and accompanying documentation demonstrating that:
> (A) The party requesting such information has made a good faith attempt to provide written notice to the individual (or, if the individual's location is unknown, to mail a notice to the individual's last known address);
> (B) The notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court or administrative tribunal; and
> (C) The time for the individual to raise objections to the court or administrative tribunal has elapsed, and:
> (1) No objections were filed; or
> (2) All objections filed by the individual have been resolved by the court or the

---

[13] It is acknowledged that undersigned counsel is likely not covered as a "medical provider" under HIPAA.  It is worthy of note, however, because the Federal Government has shown a propensity to protect the confidentiality of medical records and treatment under HIPAA.

administrative tribunal and the disclosures being sought are consistent with such resolution.

45 CFR 164.513 (e)(1)(iii).  The persons whose records are sought have not been given the opportunity to object to the release of their personally identifiable medical records or information.

**E.**   **THE SUBJECT SUBPOENA MUST ALSO BE QUASHED AS IT IS AN UNDUE BURDEN UPON EMIL KHANUKOV TO APPEAR AND TESTIFY IN THIS MATTER**

In addition to the above listed reasons, the subject subpoena is also harassing, vexatious, and an undue burden to Emil Khanukov.  Federal Rule of Civil Procedure 45(d)(3)(A)(iv) states that:

> (A) When Required.  On timely motion, the court for the distric where compliance is required must quash or modify a subpoena that:
>
> [. . .]
>
> (iv) subjects a person to undue burden.

Here, Emil Khanukov will be subject to an undue burden if permitted to testify.

First, Emil Khanukov has provided services as a legal assistant to the Law Offices of Smauel Fishman for a number of years.  Plaintiff has provided no information as to the information being inquired into and, therefore, has no real ability to prepare for the deposition.  The inability to properly prepare for deposition is an undue burden to place upon a non-party witness.

Second, Emil Khanukov is not an attorney and is presumably being asked to testify regarding the representation of present and former clients of the Law Offices of Samuel Fishman.  It would be an undue burden for Mr. Khanukov to need to prepare and learn the Rules of Professional Conduct to ensure that he does not inadvertently violate one.  As stated, supra,

the Rules of Professional Conduct explicitly acknowledge that while the non-attorneys must follow the rules, that a non-attorney has not received legal training and is inherently less equipped to understand the intricacies of the ethical rules. Pa.R.C.P. 5.3, comment (2).

Third, questioning a legal assistant regarding the representation of clients by the Law Offices of Samuel Fishman who are not before this Court is an undue burden upon said assistant. This is not a responsibility that a legal assistant could or should expect. In addition, there is no possible way that an attorney's client could ever expect that a legal assistant from the attorney's office would be summoned to testify about the client's representation.

Fourth, the fact that this request is being made upon a non-party is a factor that should be considered in determining whether the subpoena constitutes an undue burden. This is a factor that is considered when determining if a subpoena is unduly burdensome when it seeks records, however, it is submitted that it is no different here where the subpoena seeks testimony. See Arthur Frank, M.D., Ph.D. v. Honeywell International Inc., 2015 U.S. Dist LEXIS 106453, *12 (E.D.Pa. 2015).

Fifth, no time frame has been provided for the information sought.

Sixth, no limitation on breadth of the subject matter to inquired into has been provided. nor has the scope of the testimony been described with any sort of particularity.

Seventh, Plaintiff has made no showing of relevance of the testimony of a legal assistant of the Law Offices of Samuel Fishman. Notwithstanding this, "[e]ven if the information is relevant, discovery is not allowed where no need is shown." Arthur Frank, M.D., Ph.D. v. Honeywell International Inc., 2015 U.S. Dist LEXIS 106453, *12 (E.D.Pa. 2015) (citing Garden City, 2014 WL 272088, at *4 (internal citations omitted)).

Eighth, Plaintiff has not shown a need for the testimony of the legal assistant of a law firm. This case is regarding the billing practices of a medical provider as it pertains to an insurance company. Mr. Khanukov did not participate in said billing. He is also not an employee and has never worked for any of the defendants. There is no information that is in the possession of Mr. Khanukov that is needed by Plaintiff for any reason.

