| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE | : |
| INSURANCE COMPANY | |
| And | : |
| STATE FARM FIRE & CASUALTY COMPANY | |
| | :     CIVIL ACTION |
| v. | NO. 2:15-cv-05929-JCJ |
| | : |
| LEONARD STAVROPOLSKIY, P.T., D.C., et. al | |
| | : |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

Dr. Joseph Wang came to the United States from China in 1978 at the age of 4.  He obtained his B.A. in Biology from LaSalle University in 1996 and a Doctorate of Chiropractic from the University of Bridgeport's College of Chiropractic in 2000.  While practicing full time as a chiropractor, Dr. Wang later obtained his Doctorate in Physical Therapy from Neumann University in 2008.

Dr. Leonard Stavropolskiy came to the United States from Ukraine in 1991 at the age of 21. He obtained a B.A. in Biology from Regents College in 1994 and a Doctorate of Chiropractic from the University of Bridgeport's College of Chiropractic in 1998.  While practicing full time as a chiropractor, Dr. Stavropolskiy obtained his Doctorate in Physical Therapy from Neumann University in 2001.

Upon information and belief, Dr. Wang and Dr. Stavropolskiy are 2 of only 6 doctors in Pennsylvania who are dual licensed as chiropractors and physical therapists.  Dr. Wang and Dr. Stavropolskiy are also family.  Dr. Stavropolskiy married Dr. Wang's sister in 1994, and it was with Dr. Stavropolskiy's encouragement that Dr. Wang pursued his dual licensure.

In 2003, after years of discussing it and planning and saving, Dr. Wang and Dr. Stavropolskiy opened together a physical therapy and chiropractic clinic in the Chinatown section of Philadelphia called Aquatic Therapy of Chinatown.  They chose this area because of Dr. Wang's (and Dr. Stavropolskiy's by marriage) family heritage and ability to speak Chinese and Mandarin.  The new facility was structured around an indoor aquatic therapy and exercise pool and marketed exclusively to hospital and doctor groups with patients in need of physical therapy services.

In 2004, because of Dr. Stavropolskiy's ethnic background and language capabilities, the brothers-in-law opened Eastern Approach Rehabilitation in the Northeast section of Philadelphia with its large Eastern European language speaking population, seeking to provide physical therapy services to patients referred by hospitals and doctor groups.  The doctors are network providers to all of the major health insurers operating in Pennsylvania as well as Medicare.

From their inception through the present, both facilities have also provided chiropractic treatment to automobile accident patients.  Since 2003, approximately 20 different chiropractors have provided treatment to auto accident patients at both facilities, including Dr. Wang and Dr. Stavropolskiy.  Less than 20% of the patients *ever seen* at both facilities have been patients injured in automobile accidents.[1]

 Prior to starting their own practice, Dr. Wang and Dr. Stavropolskiy had worked in chiropractic offices which had utilized a medical record software program called Writepad.  Because it was a program with which they were familiar, the doctors decided to use Writepad in their practice, which they have done continuously since 2003.

---

[1] Of the 16,268 patients which have been treated at the facilities, 3,237 have been patients injured in auto accidents (19.89%), 13,031 have been general physical therapy or chiropractic patients insured by Medicare, private insurance, and/or (to a much lesser extent), paid out of pocket (80.1%).

Both Dr. Wang and Dr. Stavropolskiy vehemently deny and contest the accusations made by State Farm in this lawsuit, accusations which no other insurer or Medicare ever made. (Attached as **Exhibit "A"** is an 88-page rebuttal the doctors authored in response to all accusations of inappropriate care and record-keeping offered by State Farm's chiropractic expert). The doctors understand, however, that in the context of a Motion for Summary Judgment, they are limited to exposing for the Court the facts which not even State Farm can argue to be in dispute and which demonstrate State Farm's inability as a matter of law to sustain its burden of proof.

The indisputable facts demonstrate the following:

- Any and all claims of Statutory Insurance Fraud based on payments made prior to October 30, 2013 are barred by the statute of limitations;

- All claims of Common Law Fraud, Unjust Enrichment, and Restitution are barred entirely.

The doctors submit this Motion for Summary Judgment in order to narrow the issues and evidence for trial.

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Parks v. Woodbridge Golf Club, Inc., No. CV 11-0562, 2016 WL 8716606, at *2 (E.D. Pa. July 22, 2016), reconsideration denied, No. CV 11-0562, 2017 WL 1133949 (E.D. Pa. Mar. 27, 2017).

The court must view the evidence in the light most favorable to the non-moving party. Id., citing Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary

judgment.  Id., *citing* <u>Schaar v. Lehigh Valley Health Servs., Inc.</u>, 732 F. Supp. 2d 490, 493

(E.D. Pa. 2010) (*citing* <u>Williams v. Borough of W. Chester,</u> 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify

an absence of a genuine issue of material fact by showing the court that there is no evidence in

the record supporting the nonmoving party's case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

(1986); <u>UPMC Health Sys. v. Metro. Life Ins. Co.</u>, 391 F.3d 497, 502 (3d Cir. 2004).  "If the

moving party carries this initial burden, the nonmoving party must set forth specific facts

showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a

fact ... is genuinely disputed must support the assertion by ... citing to particular parts of

materials in the record...."); *see also* <u>Matsushita Elec. Indus. Co., v. Zenith Radio Corp.</u>, 475

U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts")."  <u>Parks v. Woodbridge Golf Club,</u>

<u>Inc.</u>, *supra.*, at *2.  "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial."  <u>Id.</u>, *citing* <u>Matsushita</u>, 475

U.S. at 587.

### III.     STATE FARM AND ITS LAWYERS HAVE BEEN ATTEMPTING CONTINUOUSLY SINCE BEFORE SEPTEMBER OF 2011 TO CREATE A FRAUD LAWSUIT AGAINST DEFENDANTS

State Farm filed its lawsuit in this case on October 30, 2015.  Attached as **Exhibit "B"** is

State Farm's operative pleading, the Amended Complaint.

As this Court has explained in a Memorandum Opinion dated May 18, 2016 (Doc. No. 28),

State Farm alleges "that the defendants conspired and continue to conspire to file false and

fraudulent insurance claims with State Farm."

The Court further identified that:

**"In support of their allegations, Plaintiffs note that the records submitted by the Defendants indicate observations and treatment for a variety of patients, and across multiple visits, that is implausibly similar. [Citing to the Am. Compl. At ¶24]. In particular, in the initial examination, nearly all patients are reported as having "moderate-to-severe joint dysfunctions, pain, and muscle spasms across multiple regions of the spine" and pelvis. [Citing to the Am. Compl. at ¶¶ 29, 47]. Records from subsequent visits contain the same findings as in the initial examinations, suggesting they were copied and pasted from the initial examination. [Citing to Am. Compl. at ¶¶ 30, 54, 63]. The treatment recorded is not "uniquely tailored" to the individual patient, but instead "predetermined" for a large number of patients. [Citing to Am. Compl. at ¶31]. Plaintiffs allege this practice has been ongoing since 2010, and continues today. [Citing to Am. Compl. at ¶ 8]."**

Since the Court's May 18, 2016 Opinion above, extensive discovery has revealed that State Farm, in concert with its counsel in this case, first began targeting Dr. Wang and Dr. Stavropolskiy for an accusation of "fraud" prior to September of 2011. State Farm (and its counsel's) "investigatory" activities seeking to find some evidence of wrongdoing on the part of these doctors has been so continuous and consistent since 2010, that its effort to conceal this reality, has over time been almost a game.

The very long game State Farm and its lawyers have been playing against Dr. Wang and Dr. Stavropolskiy for nearly a decade is best understood by breaking it down into 4 quarters.

**A. The 1st Quarter: January, 2007 to August, 2011**

On July 19, 2005, a State Farm insured rear-ended at a traffic light F.W., the step-mother of Dr. Joseph Wang. State Farm assigned number 38-K774-559 to the claim. A copy of State Farm's claim activity log for the claim is attached as **Exhibit "C"**. On November 3, 2006, State Farm received a demand for settlement of F.W.'s claim for injuries she sustained in the accident. As in all such circumstances, the demand was routed to State Farm's fraud unit, called the Special Investigations Unit, for review. (See Ex. "C",

Bates numbered page 267855).

On January 29, 2007, SIU representative John Costanzo took over handling of

F.W.'s bodily injury claim. (Bates 267848). On May 8, 2007, Mr. Costanzo noted that suit

had been filed by the attorney for F.W. Mr. Costanzo immediately referred the case to the

law firm of Goldberg, Miller & Rubin for handling. (Bates 267847).