Ninth, any information that could possibly be sought regarding the Defendants would be in possession of the defendants. This matter is a billing dispute between Plaintiffs and Defendants. Emil Khanukov has no information regarding said billing and all such billing is in the possession of Defendants themselves. Therefore, as it pertains to this case, the information at issue can be obtained through another source that is more convenient, less burdensome, and less expensive than forcing non-party Khanukov to appear for deposition.

Tenth, the federal discovery rules were not created to allow for fishing expeditions directed at non-parties. In fact, "[t]he discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable *without discovery,* not to find out if it has any basis for a claim." See Barry v. Medtronic Inc., No. 16-47, (E.D.Pa. March 17, 2016) (citing Micro Motion, Inc., 894 F.2d at 1327). "Subpoenaed information 'is not relevant to `subject matter involved' in the pending action if the inquiry is based on the party's mere suspicion or speculation." See Barry v. Medtronic Inc., No. 16-47, (E.D.Pa. March 17, 2016) (citing Micro Motion, Inc., 894 F.2d at 1326). This is nothing more than a fishing expedition in an attempt to seek additional bases for claim against Defendants.

Eleventh, it is clear that Plaintiff does not even know the information that it is seeking because the subpoena that was issued to the Law Offices of Samuel Fishman requested information about an employee named "Emil". Plaintiff did not even know Emil Khanukov's last

name until the Law Offices of Samuel Fishman responded to the subpoena directed to the Law Offices of Samuel Fishman. While undersigned counsel cannot be sure, undersigned counsel can be reasonably certain that Plaintiff originally obtained the name "Emil" off of documents sent to our office from one of the Defendants.[14] One of Emil's duties with this office is to obtain records from various doctor's offices. Often, the records from a medical provider arrive with a cover sheet that states Attn: Emil, or something of the sort. The fact that incoming documents were addressed to Emil in order to ensure that they reached the correct file does not warrant or justify the taking of Emil Khanukov's deposition.

Twelfth, the non-party present and former clients of the Law Offices of Samuel Fishman have not been afforded the opportunity to defend themselves against the improper disclosure of their information.

Thirteenth, the harm of permitting a legal assistant to testify regarding the representation of a client far outweighs any benefit to the Plaintiff.

In addition, the Honorable Gerald J. Pappert of this Federal Judicial District recently held that a:

> "court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on a non-party." *In re Domestic Drywall,* 300 F.R.D. at 239 (quotation omitted); *accord Frank Brunckhorst Co. v. Ihm,* No. 12-mc-0217, 2012 WL 5250399, at *5 (E.D. Pa. Oct. 23, 2012) ("In the case of nonparty deponents, courts recognize that `[d]iscovery should be more limited to protect nonparty deponents from harassment, inconvenience or disclosure of confidential documents.'").

Arthur Frank, M.D., Ph.D, v. Honeywell International Inc., 2015 U.S. Dist. LEXIS 106453, *12-13 (E.D.Pa. 2015).

---

[14] It appears that this is correct based upon information learned in Plaintiff's Motion to Compel.

Here, there is no discernable purpose for the subject deposition other than to inconvenience and harass the deponent through an unnecessary and improper inquiry into the confidential information of present and former clients of the Law Offices of Samuel Fishman. The subpoena is improper and unduly burdensome. Therefore, said subpoena must be quashed.

## F.    ALTERNATIVE REQUEST FOR A PROTECTIVE ORDER

Notwithstanding the fact that Respondent believes that the Subpoena should be quashed in its entirety, should the Court require Respondent to appear, it is respectfully requested that this Honorable Court explicitly restrict the scope of the deposition to that set forth in Plaintiff's Motion to Compel Deposition. Specifically, the scope of the deposition must be restricted to to whether a referral relationship existed between Emil Khanukov and any of the Defendants to this case.

## G.    CONCLUSION

For the reasons stated herein, Plaintiff's subpoena must be quashed. In the alternative, it is hereby requested that this Honorable Court issue a Protective Order limiting Emil Khanukov's testimony to whether a referral relationship existed between Emil Khanukov and any of the Defendants to this case.

Respectfully submitted,

Dated: July 14, 2017

/s/ Samuel Fishman, Esquire
Samuel Fishman, Esquire (I.D. No.: 78452)
Law Offices of Samuel Fishman, P.C.
11450 Bustleton Avenue
Philadelphia, PA 19116
Telephone: 215-464-4600
Facsimile: 215-464-4558
Attorney for Respondent Emil Khanukov