Subsequent activity in just this one claim reflects that:

- 9/6/07 – John Costanzo notes receipt of a message from Joe Fritz, Esquire regarding settlement of F.W.'s claim. Mr. Costanzo wrote: "I passed along the message to Matt Moroney who is handling the defense. As previously discussed the offer has been withdrawn and there is currently no authority to settle the case until we re-evaluate following discovery." (267846-267847)

- 4/13/09 – John Costanzo notes that an arbitration of F.W.'s claim resulted in an award of $5,000. Mr. Costanzo wrote: "This was a minor impact case in which the plaintiff treated with her son, Dr. Joseph Wang." Mr. Costanzo recommended that Mr. Moroney appeal. (267844)

- 3/11/10 – John Costanzo's boss, SIU team manager Austin Bowles, notes that he reviewed the pre-trial letter of Matt Moroney and spoke with John Costanzo regarding F.W.'s claim. Mr. Bowles writes: "The 53-year-old full tort plaintiff sought treatment from her step son, Dr. Wang, at Aquatic Therapy of Chinatown. She has a history of back trouble, but not related to accident history, apparently age-related degeneration. There is also a three-week gap in treatment. **We do know that her original attorney Adrien Reid solicits accident victims,** which [sic] indicative to 'suggestion' that she seek medical treatment." (267841)

- 4/12/10 – Matt Moroney, Esquire deposes Dr. Joseph Wang in F.W.'s claim. A copy of Dr. Wang's 4/12/10 deposition is attached as **Exhibit "D"**. Dr. Wang testifies that his partner is Dr. Stavropolskiy (pg 12); that patient notes are created using Writepad software (pg 38); that the Writepad software has "various templates and we do check off on the template. There are comment spaces if we need to insert certain comments. But after that, it would take everything that we put in the template and generate it into a report format" (pg 43-44); that Writepad is "actually a sentence generator after we click on it" (pg 46); and that he and Dr. Stavropoloskiy own a second office called Eastern Approach Rehabilitation in the Northeast (pg 47);

In the deposition of Dr. Wang in his step-mother's claim, attorney Moroney spent a great

deal of time questioning Dr. Wang as to why his stepmother chose the law firm of Reid and Fritz

(pg 51). Mr. Moroney stated on the record that he had filed a motion to compel the deposition of the corporate designee of Reid and Fritz in the case (pg 51), and stated that he wished to question Dr. Wang about any referral relationship which may exist between Dr. Wang and the law firm of Reid and Fritz (pg 53). Mr. Moroney questioned Dr. Wang extensively about the number of clients of Reid and Fritz which had been patients of Dr. Wang (pg 62).

Mr. Moroney's focus on attempting to discover information about the referral relationship between Aquatic Therapy of Chinatown and the law firm of Reid and Fritz, taken in conjunction with Austin Bowles' claim entry concerning the alleged solicitation of accident victims by attorney Reid, demonstrates that as long ago as April of 2010, John Costanzo and State Farm's SIU and the law firm of Goldberg, Miller & Rubin were actively investigating whether some such relationship existed between the two.

The deposition of Dr. Wang also obviously demonstrates that Dr. Wang had no hesitancy to explain to State Farm his use of the Writepad program and how it works. Also demonstrated of course is the fact that since at least April of 2010, State Farm and its counsel were fully aware of Defendants' use of the Writepad program, how it worked to generate notes, and how the doctors used it to do so.

On November 9, 2010, John Costanzo writes his SIU CLOSING REPORT in the claim of F.W., noting about the records of Aquatic Therapy of Chinatown: "If you carefully review the initial examination you will observe that several of the 'fill in the blank' answers in the 'history of the injury' section of the template were left blank." (267839). This note of course demonstrates Mr. Costanzo's practice of closely scrutinizing the Defendants' medical records for any deficiencies or inconsistencies and that he has had this practice since at least 2009.

The claim of F.W. was merely one of several John Costanzo and the lawyers at Goldberg, Miller & Rubin were using within this time frame to investigate Dr. Wang and Dr. Stavropolskiy. Another involved an accident which occurred on October 24, 2007 when a State Farm insured rear-ended W.R. on Academy Road. State Farm assigned number 38-L331-500 to the claim. The claim activity log for this claim is attached as **Exhibit "E"**.

On August 6, 2008, the adjuster who had been handling the W.R. claim to that point noted that the attorney involved on behalf of W.R. was Joseph Fritz. On August 8, 2008, reflecting the fact that he was scrutinizing claims involving Reid & Fritz, John Costanzo enters and takes over handling of the claim. (Bates 268660). On August 20, 2008, John Costanzo notes that the reasons for SIU involvement include the fact that the claimant treated at Aquatic Therapy of Chinatown. (Bates 268659).

On November 5, 2009, John Costanzo notes that suit has been filed in the W.R. claim and that he has forwarded it to Matt Moroney, Esquire for handling. (Bates 268655-268656). On July 9, 2010, John Costanzo reviews Matt Moroney's pre-arb report (Bates 268654) and on October 13, 2010, Mr. Costanzo notes an arbitration award of $10,000, stating that "Neither our insured or the plaintiff made a good witness." (Bates 268653). On October 15, 2010, SIU Manager Bryan Acornley reviews Mr. Costanzo's file note in the claim and agrees that an appeal should be filed by Mr. Moroney. (Bates 268653).

On February 3, 2011, Matthew Moroney deposes Dr. Stavropolskiy in the W.R. claim. A copy of the 2/3/11 deposition of Dr. Stavropolskiy is attached as **Exhibit "F"**. Again Mr. Moroney's questions reveal that he and State Farm were investigating Aquatic Therapy and its relationship with Reid & Fritz. Specifically, Mr. Moroney interrogated Dr. Stavropolskiy about

the ownership of Aquatic Therapy, how W.R. was referred to Aquatic Therapy, and whether Reid & Fritz had represented other Aquatic Therapy patients. (Bates 267761).

Mr. Moroney also interrogated Dr. Stavropolskiy about the Writepad program and how it is used to create records (Bates 267766-267767), as well as Dr. Stavropolskiy's ownership and partnership with Dr. Wang in Eastern Approach Rehabilitation. (267747-267790).

On May 12, 2011, reflective of the fact that John Costanzo was carefully reviewing bills from Goldberg, Miller & Rubin for work performed, notes in W.R.'s claim regarding Matt Moroney's bill: "Notice error in recent defense bill, item for filing expense. Called defense counsel who will check it out, make correction and re-submit." (268651)

On June 6, 2011, SIU Manager Bryan Acornley notes in W.R.'s claim that he has reviewed Matt Moroney's and John Costanzo's pre-trial reports, agrees with their recommendations, and changes the reserve for plaintiff to $1. (268650).[2] This reserve reflects the fact that no one within State Farm, nor its lawyers, were relying on any representations by the doctors in determining the value of claims or the amounts to be paid in settlement of them.

### 1. The Claim of S.B., No. 38-L739-155

In the midst of their handling of these and other claims involving treatment at Aquatic Therapy and Eastern Approach, State Farm was notified on August 23, 2011 that a lawsuit had been filed by S.B., a patient at Eastern Approach injured in an accident caused by a State Farm insured. The claim activity log of this claim, number 38-L739-155, is attached as **Exhibit "G"**. The Plaintiff's attorney was noted to be Adrian Reid. (Bates 270880).

---

[2] On February 8, 2012, Mr. Costanzo notes in the W.R. Claim that he was continuing to make no offers to settle the claim, but later, on May 18, 2012, notes that he agreed to settle the claim as the result of a settlement conference with Judge Maier for $2,600.00. (See Bates 268647-268648). State Farm claims this payment as damages even though the claim file clearly reflects that at no time did State Farm rely on any representations of the defendants as truthful and accurate in issuing the payment.

Within hours of noting that Adrian Reid is the attorney on the case, Adjuster Steven McGee refers the claim to SIU for handling. The <u>sole</u> reason for referring the case to State Farm's fraud unit was: "Review Reasons/NICB Indicators: Adrian Reid, Esq." (Bates 270879). In other words, the mere presence of Adrien Reid, Esquire in a claim as of August 23, 2011, was an indicator of potential fraud in the eyes of State Farm.

Less than 2 minutes after noting Adrien Reid's presence in the claim, it is assigned to Goldberg, Miller & Rubin for handling. Attorney Warren Holland, Esquire is assigned the case "as he has experience dealing with" Mr. Reid." (Bates 270879). The invoices of Goldberg, Miller & Rubin in the S.B. claim are attached as **Exhibit "H"**. These invoices reflect that both Mr. Holland *and* Matthew Moroney, Esquire immediately began working on the S.B. claim, and even State Farm's redacted claim file notes reflect that the lawyers were concentrating entirely on the treatment records of Eastern Approach:

- 8/26/11 – Warren Holland bills .4 hours to State Farm working on claim 38-L739-155 to State Farm (Ex. "H")

- 9/2/11 – Matthew Moroney and Warren Holland bill State Farm for 2.8 hours of time working on claim 38-L739-155 (Ex. "H")

- 9/6/11 – Steven McGhee notes discussion with attorney Holland re claim 38-L739-155. Says he will argue comparative negligence of plaintiff and will object to the medical bills on relatedness grounds. (Ex. "G", Bates 270876).

- 9/6/11 – Warren Holland bills State Farm for .2 hours of time working on claim 38-L739-155 (Ex. "H")

- 9/8/11 – Warren Holland bills State Farm for .2 hours of time working on claim 38-L739-155 (Ex. "H")

- 9/14/11 – Warren Holland bills State Farm for .7 hours of time working on claim 38-L739-155 (Ex. "H")

Critically, according to John Costanzo's testimony as State Farm's corporate designee in this case, it was in September of 2011, presumably after spending the above-referenced time

reviewing the treatment records of Eastern Approach, that Warren Holland approached Mr.

Costanzo, **who had no association with claim 38-L739-155,** and advised that range of motion

findings in the treatment records appeared to be cut and pasted from one visit to the next.  <u>See</u>

the Deposition testimony of John Costanzo as Corporate Designee, pp. 198-217, attached as

**Exhibit "I"**.  According to Mr. Costanzo, in response to Mr. Holland's overture, he instructed

Goldberg, Miller & Rubin to look "in-house" at "claims that involved Eastern Approach."  <u>Id.</u>

Thus was marked the end of the 1st quarter of State Farm's pursuit of a claim against the

Defendants.

**B.  <u>Second Quarter: September 19, 2011 to January 26 2011</u>**

Mr. Costanzo could not recall nor could State Farm identify when in September of 2011

Warren Holland approached him with the idea of investigating what Mr. Holland clearly saw as

possible "cut and pasted" treatment records at Eastern Approach Rehabilitation.  We can be

certain, however, that it was sometime <u>before</u> September 19, 2011, because this is the date on

which the lawyers at Goldberg, Miller & Rubin, opened what *they characterized* as a RICO

Investigation into Aquatic Therapy of Chinatown and Eastern Approach Rehabilitation at Mr.

Costanzo's direction, which was made in response to Mr. Holland's solicitation.

Attached as **Exhibit "J"** are a series of invoices created by Goldberg, Miller & Rubin for

work performed from September 19, 2011 through September 27, 2013 on behalf of State Farm

conducting a RICO Investigation of Eastern Approach and Aquatic Therapy.  Although the facts

demonstrate that Mr. Costanzo carefully scrutinized all bills received from Goldberg, Miller &

Rubin for inaccuracies, Mr. Costanzo made no correction to Goldberg, Miller & Rubin's

characterization of their work regarding Aquatic Therapy of Chinatown and Eastern Approach as

a "RICO Investigation."

The Court should take careful note of one glaring fact contained in these invoices which exposes that Mr. Costanzo and Goldberg, Miller & Rubin were actively conducting some type of RICO investigation of the Defendants **before** September 19, 2011.

The S.B. claim <u>only</u> involved treatment at Eastern Approach Rehabilitation. According to Mr. Costanzo's testimony, Mr. Holland approached him <u>only</u> about concerns he had about the records of Eastern Approach Rehabilitation in one file. Mr. Costanzo further testified that he instructed Mr. Holland to look "in-house" at "**claims that involved Eastern Approach**." <u>See</u> Ex. "I", pg. 204. However, on their very first invoice, and on every invoice thereafter, Goldberg, Miller & Rubin characterized their RICO investigation as being conducted into "**Aquatic Therapy of Chinatown** & Eastern Approach."

There is simply no explanation for Goldberg, Miller & Rubin including <u>Aquatic Therapy</u> on its RICO Investigation invoices to John Costanzo other than the fact that Goldberg, Miller & Rubin and Mr. Costanzo <u>had already been working</u> in concert to "investigate" the treatment and billing being performed at <u>both facilities</u>. While the credibility of Mr. Costanzo's testimony is not necessarily part of the Court's calculus in deciding a Motion for Summary Judgment, the burden of proof clearly is. State Farm has consistently concealed through claims of attorney-client privilege or has professed not to recall or know what it knew and what it did from September of 2011 through January of 2012 relative to the Defendants.

Fortunately, the evolving testimony of Mr. Costanzo, combined with the records ordered by the Court to be produced over State Farm's objection, reveal what State Farm has tried to hide.

Mr. Costanzo's initial deposition as a fact witness is attached as **Exhibit "K"**. He initially testified that he first retained Goldberg, Miller & Rubin in "late September, October

2011 that I recall but I don't remember specifically what it was. It was an issue *that we brought to counsel's attention* and it closed up relatively quickly and I really don't remember anything specifically about it." Ex. "K", p. 62 (emphasis added). This testimony was later revealed to be false of course when Mr. Costanzo admitted as the corporate designee that it was in fact Warren Holland, Esquire who had solicited State Farm to expand its investigation into the Defendants (and pay Goldberg, Miller & Rubin to do it).

Mr. Costanzo also testified initially that to his recollection, "whatever it was with counsel" in 2011, "we decided there was nothing else and so when I say closed, we didn't pursue anything at that point." He professed not to recall what it was he *might* have pursued, nor could he recall whether it involved an issue of alleged fraud or billing irregularity. Id., p. 65. Mr. Costanzo swore under oath, however, that whatever it was he and Goldberg, Miller & Rubin did in 2011, it only lasted "a month or two". Id., p. 65.

Mr. Costanzo later testified as the corporate designee, however, that he actually reviewed 3 or 4 claim files in January of 2012 as part of the investigation Goldberg, Miller & Rubin had "started" in September of 2011 into Aquatic Therapy of Chinatown and Eastern Approach. The testimony as corporate designee was as follows:

> **Q. Did you yourself do any review of other claims involving Eastern Approach as the result of Warren Holland bringing this to your attention?**
>
> **MR. CASTAGNA: You can answer that.**
>
> **A. I did.**
>
> **Q. What other claims did you review?**
>
> **A. I don't remember specifically the claims. I reviewed claims sometime in January**

**of 2012 and the claims that I looked at that
were open claims or claims contemporaneous with
that time, that issue, that range of motion
issue wasn't in the claims. It wasn't in all
of the claims and that's my recollection.**

**Q. How many did you look at?**

**A. Three or four.**

**Q. How did you obtain those claim files?**

**A. They were claims that were open at
that time.**

Ex. "I", p. 205.

In response to a Supplemental Interrogatory, State Farm later identified the 3 claim files

Mr. Costanzo reviewed.  Attached as **Exhibit "L"** is State Farm's Responses to the

Supplemental Interrogatory, indicating that the claims Mr. Costanzo reviewed in January of 2012

were 38-0D99059, 38-0G60773, and 38-047R431.  These claim files involved 4 patients (I.S.,

K.H., T.F., and D.Y.), each of whom was treated at Eastern Approach Rehabilitation.  Each of

the 4 patients are included on State Farm's list of claims in which it seeks to recover damages

(numbers 145, 161, and 169 respectively on State Farm's Exhibit "A" to its Amended

Complaint).

Mr. Costanzo testified that in reviewing these files specifically for the purpose of

discerning whether the records reflected some inappropriate pattern of "cut and pasted" findings,

he saw <u>nothing</u> which warranted further investigation and considered the entire inquiry closed.[3]

Ex. "I", pg. 212.

---

[3] The treatment notes of these 4 patients were shown to State Farm's expert, Michael Schneider, DC, at his deposition on February 2, 2018.  After reviewing the charts for approximately 10 minutes, Dr. Schneider offered the knee jerk opinion that each of the files exhibited most if not all of the features State Farm alleges to indicate fraud on the part of the Defendants.  (The transcript of Dr. Schneider's deposition has not yet been completed).

Again, while credibility is not necessarily an issue at the summary judgment juncture, context and reality cannot be ignored. Mr. Costanzo was reviewing files which State Farm now claims to contain *entirely cut and pasted findings,* and he was reviewing them specifically for the purpose of identifying whether there was any issue of concern in them, including *whether the doctors might be cutting and pasting findings*. The larger context of course was that Mr. Costanzo was performing this task as part of his mission as a State Farm SIU (later changed to MCIU) claim representative.

Jeff Denner worked for nearly twenty years in State Farm's MCIU from the mid 1990's to 2014, many of which years were spent working alongside John Costanzo with the same exact job description. Mr. Denner was deposed in this case by State Farm. A copy of his deposition is attached as **Exhibit "M"**. Mr. Denner testified that "the MCIU team [was] <u>put in place to look for and ferret out medical provider fraud</u>." (pg. 46-47). Mr. Denner further testified that:

- John Costanzo had the same job that Mr. Denner did in 2010-2012 (pg. 94-95);

- Mr. Costanzo had the same supervisors Mr. Denner did (pg. 95);

- 95% of multi-claim investigations he did involved medical providers and he believes that percentage applied equally to Mr. Costanzo's work (pg. 97-98);

- Any time an MCIU claim representative formed a belief that affirmative litigation might be initiated against a medical provider being investigated, "you absolutely had to redirect" the project to one of three law firms, one of which was Goldberg, Miller & Rubin (pg. 102);

- Every multi-claim investigation he was ever involved in at MCIU began based on some suspicion of wrongdoing (pg. 113);

The larger context, provided by Mr. Denner, demonstrates that Mr. Costanzo and Goldberg, Miller & Rubin had been attacking claims involving the Defendants since 2007 with, to be charitable, deep skepticism about the care being provided at both Aquatic Therapy and

Eastern Approach as well as concerns about patient solicitation by Reid and Fritz. In September of 2011, Goldberg, Miller & Rubin, one of three firms State Farm demands its MCIU use for affirmative litigations against medical providers, approached Mr. Costanzo with an accusation that a patient's records at Eastern Approach appeared to have cut and pasted findings and the patient was represented by Adrien Reid.

Mr. Costanzo directed Goldberg, Miller & Rubin to conduct a multi-claim investigation which Goldberg, Miller & Rubin understood to be a <u>RICO investigation</u> into both Aquatic Therapy of Chinatown and Eastern Approach Rehabilitation. In January of 2012, Mr. Costanzo reviewed 4 patient files specifically looking for evidence of cut and pasted findings which files State Farm now claims in this lawsuit are replete throughout each of the files.

Mr. Costanzo and State Farm, however, have testified under oath and represented to the Court that its 2011 inquiry was somehow "limited" and ended entirely in January of 2012 with no further action or even suspicion on the part of State Farm of any wrongdoing whatsoever by the Defendants.

This story ignores the facts and common sense, but it also ignores the file State Farm created on January 26, 2012 to house documentation of their active and ongoing RICO investigation into Eastern Approach and Aquatic Therapy of Chinatown.

## C.  3rd Quarter: January 26, 2012 to October 31, 2012 - The Lead File

In 2011-2013, State Farm, utilized "lead files" to store information about an ongoing fraud investigation being conducted by its MCIU. This practice was revealed in a recent case wherein State Farm was sanctioned for concealing surveillance videos taken in a "pre-project" MCIU investigation. In attempting to avoid these sanctions in 2015, State Farm's counsel tried to explain State Farm's use of "lead files" in its investigations. Counsel for State Farm stated:

> **"At the time the invoices in this file were paid, investigations were conducted under a 'lead file', be it an investigation into body shops, claimed staged accidents, provider billing fraud, etc. An individual lead file was chosen initially, particularly to have a claim number against which to pay vendors' bills. Before 2013, this happened in SIU investigations and not every investigation became a project."**

Jeff Denner also confirmed how and why the MCIU used lead files:

- A lead file in a project or MCIU investigation was simply one of the underlying claim files included in the investigation being designated for the purposes of keeping track of the investigation, the outside resources being used, reporting to management, and expenses incurred in the course of the investigation. (Ex. "M", pg. 139-140);

- Bryan Acornley told the MCIU claim representatives that he had been instructed by people above him to start using lead files. (pg. 140);

- The opening of a lead file necessarily meant that there was an investigation occurring which involved multiple files (pg. 141-142);

- A lead file had to be an open file that was associated with the investigation and would be kept open throughout the entire investigation. (pg. 147);

Consistent with State Farm's representations in previous cases and Mr. Denner's testimony, State Farm officially designated a lead file in its Aquatic Therapy and Eastern Approach investigation on January 26, 2012. Attached as **Exhibit "N"** is the lead file. Note that the date of its creation is the same day State Farm received Goldberg, Miller & Rubin's first invoice for "**RICO-Investigation-Hrly**" work on Aquatic Therapy of Chinatown & Eastern Approach, which was performed from September, 2011 through December, 2011. (See Ex. "J").

According to State Farm's prior representations and Mr. Denner's testimony, a lead file would be opened at the *beginning* of a multi-claim investigation. Incredibly, however, State Farm's testimony and representations to the Court in this case are that the *opening* of the lead file somehow marked the *end* of its investigation.

Bryan Acornley was Mr. Costanzo's (and Mr. Denner's) boss and the MCIU Team Manager at the time the Eastern Approach lead file was created. Mr. Acornley's deposition is attached as **Exhibit "O"**. Mr. Acornley testified that the lead file was created for the singular purpose of paying the bills submitted by Goldberg, Miller & Rubin for the "RICO-Investigation-hrly" work they had done from September through December of 2011:

**Q. The testimony that I understand Mr. Costanzo to have given is that there was a time frame from September of 2011 until the end of 2011 and early 2012, January of 2012, in which there was a review of some files related to Eastern Approach and Aquatic Therapy. I'm not asking you to agree or disagree with me. I'm telling you my understanding.**

**A. Okay.**

**Q. Mr. Costanzo, as I understand further, testified that that work was completed and there was no additional investigation expected at that point. Is that your understanding based on your conversations with him?**

**A. It is.**

**Q. So, if there was no additional investigation anticipated in January of 2012, why was there a need to open a lead file?**

**MR. CASTAGNA: Objection to the form of the question.**

**A. To pay the invoices or invoice.**

**Q. Invoices for work which had already been done?**

**A. Correct.**

**Q. Once those invoices were paid, was the lead file closed?**

**A. It was not.**

**Q. Why?**

**A. I don't know.**

Ex. "O", pg. 58-59.

Mr. Acornley further testified that "it was just a lucky coincidence" that everyone at State

Farm somehow just forgot to close the Eastern Approach lead file such that when subsequent

invoices came in from Goldberg, Miller & Rubin for its RICO-investigation-hrly work on

Aquatic Therapy and Eastern Approach, the bills were able to be paid in the lead file. Ex. "O",

pg. 78.

Testifying as State Farm's corporate designee, Mr. Costanzo doubled down on this

professed ignorance as to why the lead file was not closed in January of 2012.

> Q. Why was the lead file not closed in
> January of 2012?
>
> **A. I have no independent recollection.
> Lead files were not something that we were
> involved in. It was a procedural thing. We
> kept lead files open in MCIU to pay things for
> a variety of reasons. The last bill was paid,
> and this I do remember, the last bill from
> counsel with that issue that we spoke about,
> the issue with regard to September of 2011
> through January of 2012 was paid at the end of
> February 2012. We didn't close the lead file.
> There was no reason. We didn't go into it. We
> didn't look at it. It was an open active file.**

Ex. "I", pg. 118-119.

Mr. Costanzo and Mr. Acornley's professed ignorance as to why their Eastern Approach

lead file remained opened after January 2012 and their protestations that its continued use did not

mean there was an active RICO investigation continuing, however illogical, are irrelevant once

the entries actually made in the lead file from January through October of 2012 are exposed:

- **1/31/12** – SIU claim representative David Dormer issues payment to Goldberg, Miller & Rubin in the amount of $432.00 and records it in the Eastern Approach lead file. This is the exact amount of the invoice submitted by Goldberg, Miller & Rubin for "RICO-Investigation-Hrly" work performed from September through December of 2011 concerning Aquatic Therapy of Chinatown and Eastern Approach Rehabilitation. (Bates pg. 255972).

- **2/9/12** – Goldberg, Miller & Rubin submits its invoice to John Costanzo for "RICO-Investigation-hrly" work regarding Aquatic Therapy of Chinatown & Eastern Approach performed in January, 2012, in the amount of $1,606.50. This bill includes the previous balance owed of $432.00. Ex. "J".

- **2/27/12** – Mr. Dormer pays Goldberg, Miller & Rubin $1,174.50 ($1606.50 - $432) and records the payment in the Eastern Approach lead file. Ex. "N", Bates pg. 255971.

- **3/26/12** – David Dormer notes "<u>Rev'd on cal. Lead file.</u>" Ex. "N", Bates pg. 255971.

- **5/17/12** – John Costanzo notes in the Eastern Approach lead file that he is ***<u>extending the expense authority in the lead file to $15,000.00.</u>*** Ex. "N", Bates pg. 255971.

- **6/6/12 –** David Dormer notes "Rev'd. SIU lead file." Ex. "N", Bates pg. 255971.

- **7/25/12 –** Bryan Acornley notes "Management, Investigation" and "OAR-SIU. Rev'd. <u>Rediary 1/24/13.</u>" OAR means "open assignment review."

When confronted with these entries in the lead file which they claimed should have been

closed and had no idea why it was not, both Mr. Costanzo and Mr. Acornley twisted themselves

into knots attempting to explain why they would be actively increasing the expenses in a closed

investigation while continuously re-confirming its status as the lead file and re-diarying it for

review six months hence. <u>See</u> generally Ex. "I", pg. 120-122, and Ex. "O", pg. 63-65.

Mr. Denner, however, unconstrained by any need to conceal the plain fact that the lead

file was opened and kept open because Mr. Costanzo and Goldberg, Miller & Rubin were in the

midst of an ongoing RICO investigation, testified regarding Mr. Costanzo's act of increasing

expense authority in a lead file that "John would have to raise the authority to make sure that incoming bills could be paid. That's what John's doing here." Ex. "M", pg. 159.

Mr. Denner also stated the obvious, which is "I'm assuming he raised the expense authority because he was expecting more bills, otherwise he would have closed the file." Id., pg. 160. Mr. Denner further explained that he made notes extending expense authority in lead files many times and could not think of a single time he did so when there was no more investigation occurring. Id., pg. 160.

Mr. Denner also lent insight into the affirmative action taken repeatedly by David Dormer and Bryan Acornley of reviewing and re-diarying the lead file. "The fact that the file keeps popping up on a diary system *means it's an active file*. Every time they rediary it they have to physically put in a new date, the system doesn't put dates in automatically. They have to put a date in. They have to click on a date and rediary it." Id., pg. 165.

Regarding Mr. Acornley's entry on July 25, 2012, Mr. Denner testified: "Mr. Acornley is saying that he opened the file, reviewed it, and he is setting himself a diary to rereview this again, on January 24, 2013, that he physically goes to the calendar, clicks to set his name and to tell the computer to find this file again and bring it back into his queue on January 24, 2013." Id., pg. 166-167.

This act of physically opening and noting a re-diary date was no mere mindless function according to Mr. Denner:

**"All I can tell you is OAR-SIU reviewed is something that I would routinely see by Bryan in my files. Again, sometimes it would just be OAR-SIU reviewed, meaning he opened the initial assignment that I sent him and he reviewed it. Other times he would say I opened the initial assignment and reviewed it, and then he would give me a little blurb, do this, don't do this, talk to so-and-so, come and see me. Sometimes there was, sometimes this was all it said. And then, yes, there was always a calendar date, because there's a -- by-- by design of our computers, you must physically put in a calendar date. If you click out of it, it simply goes right back into your queue and comes right back to you again. Your only options are**

**close the file or assign it to a future date or move it to a different claim rep altogether, reassign it to another person, which is an ordeal. That's actually hard to do.**

<u>Id.</u>, pg. 170-171.

Mr. Denner ultimately pointed out what is clearly the truth: "I wouldn't rediary a file that I never wanted to see again. I don't know why John or Dave or why both of them would." <u>Id.</u>, pg. 165. The obvious answer is that they wouldn't. The file was continuously re-diaried and its expense increased because it was an ongoing, active investigation in which State Farm expected to spend at least $15,000 **more** dollars over a period of several months.

The continued entries by David Dormer, John Costanzo, and Bryan Acornley after January of 2012 in the lead file clearly demonstrate that State Farm was actively and continuously performing what its own lawyers were calling a RICO investigation into Eastern Approach and Aquatic Therapy. But even State Farm cannot deny that by November 1, 2012, it had fully acquiesced to the solicitation of Goldberg, Miller & Rubin and committed itself to an all-hands-on-deck effort to create "affirmative litigation" against the Defendants.

> **D. 4th Quarter: November 1, 2012 to November 15, 2013 - The Building of a Lawsuit**

Despite being compelled to do so by the Court, State Farm has never articulated any specific reason why it actually began its investigation of the Defendants. While State Farm's motives may not be considered at the summary judgment stage, their professed ignorance as to <u>why</u> shows they cannot offer any reliable evidence as to <u>when</u> they knew or should have known of the "fraud" they allege in their lawsuit.

What State Farm has no choice but to admit, however, is that its RICO investigation of the Defendants was fully in bloom by November 1, 2012. <u>See</u> Ex. "L". While State Farm can cling to illogical and contrary stories about what John Costanzo and Goldberg, Miller & Rubin

were up to from 2007 through October 31, 2012, it cannot avoid the documents it was ultimately forced to produce in discovery which evidence direct analysis of all treatment and billing ever provided in State Farm claims by the Defendants in order to evaluate the viability of a civil lawsuit.

In his depositions, Mr. Costanzo could not recall any particular reason why he decided to "start" an investigation into the Defendants on November 1, 2012. <u>See</u>, e.g., Ex. "I", pg. 165: "I don't remember the specific questions. I didn't prepare for that. I don't remember specifically what caused us to start the multi-claim investigation in November of 2012. My general recollection was that it was activity in some of the claims that were being handled at that time. I don't remember specifically what they were."

State Farm's answer to the Supplemental Interrogatory seeking a definitive answer to the question as to what it was that sparked State Farm's "new" interest in the Defendants on November 1, 2012 could only offer that claims Mr. Costanzo had handled prior to November 1, 2012 "had issues of concern including, among other things, long delays in treatment, questionable involvement in the accident, and minimal property damage" and pointed to the three claims reviewed by Mr. Costanzo in January of 2012. <u>See</u> Ex. "L".

But according to the State Farm version of events, the review by Mr. Costanzo in 2012 ended any concern State Farm had about the treatment records of the Defendants. So it remains a completely mystery, even apparently to State Farm, why on November 1, 2012, Mr. Costanzo sent a request to State Farm's SIU Analytics department seeking an "Exposure Analysis" identifying all payments made to Eastern Approach and Aquatic Therapy by State Farm since 2007. Attached as **Exhibit "P"** is the email sent by Mr. Costanzo requesting the analysis.

Despite State Farm's professed inability to piece together why Mr. Costanzo sought this information on November 2, 2012, we know that on November 1, 2012, Matthew Moroney, Esquire and Richard Castagna, Esquire spent 7.2 hours, and a paralegal spend .8 hours, working on "Eastern Approach."  <u>See</u> Ex. "J", Bates page 166163.  Mr. Costanzo admitted that "it could have" been Goldberg, Miller & Rubin who convinced him to initiate his request for the analytics he received on November 2, 2012.  <u>See</u> Ex. "I", pg. 235-236.

Perhaps Mr. Costanzo just woke up on the morning of November 2, 2012 and decided that day for no other reason to "start" an investigation of doctors about whom he had no prior suspicion or concern.  Perhaps State Farm had truly recognized previously that there was no basis upon which to attack the Defendants and their really was no ongoing investigation from September, 2011 through October 31, 2012.  What most likely happened, is that Goldberg, Miller & Rubin went back to the RICO file and found a way to make it a more attractive case for Mr. Costanzo than they had in September of 2011 and convinced Mr. Costanzo that they should continue to be paid to keep on trying to make a RICO case against the Defendants.

We will never know the truth because State Farm says it cannot tell us what happened or why it happened before November 2, 2012 which caused Mr. Costanzo to want to find out just how much money State Farm had paid the Defendants since 2007 (and State Farm is shielding the documentation which would reveal the truth behind claims of attorney-client privilege).  What is indisputable, however, is that Mr. Costanzo sought this information in order to evaluate the viability of filing a lawsuit for money damages against the doctors.

The timeline of events thereafter, in spite of State Farm's attempt to conceal the information behind claims of attorney-client privilege, demonstrates that at least as of November 7, 2012, the doctors of Eastern Approach and Aquatic Therapy of Chinatown were looked upon by State

Farm as a "fraud ring" and every claim received which involved them was handled by the MCIU and Goldberg, Miller & Rubin as if it were entirely fraudulent from its inception.

Consider:

- **11/2/12** – State Farm analyst Rick Wanko is given the assignment of producing the requested reports for John Costanzo.  Ex. "P".

- 11/7/12 – Rick Wanko creates a report identifying all payments made by State Farm to Aquatic Therapy of Chinatown from 2007 to August, 2012.  Attached as **Exhibit "Q"**, Bates pages 266800-266828.

- 11/7/12 – Rick Wanko creates a report identifying all payments made by State Farm to Eastern Approach Rehabilitation from 2007 to August, 2012.  This report is attached as **Exhibit "R"**, Bates pages 266841-266911.

- 11/8/12 – Rick Wanko creates a report identifying every payment made by State Farm in all causes of loss in which Eastern Approach Rehabilitation and/or Aquatic Therapy of Chinatown was involved as a treater.  This report is attached as **Exhibit "S"**, Bates pages 266829-266837.

- 11/8/12 – at 8:58 a.m. SIU investigator John Daemer performs initial review of claim 38-L991-367.  Although largely redacted, the participant about whom he is writing his "SIU Preliminary Report" is "Aquatic Therapy of Chinatown."  Claim 38-L991-367 is attached as **Exhibit "T"** (See Bates page 252378)

- 11/8/12 – at 9:15 a.m. John Daemer notes in claim 38-L991-367 that participant Aquatic Therapy of Chinatown is under SIU investigation and that the claim is **associated with an insurer fraud ring investigation**.  Ex. "T", Bates pgs. 252452-252453.

- **11/12/12** – Rick Wanko notifies John Costanzo and Costanzo's boss that the requested reports have been uploaded to the Potential Projects Data Base (PPDB).  See Ex. "P".

- 11/19/12 – John Costanzo notes receipt of a lawsuit in claim 38-0G60-773 and immediately assigns the defense to Matt Moroney, Esquire of Goldberg, Miller & Rubin.  Claim 38-0G60-773 is attached as **Exhibit "U"**.  (See Bates pages 204000-204001).[4]

- 11/19/12 – MCIU claim handler Fred Gerstenfield is immediately assigned to handle claim 38-0G60-773, writes a "NESS Update", and requests the file to be copied and sent to Matt Moroney.  Ex. "U", Bates pg. 204000.

---

[4] Note that this is one of the 4 files Mr. Costanzo reviewed in January of 2012 and claims to have seen no issues of concern.

The assignment to Mr. Gerstenfield is worth special note. Mr. Gerstenfield's deposition is attached as **Exhibit "V"**. Mr. Gerstenfield testified that at some point he could not identify, Mr. Costanzo began assigning all claims involving the Defendants directly to him for handling and further that his instructions, which he followed, were to refer the defense of any such claims to Goldberg, Miller & Rubin. Ex. "V", pg. 60-62.

Based on his notes in Ex. "U", it appears that Mr. Gerstenfield was being assigned to all claims involving the defendants and funneling them to Goldberg, Miller & Rubin by at least November 19, 2012.

The overall investigation certainly continued consistently with this pattern:

- **12/11/12** – Goldberg, Miller & Rubin submits its invoice for "Eastern Approach" work performed in November in the amount of $1,356.00. Ex. "J".

- **12/28/12** – David Dormer issues payment to GMR in the amount of $1,356.00 and records the payment in the Eastern Approach lead file. Ex. "N", Bates pg. 255970.

- 2/5/13 – State Farm claim adjuster Sandy Huddle reviews claim 38-1H77-278. She notes: "2013 emg/ncv billing rev'd by nurses, determined that 95886 2 units is correct but needs to be billed with 95909 denying invalid codes used for billing for 2013 and end edit 627." Ms. Huddle's Team manager, Matthew Cook, states "we will forgo a peer review and monitor the outcome of the liability action." Claim 38-1H77-278 is attached as **Exhibit "W"**. (See Bates pg. 213517).

- 2/27/13 – At 10:10 a.m. John Costanzo reviews the specials package submitted in claim 38-0T98-354. Claim 38-0T98-354 is attached as **Exhibit "X"**. (See Bates pg. 209845).

- 2/27/13 – At 10:11 a.m. John Costanzo notes that claim 0T98-354 is "**associated with insurer fraud ring investigation**." Ex. "X", Bates pg. 209857. (Note that this is claim number 201 on State Farm's list attached to its Amended Complaint).

- 2/27/13 – At 10:12 a.m. John Costanzo notes in claim 38-0T98-354 that Eastern Approach Rehabilitation **is currently under SIU investigation**. Ex. "X", Bates pg. 209857.

- 2/28/13 – John Costanzo evaluates the medical bills in claim 38-0T98-354. Ex. "X", Bates pg. 209853.

- 2/28/13 – John Costanzo writes an SIU Preliminary investigation report in claim 38-0T98-354. The note is completely redacted. Ex. "X", Bates pg. 209833.

- 2/28/13 – John Costanzo writes in claim 38-0T98-354 his evaluation of the claim "injury eval – strengths & assertions". Ex. "X", Bates pg. 209839.

- 3/12/13 – John Costanzo notes that he has reviewed claim 38-0M15-479, that the participant is EASTERN APPROACH REHAB, and "SIU reviewed – not accepting at this time." Claim 38-0M15-479 is attached as **Exhibit "Y"** (See Bates pg. 205927). This entry by Mr. Costanzo in a file is also noteworthy because he reviewed the claim to identify any of the issues of concern which State Farm claims to exist in Defendants' treatment records and specifically declined to have MCIU handle the claim. Yet State Farm includes this claim on its list of claims in which it was somehow "defrauded" (it is number 176 on State Farm's list). There are countless such instances amongst all of the claims on State Farm's list.

- **5/21/13** – Joe Walsh, Esquire, representing State Farm in a PIP suit filed by Eastern Approach (claim 38-M126-658), deposes Dr. Wang and the office manager of Eastern Approach, Eugene Kartashov. Both Dr. Wang and Mr. Kartashov testify freely concerning the Writepad program. Dr. Wang is specifically asked about the program's use of synonyms to communicate the same fact on alternating visits. Dr. Wang is also interrogated as to what percentage of auto accident patients are referred by attorneys and Mr. Kartashov is interrogated about the terms of his compensation and whether he has any ownership interest in Eastern Approach Rehabilitation. The deposition of Dr. Wang taken 5/21/13 is attached as **Exhibit "Z"**. The deposition of Mr. Kartashov is attached as **Exhibit "AA"**.

- **6/8/13** – Richard Castagna, Esquire spends .2 hours working on State Farm matter **2013-107-PA32**. Ex. "J", Bates pg. 166160.

This precisely numerical identification of the Eastern Approach and Aquatic Therapy RICO investigation by Goldberg, Miller & Rubin in June of 2013 is critically important in understanding that State Farm's SIU and its lawyers were conducting a full blown medical provider project long before State Farm has sworn under oath the project was actually opened. The identifier "2013-107-PA32" is the number which State Farm would not "officially" assign to its Eastern Approach/Aquatic Therapy Project on *more than 6 months later* on November 26, 2013. The fact that Goldberg, Miller & Rubin managed to know the identification number of a

project 6 months before State Farm claims to have created it shows just how deeply this game has been played.

Despite all the subterfuge, though, by State Farm and its counsel, the truth is still discernible in the timeline:

- 6/10/13 – At 11:26 a.m. Sandy Huddle reviews claim 38-2H79-847 and notes the insured is treating with Eastern Approach Rehabilitation.  Claim 38-2H79-847 is attached as **Exhibit "AB"**.  (See Bates pg. 222751-222752).

- 6/10/13 – At 11:49 a.m. Sandy Huddle notes in claim 38-2H79-847 a "performer change" to John Costanzo.  Ex. "AB", Bates pg. 222813.

- **6/10/13** – At 12:45 p.m., State Farm Executive Matthew Cook, Sandy Huddle's manager, reviews the transcripts of the depositions taken of Dr. Wang and Mr. Kartashov by State Farm on May 21 in PIP Claim 38-M126-658.  This claim is attached as **Exhibit "AC"**. (See Bates pg. 261689)

- 6/14/13 – John Costanzo assigns claim 38-2H79-847 to Fred Gerstenfield.  Ex. "AB", Bates pg. 222813.

- 6/17/13 – Fred Gerstenfield writes his SIU Preliminary Report in claim 38-2H79-847, it is mostly redacted, but on the same date notes that he has assigned the claim to Goldberg, Miller & Rubin.  Ex. "AB", Bates pg. 222750.

- **6/19/13** – Richard Castagna, Esquire spends .3 hours working on State Farm matter number 2013-107-PA32.  Ex. "J".

- **7/9/13** – A GMR paralegal spends 1.3 hours working on State Farm matter number 2013-107-PA32.  *Id.*

- **7/12/13** – A GMR paralegal spends 1.0 hours working on State Farm matter number 2013-107-PA32.  *Id.*

- **7/17/13** – A GMR paralegal spends 1.0 hours working on State Farm matter number 2013-107-PA32.  *Id.*

- **7/30/13** – Sandy Huddle discusses claim number 38-2Q61-598 with SIU claim representative Fred Gerstenfield, who immediately seeks to obtain a recorded statement from the Eastern Approach patient who is the subject of the claim.  Claim 38-2Q61-598 is attached as **Exhibit "AD"**.  (See Bates pg. 223945-223946).

- **8/5/13** – Bryan Acornley increases the expense authority in the Eastern Approach lead file to $25,000.00.  Ex. "N", Bates pg. 255970.

- 8/16/13 – Sandy Huddle notes in claim 38-M126-658 that arbitrators awarded Eastern Approach the full amount of remaining Act VI coverage under State Farm's policy to Eastern Approach, $1,687.09. Ex. "AC", Bates pg. 261689.

- **8/22/13** – Matthew Moroney, Esquire spends .2 hours working on State Farm matter number 2013-107-PA32. Ex. "J".

- **8/24/13** – Matthew Moroney, Esquire spends 2.6 hours working on State Farm matter number 2013-107-PA32. *Id.*

- **8/24/13** – Warren Holland, Esquire spends 3.3 hours working on State Farm matter number 2013-107-PA32. *Id.*

- **9/5/13** - Matthew Moroney, Esquire spends .1 hours working on State Farm matter number 2013-107-PA32. *Id.*

- **9/10/13** - Fred Gerstenfield takes the recorded statement of the Eastern Approach patient who is the claimant in claim number 38-2Q61-598. Gerstenfield makes a note that the patient claims not to have received traction "which was billed." Ex. "AD", Bates pg. 223943.

- **9/11/13** – Mr. Gerstenfield makes a note that the transcript of the statement taken in claim 38-2Q61-598 should be obtained and sent to State Farm's attorney. Matthew Cook reviews this note as well. Id.

- **9/11/13** – Matthew Moroney, Esquire spends .2 hours working on State Farm matter number 2013-107-PA32. Ex. "J".

- **9/12/13** – A GMR paralegal spends 1.4 hours working on State Farm matter number 2013-107-PA32. Ex. "J".

- **9/13/13** – A GMR paralegal spends .9 hours working on State Farm matter number 2013-107-PA32. Ex. "J".

- **9/17/13** – Goldberg, Miller & Rubin submits its invoice for time spent working in June, July and August on State Farm matter number 2013-107-PA32 in the amount of $1,386.00. Ex. "J".

- **9/19/13** – David Dormer issues payment to GMR in the amount of $1,386.00 and records the payment in the Eastern Approach lead file. Ex. "N", Bates pg. 255970.

- **9/23/13** – A State Farm analyst creates multiple reports concerning Eastern Approach and Aquatic Therapy, including an "exposure analysis" detailing all payments made to both entities by State Farm, as well as a "Connected Provider Analysis", detailing all of the

other medical providers who have participated in treatment of Eastern Approach and Aquatic Therapy patients.  These reports are attached collectively as **Exhibit "AE"**.

- **9/24/13** – State Farm analyst Kevin MacElroy sends an email to John Costanzo and Costanzo's boss, Bryan Acornley, providing a hyperlink to the "preliminary analysis" regarding State Farm project 2013-107-PA32.  MacElroy notes that it is a "large file" which might take time to load.  MacElroy also notes "we'll see you tomorrow."  Mr. Macelroy's email is attached as **Exhibit "AF"**.

- **9/24/13** – Matthew Moroney, Esquire spends 1.6 hours working on State Farm matter number 2013-107-PA32.  Ex. "J".

- **9/25/13** – Matthew Moroney, Esquire spends 8.1 hours working on State Farm matter number 2013-107-PA32.  *Id.*

- **9/25/13** – Fred Gerstenfield sends a fax to Richard Castagna, Esquire, stating "Rich, enclosed is a statement I took pertaining to treatment at Eastern Approach."  The statement referred to is the statement taken in claim number 38-2Q61-598.  Mr. Gerstenfield testified that he would only have sent this statement to Richard Castagna, Esquire if there was a project opened and Mr. Castagna was the counsel assigned to it. **Mr. Castagna had no involvement in claim 38-2Q61-598**.  See Ex. "AD", Bates pg. 223949.

- **9/25/13** – Richard Castagna, Esquire spends .1 hours working on State Farm matter number 2013-107-PA32.  Ex. "J".

- **9/26/13** – Richard Castagna, Esquire spends 1.8 hours working on State Farm matter number 2013-107-PA32.  *Id.*

- **9/26/13** – Matthew Moroney, Esquire spends 3.8 hours working on State Farm matter number 2013-107-PA32.  *Id.*

- 10/3/13 – State Farm runs a comprehensive background search on Victoria Volosov, the billing clerk for Eastern Approach and Aquatic Therapy of Chinatown.  The purpose of the search is identified by State Farm as "fraud prevention or detection."  This report is attached as **Exhibit "AG"** (Bates pg. 267123-267130)

- **10/17/13** – Goldberg, Miller & Rubin submits its invoice for time spent working in June, July, August, and September on State Farm matter number 2013-107-PA32 in the amount of $4,587.00.  Ex. "J".

- **10/17/13** – David Dormer issues payment to Goldberg, Miller & Rubin in the amount of $4,587.00 and records the payment in the Eastern Approach lead file.  Ex. "N", Bates pg. 255969.

**The above detailed activity, which is but a mere sampling of that which was engaged in by Mr. Costanzo, Mr. Gerstenfield, Goldberg, Miller & Rubin, and others, <u>all</u> occurred more than 2 years prior to the filing of State Farm's lawsuit.**

In November of 2013, after more than 4 years of an active and aggressive shadow investigation in which it was scrutinizing every treatment record of the Defendants in every claim to mine for a possible RICO case, State Farm brought its multi-year RICO investigation out into the light.

Below are just a few highlighted events documenting how State Farm decided at long last to reveal its investigation and its intention to create an affirmative litigation against the Defendants:

- **11/4/13** – David Dormer notes that claim 38-M046-279 is still the lead file and that "payments continue". Ex. "N", Bates pg. 255969.

- **11/4/13** – Paul Dohner, an outside investigator hired by John Costanzo to conduct surveillance of Aquatic Therapy and Eastern Approach, submits an invoice for time spent doing so. <u>See</u> email attached as **Exhibit "AH"**.

- **11/26/13** – After the submission of a "project recommendation" memo by John Costanzo, State Farm records the formal opening of a project into Eastern Approach and Aquatic Therapy of Chinatown in its Potential Fraud Management Tool data base. The official project number assigned is 2013-107-PA-32. "Project Counsel" is identified as Goldberg, Miller & Rubin. The Potential Fraud Management Tool document is attached as **Exhibit "AI"**.[5]

- 11/26/13 – John Costanzo notifies Robin Seeler that he has added the Eastern Approach Project to VAT and asks her to add the project to NESS. <u>See</u> the email of John Costanzo attached as **Exhibit "AJ"**, Bates pg. 266912.

- **12/9/13** – State Farm SIU processor Robin Seeler writes a note in claim 38-M046-279 to Bryan Acornley: "Bryan, this was a lead file. I have copied all Legal Expense Invoices on this file to the appropriate folder. Invoices being paid through LEX and vouchers. Okay to close? Please advise." Ex. "N", p. 255969.

---

[5] The Court should note that all documentation from the Potential Fraud Management Tool was requested by the Medical Parties on September 1, 2016. State Farm refused to produce any of the documentation. It was only after Jeff Denner's revelations that State Farm realized it could not withhold these documents any longer and produced Exhibit "U".

- **12/9/13** – Mr. Acornley says "OK to close this file." *Id.*

It was of course finally okay to close the lead file because State Farm had outed its years

long pursuit of the doctors by officially and finally documenting it as a formal "project".

### E. The Indisputable Facts Demonstrate that State Farm Knew or Should have known of The "Injury" They Claim in This Case Long Before October 30, 2013

In its Opinion outlining the reasons why State Farm's Amended Complaint would not be

dismissed (Document 28 dated 5/28/16), this Honorable Court wrote:

> **Defendants argue that the claims against them that fall outside of the relevant statute of limitations period must be dismissed. In Pennsylvania, fraud claims are subject to a two-year statute of limitations. 42 Pa.C.S.A. § 5524(7). Unjust enrichment and restitution claims are subject to a four-year statute of limitations. 42 Pa.C.S.A. § 5525(a). If the statute of limitations "bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." <u>Schmidt v. Skolas</u>, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation and citation omitted). A complaint need not "anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense."**
>
> **"'The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct.'" <u>Id.</u> at 251 (*quoting* <u>Crouse v. Cyclops Indus.</u>, 745 A.2d 606, 611 (Pa. 2000)). The inquiry "focuses on whether the plaintiff was reasonably diligent in discovering his injury." <u>Id.</u> (quotation omitted). In <u>Schmidt</u>, the Third Circuit noted that while generally a plaintiff bears the burden of showing the discovery rule tolls the statute of limitations, a plaintiff is also not required to plead responses to anticipated affirmative defenses in the complaint. <u>Id.</u> The Third Circuit resolved that tension in finding "that when 'the pleading does not reveal when the limitations period began to run ... the statute of limitations cannot justify a Rule 12 dismissal.'" <u>Id.</u> (alteration in the original) (*quoting* <u>Barefoot Architect, Inc. v. Bunge</u>, 632 F.3d 822, 835 (3d Cir. 2011)).**
> **State Farm does not dispute that some of the allegedly**

> fraudulent records were submitted outside of the statute of
> limitations period. Instead, they argue that the Amended Complaint
> does not demonstrate, as a matter of law, whether the discovery
> rule applies, and therefore it also does not demonstrate when the
> statute of limitations period began to run. We agree with State
> Farm. As we have addressed above, the Plaintiffs claim that they
> were not aware of the fraud until reviewing a large number of
> claims revealed the implausible similarities among them. Nothing in
> the Amended Complaint indicates Plaintiffs had knowledge during the
> relevant time period. Dismissal on this ground would therefore be
> improper. Accordingly, we deny Defendants' motion to dismiss on
> this ground.

The Court also stated:

> It is clear from the Amended Complaint that
> it is the pattern of similarity, according to the Plaintiffs, that
> led them to suspect the individual claims were fraudulent.
> Additionally, State Farm alleges that through the use of
> [Writepad] Defendants have attempted to conceal the similarity among
> claims, making it difficult for State Farm to have recognized the
> pattern. Defendants do not address this claim, nor the claim that
> it is only by viewing the submissions collectively that Plaintiffs
> were able to detect the fraud.

The timeline of indisputable facts detailed throughout this Motion demonstrate that

before September of 2011, State Farm's specialized unit that was created for the primary purpose

of "ferreting out medical provider fraud" began actively and aggressively reviewing Defendants'

treatment records and investigating multiple claims together specifically to "ferret out" the very

fraud State Farm deliberately chose not to allege until October 30, 2015.  The inquiry which

must be made, therefore, is whether State Farm knew or reasonably should have known of its

injury prior to October 30, 2013.

In this case, State Farm's documented conduct shows what it knew or reasonably should

have known, but the Court can simplify the inquiry by focusing just on what State Farm *officially*

claims was the information which first alerted it to the claims it eventually chose to make.  The

facts demonstrate that even this information was known to State Farm long before October 30,

2013.

Although State Farm has concealed the actual Project Recommendation Memo behind a claim of attorney-client privilege, Mr. Costanzo testified that the Project Recommendation Memo contained "the reasons we opened the project" in November of 2013. Ex. "I", pg. 42. Mr. Costanzo said these reasons were that some individuals "testified that they didn't receive some of the treatment that was billed. There was an issue regarding the necessity of treatment. There as an issue that I recall of an instance of solicitation." The attorney involved in this alleged solicitation was Adrien Reid. Id. at 43.

With regard to "solicitation" concerns involving Adrien Reid, as long ago as March of 2010, John Costanzo and his boss noted in a claim a concern that the law firm of Reid & Fritz solicited patients. See Ex. "C", Bates pg. 267846-267847). Matthew Moroney, Esquire aggressively interrogated both Dr. Wang and Dr. Stavropolskiy about any referral relationship with Reid & Fritz in April of 2010 and February of 2011 respectively. Mr. Moroney went so far as to seek to forcibly compel the deposition of the corporate designee of Reid & Fritz regarding any referral relationship between the firm and the doctors. See Ex. "D", pg. 51.

With regard to patients allegedly testifying that they did not receive some of the treatment billed, Fred Gerstenfield took a recorded statement of a patient on September 10, 2013 which Mr. Gerstenfield reported to indicate that the patient claimed not to have received traction "which was billed." Mr. Gerstenfield faxed the statement to Richard Castagna, Esquire on September 25, 2013 (even though Mr. Castagna had no involvement in the claim in which the statement was taken). See Ex. "AD", Bates pg. 223943-223949.

As to any concern about the "necessity" of treatment, it is apparent from the facts outlined that Mr. Costanzo and all other adjusters evaluating the records of the Defendants at all

times and in all instances challenged the necessity of the care provided.

These are just the "official" reasons State Farm says it was put on notice of its claims in this case. Even by State Farm's own admission, these "facts" were actually known to State Farm before October 30, 2013.

Of course, these "official" reasons are not nearly the sum total of what State Farm knew or should have known as long ago as 2007, but without question by September of 2011. That is when a law firm which is specifically required by State Farm's SIU to be called in to investigations in which affirmative litigation is contemplated, came to State Farm with an allegation that the Defendants were cutting and pasting findings in one chart. State Farm immediately authorized the law firm to begin an investigation which the law firm itself characterized from its inception as a RICO Investigation into both of the Defendants' facilities (even though the file only involved one of the facilities).

The facts demonstrate that this RICO investigation, conducted jointly by State Farm claim handlers and Goldberg, Miller & Rubin, was continuous and active from September of 2011 through the filing of State Farm's lawsuit on October 30, 2015.

Judging from the mental gymnastics State Farm's witnesses engaged in to explain that they did not <u>actually know</u> of their alleged injury until they opened a project in November of 2013, State Farm will apparently argue that the statute of limitations is tolled until the time (they say) they *subjectively* saw the fraud they allege. As the Court has pointed out, however, this is not nearly the standard. The standard is entirely objective, and asks what State Farm knew or should have known based on the objective facts. The inquiry "focuses on whether the plaintiff was reasonably diligent in discovering his injury."

The evidence demonstrates that State Farm was *incredibly* diligent and that it (and even

more so its lawyers) were determined to find a way to sue these doctors as long ago as September of 2011.  State Farm's argument that they somehow did not see in 2011 what they now claim to exist in *every record they looked at* cannot sustain their burden.

State Farm's medical fraud investigators and its medical fraud lawyers were looking at the files in 2011 to identify the very same conduct in both 2011 and 2013.  It would be unreasonable (and illogical) to measure diligence subjectively such that simply claiming not to have noticed something which a defendant later claims to have been right where he was looking would be enough to satisfy a Plaintiff's burden of demonstrating that the discovery rule applies.

## IV.    STATE FARM IS NOT ENTITLED TO THE DAMAGES OR RELIEF IT SEEKS

### A.  Any Claims for Damages Under Pennsylvania's Insurance Fraud Statute Based on Payments Made Before October 30, 2013 are Time Barred

Attached as **Exhibit "AK"** is a copy of State Farm's Amended Rule 26 Disclosures in which it identifies its claimed damages as $951,786.79 in payments directly to Eastern Approach Rehabilitation, LLC and Aquatic Therapy of Chinatown, Inc.  In addition, State Farm seeks "moneys paid in settlements and judgments on claims by others that were based on and caused by the fraudulent records of the Defendants."

Of the $951,786.79 claimed as damages by State Farm based on payments made directly to the Defendants, $904,180.93 of this amount was paid before October 30, 2013. In other words, 95% of the "damages" State Farm claims to have occurred as the result of "fraud" were incurred more than 2 years before the filing of its lawsuit.

The record in this case indisputably demonstrates that State Farm actually knew or should have known long (long) before October 30, 2013 of the "injury" it claims in this lawsuit.  Any claims for damages as the result of alleged fraud which are based on payments made before

October 30, 2013 are barred by the statute of limitations.

**B.  State Farm's Claims for Common Law Fraud Are Barred in Their Entirety**

As this Court has pointed out, State Farm does not have to prove reliance on the representations made in Defendants' treatment notes under Pennsylvania's Insurance Fraud statute 18 Pa.C.S.A. §4117.  However, in order to sustain a claim of common law fraud, State Farm must prove that it justifiably relied upon alleged misrepresentations in Defendants records in issuing payments to them.  The record clearly establishes that State Farm did not ever actually rely on any submissions of the Defendants and in fact were actively and aggressively seeking to undermine Defendants' records as fraudulent at all times.

The elements of common law fraud are:  1) misrepresentation of a material fact: 2) scienter; 3) intention by the declarant to induce action; 4) justifiable reliance by the party defrauded upon the misrepresentation; and 5) damage to the party defrauded as a proximate result.  Gidley v. Allstate Insurance. Company, 2009 U.S. Dist. LEXIS 118246 (E.D. Pa. Dec. 17, 2009)(emphasis added).

Rule 541 of the Restatement (Second) of Torts provides as follows:  **Representation Known to be or Obviously False** - The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.

The appellate courts of Pennsylvania have adopted this provision of the Restatement, and in doing so, have stated: "Thus, although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the makers honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."  Toy v.

38

Metropolitan Life Insurance Company, 63 A.2d 1(Pa. 2004)(emphasis added).

"Furthermore, neither a court nor a jury can consider the issue of justifiable reliance without considering the relationship of the parties involved and the nature of the transaction." Id, citing Rempel v. Nationwide Life Insurance Company, 370 A.2d 366, 368 (Pa. 1977).

The relationship of the parties here is obviously a critical consideration. From prior to September of 2011, State Farm was conducting a RICO investigation of the Defendants based on a solicitation from their lawyers that the doctors' records allegedly contained cut and pasted findings. The Court can see for itself the course of activity this investigation took and how State Farm was attacking the claims which involved the doctors in each instance. Most importantly, State Farm's own claim logs reflect that by **November 8, 2012**, State Farm had notified its claim handlers that any claim involving the Defendants was the subject of a fraud ring investigation. See Ex. "T", Bates pgs. 252452-252453.

Quite simply, by November 8, 2012 (at the very latest) State Farm actually believed that every treatment record of the Defendants was entirely false. It is impossible under these circumstances for State Farm to argue that it "justifiably relied" on any record of the Defendants in issuing the payments now claimed as damages. State Farm cannot therefore sustain its burden of proving common law fraud.

**C.  State Farm's Equitable Claims are Barred by Laches**

State Farm's claims for Unjust Enrichment and Restitution are claims in equity under Pennsylvania law. "Pennsylvania, however, does not consider unjust enrichment to be either an action in tort or contract. Unjust enrichment, rather, an equitable remedy and synonym for *quantum meruit,* is "a form of restitution." Mitchell v. Moore, 729 A.2d 1200, 1202 n. 2 (Pa.Super.Ct.1999); *see also* Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co., 933 A.2d

664, 667 (Pa.Super.Ct.2007); <u>Sack v. Feinman</u>, 495 Pa. 100, 432 A.2d 971, 974 (1981) (*citing*

Restatement of Restitution § 1 (1937) as a source for the elements of an unjust enrichment

claim); <u>Meehan v. Cheltenham Twp.</u>, 410 Pa. 446, 189 A.2d 593, 595 (1963) (same). The

Restatement views restitution as an area of the law "which is neither contract nor tort."

Restatement (Second) of Conflict of Laws § 221 introductory note (1971)." <u>Powers v. Lycoming</u>

<u>Engines</u>, 328 F. App'x 121, 126 (3d Cir. 2009).

    The Defendants have asserted the affirmative defense of laches. "The party asserting

laches as a defensive bar must establish (1) an inexcusable delay in bringing the action and (2)

prejudice." <u>United States Fire Ins. Co. v. Asbestospray, Inc.</u>, 182 F.3d 201, 208 (3d Cir.1999)

(citations omitted). "To establish prejudice, the party raising laches must demonstrate that the

delay caused a disadvantage in asserting and establishing a claimed right or defense; the mere

loss of what one would have otherwise kept does not establish prejudice." <u>Id.</u>

    State Farm's delay in bringing this lawsuit is inexcusable and has caused the Defendants

unfair prejudice in their ability to defend themselves. At its core, State Farm's accusations are

that Dr. Wang and Dr. Stavropolskiy (and the more than 20 other doctors who provided the care

alleged to be fraudulent over the past 7 years), did not actually perform the examinations and did

not actually make the findings reflected in their records. The best and primary evidence of

course which would defeat this accusation are the recollections of the patients. By waiting so

long to file its lawsuit as memories of patients have necessarily faded, however, State Farm has

effectively deprived the doctors of this critical factual defense.

    The record demonstrates indisputably what State Farm knew and when it knew it. Their

delay in filing this action can only be attributed to a deliberate strategy of using the delay to gain

an unfair advantage. The defense of laches exists to protect litigants from exactly the kind of

pre-litigation posturing engaged in by State Farm in this case and as such, State Farm's claims for equitable relief should be dismissed.

## V.     <u>CONCLUSION</u>

For all of the foregoing reasons, it is respectfully requested that Defendants' Motion for Summary Judgment be granted and the attached Order entered.

RESPECTFULLY SUBMITTED,

_____APB2_____
ANDREW P. BARATTA, ESQUIRE
3500 Reading Way
Huntingdon Valley, PA 19006
(215) 914-2222
Attorney for Defendants