# EXHIBIT "M"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
STATE FARM MUTUAL            )
AUTOMOBILE INSURANCE         )
COMPANY, ET AL.,             )
                             ) CIVIL ACTION
          Plaintiffs,   )
                             ) NO.:  15-cv-5929
        - vs -               )
                             )
LEONARD STAVROPOLSKIY,       )
ET AL.,                      )
                             )
          Defendants.   )
- - - - - - - - - - - - - - -
EASTERN APPROACH             )
REHABILITATION, LLC, ET AL.,)
                             ) CIVIL ACTION
          Plaintiffs,   )
                             ) NO.:  16-cv-1374
        - vs -               )
                             )
STATE FARM MUTUAL            )
AUTOMOBILE INSURANCE         )
COMPANY, ET AL.,             )
                             )
          Defendants.   )
- - - - - - - - - - - - - - -
```

TRANSCRIPT OF DEPOSITION OF JEFFREY S.
DENNER, taken by and before JENNIFER WEARNE,
Registered Professional Reporter and Notary
Public, at the offices of GOLDBERG, MILLER &
RUBIN, P.C., 121 South Broad Street, Suite 1600,
Philadelphia, Pennsylvania, on Thursday,
September 7, 2017, commencing at 10:25 a.m.

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA 19103
Phone (215) 564-1233

JEFFREY S. DENNER

2

```
 1   A P P E A R A N C E S:
 2
 3           BARATTA, RUSSELL & BARATTA
             BY:  ANDREW BARATTA, ESQUIRE
 4             3500 Reading Way
               Huntingdon Valley, Pennsylvania  19006
 5               Attorneys for Defendants/Counterclaim
                 Plaintiffs
 6                 Joseph Wang, D.C., Leonard
                   Stavropolskiy, D.C., Eastern
 7                 Approach Rehabilitation, LLC, and
                   Aquatic Therapy of Chinatown
 8
 9           GOLDBERG, MILLER & RUBIN, P.C.
             BY:  RICHARD M. CASTAGNA, ESQUIRE
10             121 South Broad Street, Suite 1600
               North American Building
11             Philadelphia, Pennsylvania  19107
                 Attorneys for the Plaintiffs/Counterclaim
12               Defendants
                   State Farm Mutual Automobile Insurance
13                 Company
14
15
16
17
18
19
20
21
22
23
24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

```
 1                    I N D E X

 2

 3    WITNESS                              PAGE

 4    JEFFREY S. DENNER

 5       BY:  Mr. Castagna              4, 179

 6       BY:  Mr. Baratta             50, 185

 7

 8

 9

10

11

12                  E X H I B I T S

13

                                PAGE       PAGE

14    NUMBER      DESCRIPTION       MARKED   ATTACHED

15    DENNER-1   YOUR EMAIL INQUIRY OF  29      189

                 APRIL 5, 2017 PRINTOUT

16    DENNER-2   AUTO CLAIM FILE PRINT  152      190

                 FILE HISTORY INFORMATION

17

18

19

20

21

22

23

24
```

JEFFREY S. DENNER

4

```
1                    (It is agreed by and between
2          counsel that reading, signing, sealing and
3          filing are hereby waived; all objections,
4          except as to the form of the questions,
5          are reserved until the time of trial.)
6                    - - -
7                    JEFFREY S. DENNER, after having
8          been duly sworn, was examined and testified
9          as follows:
10                   - - -
11   BY MR. CASTAGNA:
12   Q.        Good morning, Jeff.
13   A.        Good morning.
14   Q.        We're here for your deposition in the
15   case called State Farm -- State Farm Mutual
16   Automobile Insurance Company, State Farm Fire
17   and Casualty Company versus a number of
18   defendants, and I'll name them for you.  Eastern
19   Approach Rehabilitation, are you familiar with
20   that company?
21   A.        Only in name.
22   Q.        Aquatic Therapy of Chinatown, are you
23   familiar with that company?
24   A.        No.
```

JEFFREY S. DENNER

5

```
1   Q.        A Dr. Joseph Wang, but he spells it
2   W-A-N-G, are you familiar with him?
3   A.        I am.
4   Q.        He pronounces it Wang, but it's Wang,
5   spelled Wang, I should say.
6   A.        I've heard of the name Dr. Joseph
7   Wang.  I don't know if it's the same person,
8   but, again, only in name; otherwise, I don't
9   know him, no.
10  Q.        Okay.  And there's one final
11  defendant, Dr. Leonard Stavropolskiy.  Do you
12  know that name?
13  A.        I do know that name as a chiropractor
14  in Philadelphia.
15  Q.        Okay.  Have you ever been deposed
16  before?
17  A.        Yes.
18  Q.        How many times have you been deposed
19  before?
20  A.        More than I can remember.
21  Q.        Okay.  And was it in your capacity as
22  an employee of State Farm, or was it in some
23  other capacity?
24  A.        It is my capacity at State Farm, as
```

6

1  well as testifying as an expert witness for

2  federal grand juries and state grand juries.

3  Q.      Okay.

4  A.      For the government.

5  Q.      So we have -- I'm going to give you

6  just some general instructions, and you've

7  probably heard them a number of times either

8  sitting -- I know you -- because you probably

9  sat in depositions as well as -- as testifying

10  in depositions; is that correct?

11  A.      I have, yeah.

12  Q.      Okay.  Let me just give them to you

13  just so we're a little clear on the ground

14  rules.

15          We have a court reporter to my right,

16  to your left.  She's going to take down

17  everything I say, everything that you say.  We

18  have Mr. Baratta in the room.  He's probably

19  going to ask you some questions as well.

20  Because of that, only one of us can speak at

21  once.

22          And you'll do a fine job of not

23  speaking over me, and I'll try to do the same,

24  just so we can make it clear for the court

1    reporter.

2              Anytime I ask you a question, and you

3    don't understand the question, let me know.

4    I'll restate the question or try to rephrase it.

5              Also, if I ask you a question, and you

6    didn't hear the question or you need me to

7    repeat it, let me know, and I'll do that.  Okay?

8    We only want you to answer questions that you

9    know the answer to.  So if it would be a pure

10   guess or speculation, let us know, and we'll

11   move on to a different question.

12             Let's start with a little background.

13   You went to college, Jeff?

14   A.        I did.

15   Q.        Where did you go to college?

16   A.        I started Villanova University and

17   graduated from West Chester University.

18   Q.        Approximately, if you know, what year

19   did you graduate?

20   A.        1990, I believe.

21   Q.        And do you remember what -- do you

22   remember what your degree was in?

23   A.        I graduated Bachelor of Science in

24   Business Administration and Marketing.

JEFFREY S. DENNER

8

1    Q.        And when you graduated in 1990, did

2    you go on to any further college education?

3    A.        No, I began my career at State Farm

4    right after graduation.

5    Q.        Okay.  And what was your first

6    position at State Farm?

7    A.        I was an auto claim rep in Plymouth

8    Meeting, Pennsylvania.

9    Q.        And how long were you in that

10   position?

11   A.        Two to three years.

12   Q.        What was your next position after

13   that?

14   A.        I started as an auto claim rep,

15   processing automobile claims, property damage

16   claims, and then I moved to processing MPC,

17   medical payment claims, and then a very brief

18   stint processing bodily injury claims.

19   Q.        And after that brief stint processing

20   bodily injury claims, what was your next

21   position at the company?

22   A.        I moved into what was then called a

23   senior referral unit, or what is now known as

24   special investigation, or MCIU.  The names have

JEFFREY S. DENNER

9

1    changed over the years depending on the time

2    frame.

3    Q.        Approximately what time, if you can

4    give me a year or around that time, did you

5    become or did you take the position as a senior

6    referral unit employee?

7    A.        I'd have to guess at the year.  I

8    apologize.  It would be in my personnel record.

9    Q.        Okay.

10   A.        I'm going to -- to the best of my

11   recollection --

12   Q.        That's fine.

13   A.        -- it was approximately three to

14   three-and-a-half years after I started with the

15   company.

16   Q.        Perfect.

17   A.        Maximum, four.

18   Q.        And have you ever worked at any other

19   insurance company other than State Farm?

20   A.        Never.

21   Q.        When you came into the position as a

22   senior referral unit employee, what was your --

23   what was your title when you worked in the

24   senior referral unit?

JEFFREY S. DENNER

10

```
1    A.          I don't remember.  It was claim

2    representative, but then they had -- back then

3    we had different titles of claim representative

4    depending how many years service you had.  There

5    was a senior claim representative, a claim

6    representative.

7              So I don't remember when they first

8    moved into the investigation team, so to speak,

9    what the actual title was.

10             The unit was brand new, so they were

11   just starting it, so they were actually trying

12   to come up with a title for us, what they were

13   going to call us and what they were going to put

14   on our business cards, and for the life of me I

15   just can't remember that far back what they

16   agreed to put on the business cards.

17   Q.          Do you remember who your first --

18   A.          I think it may have been called a

19   claims specialist when they first started.

20   Q.          Sure.  Do you remember who your first

21   supervisor was in that position?

22   A.          Yes, David Murphy.

23   Q.          Okay.  And how long was Mr. Murphy

24   your supervisor?
```

JEFFREY S. DENNER

```
 1   A.          Oh, gosh.  Ten, 15 years.

 2   Q.          And who was your next supervisor in

 3   the position?  I know that you said it changed

 4   to senior referral unit to SIU to MCIU.  Who was

 5   the next --

 6   A.          Austin Bowles, B-O-W-L-E-S.

 7   Q.          And how long was Mr. Bowles your

 8   supervisor?

 9   A.          Quite a few years.

10   Q.          Who was your next supervisor, if you

11   recall?

12   A.          Bryan Acornley.

13   Q.          And can you give me an estimate of how

14   many years Mr. Acornley was your supervisor?

15   A.          At least three to four.  I was managed

16   by Mr. Acornley, then I moved over to Michael

17   Knox, and then I moved back to Bryan Acornley

18   again.

19               So total time with Bryan, I don't

20   remember, but I was with Bryan twice.

21   Q.          And when you left the company, you

22   were still in the SIU or MCIU team --

23   A.          Yeah --

24   Q.          -- or unit?
```

JEFFREY S. DENNER

12

1   A.          -- again, when -- when I left the

2   company, we were in another transition, and I

3   think they were trying to rename us yet again.

4             So I think when I left, it was MCIU,

5   and I'm not sure what they're calling the claim

6   reps now.  I think they might be calling them

7   claim specialists in MCIU, but I'm not

8   100 percent sure.

9   Q.          Okay.

10  A.          Things changed a lot in that

11  department.

12  Q.          Other than Mr. Murphy, Mr. Bowles,

13  Mr. Acornley, Mr. Knox, did you have any other

14  supervisors while in the SIU or MCIU?

15  A.          None that I recall.

16  Q.          Did your supervisors have different

17  approaches to management?

18  A.          Yes.

19  Q.          And how did they -- well, let me ask

20  you, did your supervisors have different

21  approaches to reporting?

22  A.          Well, I had different supervisors at

23  different time frames.  So at different time

24  frames, there were different procedures.

JEFFREY S. DENNER

```
 1   Q.        Okay.

 2   A.        So the procedures that Mr. Murphy

 3   followed weren't necessarily the same procedures

 4   that Mr. Bowles followed because the procedures

 5   were different.

 6   Q.        Okay.  Have you ever heard the term

 7   "multi-claim investigation"?

 8   A.        Yes, sir.

 9   Q.        Have you ever heard the term used at

10   State Farm "projects"?

11   A.        Yes, sir.

12   Q.        Have you ever heard the term

13   "investigation" used at State Farm?

14   A.        Yes, sir.

15   Q.        At State Farm, have, to your

16   knowledge, individuals used the terms

17   "multi-claim investigations," "investigations"

18   and "projects" interchangeably and others

19   identify some distinction between those terms,

20   to your knowledge?

21             And if that's not a clear question, I

22   can understand if that --

23   A.        That's definitely not a clear

24   question.  I think that's confusing.
```

JEFFREY S. DENNER

14

1    Q.          Let me try that again.

2    A.          Okay.

3    Q.          We just talked about these three terms

4    that you said you're familiar with, the

5    "multi-claim investigation," "investigation" and

6    "project."

7               And what I'm trying to find out is

8    whether individuals who you've worked with,

9    whether they're your bosses or the individuals

10   that would be in the same level as you, your

11   colleagues, would they have used those terms

12   interchangeably, or would they have seen some

13   type of distinction between those terms?

14   A.          Both.

15   Q.          Do you believe the terms are

16   interchangeable or do you believe that they're

17   distinguishable?

18   A.          Both.  It depends on the context of

19   the conversation.

20   Q.          Okay.  You've worked on -- let me ask

21   you, what's your understanding of a multi-claim

22   investigation?

23   A.          Exactly what it says, an investigation

24   involving multiple claims.

JEFFREY S. DENNER

15

1    Q.        Okay.  And what do you consider a

2    project?

3    A.        A project would be an investigation

4    involving a provider of some type, and that

5    provider would be involved in various claims

6    that are being processed by State Farm.

7    Q.        Okay.  And have you ever worked on

8    either a multi-claim investigation or a project?

9    A.        Yes, sir.

10   Q.        You've handled claims at State Farm as

11   well?

12   A.        Yes, sir.

13   Q.        And have you handled claims while you

14   were in the SIU or MCIU?

15   A.        Yes, sir.

16   Q.        And have you handled claims in the SIU

17   or MCIU which you considered to be questionable

18   claims?

19   A.        Yes, sir.

20   Q.        Have you handled claims in which you

21   believe the claimant was not actually in the

22   automobile that was in the claimed accident?

23   A.        Yes, sir.

24   Q.        Jump-in?

1    A.        Yes, sir.

2    Q.        Is that a proper use of the term?

3    A.        Loose -- loosely used, yes.

4    Q.        Okay.  Have you ever investigated

5    claims with possible staged accidents?

6    A.        Yes.

7    Q.        Have you ever investigated claims

8    where the actual -- where there was an actual

9    accident, but the claimant delayed receiving

10   treatment for a long period of time?

11   A.        I guess a long period of time is

12   relevant to who, but the answer to that, the

13   short answer would be yes.

14   Q.        Okay.  Have you ever investigated

15   claims in which the claimant had extensive claim

16   history?

17   A.        Yes.

18   Q.        Would you agree with me that not every

19   questionable claim has resulted in a multi-claim

20   investigation?

21   A.        Yes.

22   Q.        Have you ever investigated a

23   questionable claim or a group of claims and

24   determined that a multi-claim investigation was

1  not warranted?

2  A.        Yes.

3  Q.        Can you estimate the number of

4  multi-claim investigations that you've worked

5  on?

6  A.        I can't.  Too many to -- I spent over

7  20 years in that unit.  Too many to even recall

8  at this point.

9  Q.        Okay.  Now, during the period of time

10  that you have participated in multi-claim

11  investigations, would you have worked for those

12  same supervisors that we've already mentioned --

13  Mr. Acornley, Mr. Bowles, Mr. Murphy and

14  Mr. Knox?

15  A.        Yes.

16  Q.        During your years working in SIU, did

17  you form any relationships with law enforcement

18  groups?

19  A.        Yes.

20  Q.        What law enforcement groups have you

21  formed relationships with during the period of

22  time you worked at SIU?

23  A.        Pennsylvania Attorney General's

24  Office; the Delaware County District Attorney's

1    Office; the Federal Bureau of Investigation in

2    Philadelphia; the Federal Bureau of

3    Investigation in Fort Washington, Pennsylvania;

4    the District Attorney's Office in Allentown,

5    Pennsylvania; the District Attorney's Office in

6    Pittsburgh, Pennsylvania; the Federal Bureau of

7    Investigation in Pittsburgh, Pennsylvania; the,

8    I think it was, County Office in Passaic County,

9    New Jersey; and the regional FBI office in

10   Northern New Jersey, to the best of my

11   recollection.

12   Q.       Sure.  Have you ever brought what you

13   considered to be fraudulent claims to any of

14   those law enforcement groups?

15   A.       You -- I think you need to clarify

16   that, because I'm --

17   Q.       Sure.

18   A.       -- confused.  What do you mean, did I

19   ever bring them a claim?

20   Q.       Did you ever refer them or discuss

21   with them what you believed to be a fraudulent

22   claim?

23   A.       I probably discussed with them.  I

24   would not bring them an actual individual claim.

1    There was a procedure to get a claim to law

2    enforcement.

3    Q.        Okay.

4    A.        I wouldn't take an individual claim to

5    a law enforcement officer.

6    Q.        Sure.  Did you ever follow that

7    procedure to ensure that that claim was referred

8    to these law enforcement groups?

9    A.        Yes.

10   Q.        Did you ever make up a claim of fraud

11   against a provider?

12   A.        Can you clarify that?

13   Q.        Sure.  Did you ever create a claim of

14   fraud, just make it up out of whole cloth or --

15   A.        Absolutely not.

16   Q.        Why wouldn't you do that?

17   A.        Lots of reasons -- it would be utterly

18   ridiculous, it would be against my ethics, it

19   would be illegal, immoral, against my better

20   judgment, flat-out wrong.

21   Q.        Do you know of anyone that you worked

22   with at State Farm who ever did that?

23   A.        No.

24   Q.        Do you know of any gain that anyone

JEFFREY S. DENNER

```
 1   would get working at the company for doing such

 2   a thing?

 3   A.        For just fictitiously making up false

 4   allegations?

 5   Q.        Sure.

 6   A.        No.

 7   Q.        If someone had done that, would there

 8   be -- to your understanding, would there be

 9   anything to lose on working as an employee of

10   State Farm?

11   A.        Their employment and their reputation,

12   maybe their freedom.

13   Q.        Did your supervisors at State Farm --

14   well, let me ask you this:  Did any of your

15   supervisors at State Farm ever suggest to you

16   that you should make up claims of fraud against

17   a provider?

18   A.        No.

19   Q.        Are you aware of any of the

20   supervisors that you've had suggesting to anyone

21   else at the company that they should make up

22   claims against a provider?

23   A.        Never.

24   Q.        Did anyone at State Farm ever suggest
```

JEFFREY S. DENNER

1    to you that you should make up claims of fraud

2    against a provider?

3    A.        No.

4    Q.        Are you aware of anyone at State Farm

5    has ever suggested to anyone that they should

6    make up claims of fraud against a provider?

7    A.        I've never heard anyone say that.

8    Q.        Did you ever get rewarded for working

9    on a multi-claim investigation?

10   A.        I would have a hard time answering

11   that question right now.

12   Q.        Okay.  Did you ever receive a monetary

13   payment for working on a multi-claim

14   investigation?

15   A.        Same answer.

16   Q.        Were there any of your multi-claim

17   investigations that you worked on that resulted

18   in State Farm bringing a lawsuit against a

19   medical provider?

20   A.        Yes.

21   Q.        Did any of those lawsuits go to trial?

22   A.        Yes.

23   Q.        How many of the lawsuits that you

24   worked on a multi-claim investigation went to

JEFFREY S. DENNER

22

```
 1   trial, if you recall?

 2   A.        Several, but I can't give you an exact

 3   number.

 4   Q.        Okay.

 5   A.        I apologize.

 6   Q.        That's fine.

 7            The several that went to trial, do you

 8   recall any of them -- well, let me ask you, was

 9   State Farm successful in bringing those claims

10   to trial?

11   A.        When you say "successful in bringing,"

12   do you mean did we prevail at the verdict?

13   Q.        Yeah, it was a bad question, but

14   that's what I meant.

15   A.        Yes, we won each one.

16   Q.        Okay.  Did you ever conduct a

17   multi-claim investigation and determine that the

18   provider was not committing fraud?

19   A.        Yes.

20   Q.        Did you provide that information to

21   your immediate supervisors?

22   A.        Yes.

23   Q.        And did your supervisors accept your

24   conclusion?
```

JEFFREY S. DENNER

23

```
 1    A.         Yes.

 2    Q.         And what happened with those

 3    investigations?

 4    A.         They would simply be terminated or

 5    closed.

 6    Q.         Was there ever an occasion where you

 7    conducted a multi-claim investigation and

 8    determined that a provider is not committing

 9    fraud, but that State Farm went ahead and still

10    sued that provider?

11    A.         Regarding myself?  Never.

12    Q.         Yes.

13               Did you ever conduct an -- or conclude

14    an investigation with the conclusion that you

15    couldn't make a determination whether or not the

16    provider was committing fraud, meaning you

17    couldn't come to a definitive conclusion?

18    A.         Yes.

19    Q.         Okay.  And in those situations, did

20    you close your investigation?

21    A.         Yes.

22    Q.         And did State Farm accept your

23    conclusion?

24    A.         Yes.
```

24

```
 1    Q.         In those investigations that
 2    ultimately resulted in lawsuits, did you believe
 3    that the provider was doing something wrong in
 4    each instance?
 5    A.         During the investigation?  Yes.
 6    Q.         Okay.  What I'm referring to is, you
 7    said certain investigations actually resulted in
 8    going -- in bringing an affirmative lawsuit
 9    against those providers?
10    A.         Yes, if the affirmative lawsuit was
11    brought, then, yes, throughout the entire case.
12    Q.         Okay.  Did State Farm ever ask you to
13    lie in those cases?
14    A.         No.
15    Q.         Did State Farm ever ask you to
16    fabricate allegations?
17    A.         No.
18    Q.         Did State Farm ever ask you to
19    fabricate evidence?
20    A.         No.
21    Q.         Do you believe in the cases that
22    State Farm brought lawsuits in which you were
23    involved in that there was sufficient evidence
24    to support bringing a lawsuit?
```

JEFFREY S. DENNER

```
 1   A.          Yes.
 2   Q.          Do you know an individual by the name
 3   of John Costanzo.
 4   A.          Yes, I do.
 5   Q.          How long have you known Mr. Costanzo,
 6   approximately?
 7   A.          Fifteen years or longer.
 8   Q.          Okay.  And do you know John to be a
 9   liar?
10   A.          No, not to me ever.
11   Q.          Okay.  Is it your understanding that
12   John is generally an honest individual?
13   A.          Yes.
14   Q.          How would you characterize John as a
15   State Farm employee?
16   A.          Good employee, conscientious, hard
17   worker, liked.
18   Q.          Do you believe that John would ever
19   manufacture false allegations against a medical
20   provider?
21   A.          Personally?  I can't believe John
22   would do that.
23   Q.          Okay.  Has John ever done or said
24   anything that would suggest to you that he's
```

1    capable of doing something like that?

2    A.        No, sir.

3    Q.        Do you have any knowledge -- I asked

4    you earlier about some -- the defendants in this

5    case.  Do you have any knowledge about

6    State Farm's investigation into any of those

7    defendants?

8    A.        Other than hearing the name Eastern

9    Approach and hearing the name of Dr. Wang, Wang,

10   and the name of Dr. Stavropolskiy, the other

11   name I don't even recall, and knowing that John

12   had an investigation and that there was a case

13   ongoing, I don't know anything about the case.

14   Q.        Do you know when John started his

15   investigation?

16   A.        I have no idea when he started it.

17   Q.        Do you know any facts relating to

18   John's investigation?

19   A.        No.

20   Q.        Did you ever participate in any

21   meetings in which John's investigation was

22   discussed?

23   A.        No, unless it was something general,

24   like the investigation's ongoing or something

1    innocuous, but nothing regarding any specifics

2    or any facts.

3    Q.        Did you have any discussions with me

4    or anyone at Goldberg, Miller & Rubin relating

5    to the investigation into the defendants?

6    A.        Never.

7    Q.        Did you have any discussions with me

8    or anyone at my law firm relating to a project

9    that was open relating to any of the defendants?

10   A.        Never.

11   Q.        Did you ever meet with anyone in my

12   office or myself relating to an investigation

13   into any of the defendants?

14   A.        Other than saying "hi" to you and

15   meeting with you a few moments before this

16   deposition started, never.

17   Q.        And when you spoke with me right

18   before this deposition, that was to tell me

19   about a meeting that you had with Mr. Baratta;

20   correct?

21   A.        Yes, to be honest, that Mr. Baratta

22   and I met, and to ask you if you were going to

23   tell me what you were going to ask me, and you

24   basically told me you'll see when I get into the

JEFFREY S. DENNER

28

```
 1   deposition.
 2   Q.        And you indicated to me, I guess, when
 3   we just spoke a little while ago that
 4   Mr. Baratta had, I guess, asked to meet with you
 5   recently, and you did sit down with him and
 6   answered his questions honestly; correct?
 7   A.        I did.
 8   Q.        And also you indicated that previously
 9   Mr. Baratta had contacted you and asked to meet
10   with you?
11   A.        He had asked if I had any records and
12   asked if I would meet, and I said if I got a
13   deposition notice.  And then I eventually did
14   get a subpoena for a deposition notice.
15   Q.        Okay.
16   A.        I don't remember when I got it,
17   though.
18   Q.        There was some questions that
19   Mr. Baratta had submitted to you via email;
20   correct?
21   A.        At some point in time, yes.
22   Q.        And then you provided written answers
23   to those emailed questions; correct?
24   A.        I did, yes.
```

```
 1                    MR. CASTAGNA:  Just mark
 2            this as -- call this Denner-1.
 3                    (Your Email Inquiry of
 4            April 5, 2017 Printout marked for
 5            identification as Exhibit Denner-1.)
 6   BY MR. CASTAGNA:
 7   Q.         Jeff, I've put in front of you what
 8   I've marked as Denner-1, I think nine pages.  It
 9   says 1 of 8, but I think there's nine pages?
10   A.         Yes, sir.
11   Q.         Yes, because there's a second 1 of 8
12   after that.
13   A.         Yes, sir.
14   Q.         Are you aware of any other emails
15   between yourself and Mr. Baratta other than
16   what's been marked as Denner-1?
17   A.         No, sir.
18   Q.         It's my understanding that you
19   provided those responses to those questions in
20   an effort to, I guess, avoid what we're doing
21   today, which is your deposition; is that
22   correct?
23   A.         That was my hope, that if I answered
24   his questions, that these answers would suffice.
```

JEFFREY S. DENNER

30

```
1    Q.         Okay.  And, unfortunately, we're still
2    here?
3    A.         Too bad.
4    Q.         Do you know how Mr. Baratta identified
5    you as someone that he wanted to speak with
6    relating to this case?
7    A.         I'd assume just because I'm a
8    State Farm employee in the same unit.
9    Q.         When you worked at State Farm, had he
10   ever come to your house?
11   A.         Yes, he'd come to my house once before
12   in another case to issue me a subpoena and serve
13   me.
14   Q.         Did you tell him anything that you
15   believe would lead him to believe that you
16   possessed information relating to the
17   defendants?
18   A.         In this case?
19   Q.         Yes.
20   A.         Not that I know of.  I don't even
21   think he asked me about this case.
22   Q.         Did he offer to pay you for any
23   information?
24   A.         No, absolutely not.
```

JEFFREY S. DENNER

31

```
 1   Q.        Has he ever done that?
 2   A.        No.
 3   Q.        One of the questions that Mr. Baratta
 4   asked you in writing and that you responded to,
 5   and I'll read the question, was:  Would
 6   State Farm ever retain counsel to start a
 7   multi-claim investigation of a medical provider?
 8             And you responded:  Yes.
 9   A.        Where -- I don't know where you're at,
10   Counsel, so --
11   Q.        I'm sorry.  Sure.  I'm just trying to
12   read them to you to make it easier.
13   A.        Sure, but I don't know where you're
14   at.
15   Q.        Number 7.
16   A.        Number 7?
17   Q.        Yes.
18   A.        Okay.
19   Q.        So it says -- so the question was:
20   Would State Farm ever retain counsel to start a
21   multi-claim investigation of a medical provider?
22             And your response was:  Yes.
23             What I'm trying to do is get an
24   understanding of what your understanding of what
```

JEFFREY S. DENNER

1   Mr. Baratta was asking.

2   A.        Okay.  Well, what -- I don't know what

3   his intention was in his question.  I only

4   understand what my interpretation of the

5   question was.

6   Q.        Sure, that's fine.  Can you provide

7   that to me, what you interpreted it to mean?

8   A.        Yes.  If I had possibly done an

9   investigation through looking at some claim

10  files and thought there was more that needed to

11  be followed up on and should we potentially

12  start a project, otherwise possibly known as a

13  multi-claim investigation, as you said before,

14  can those words be used interchangeably at

15  times, and would I at times hire counsel at the

16  beginning to say would you help me with this,

17  the answer would be yes.

18  Q.        Okay.  That's what I thought you

19  meant.  I just wanted to clarify that.  You've

20  retained different attorneys and different law

21  firms when you've performed investigations while

22  working for State Farm; is that correct?

23  A.        Many different attorneys.

24  Q.        Okay.  And these attorneys have worked

1   at different law firms?

2   A.          Yes, sir.

3   Q.          Now, are you familiar with if any of

4   these law firms have groups or teams that to

5   some extent work primarily on

6   special-investigation-type work, whether it be

7   individual SIU cases or affirmative litigation?

8   A.          My understanding is all the firms I

9   dealt with in the past had specific teams that

10  were dedicated to handling State Farm special

11  investigations or State Farm project work.

12  Q.          Do you know whether those law firms

13  have either identified names or internal names

14  that they use for those groups?

15  A.          I know of at least one firm that does.

16  They call it the SIU team.

17  Q.          Okay.

18  A.          I don't know if every firm calls it

19  the SIU team or the project team, but I would

20  assume that if they call it anything, it would

21  be called the SIU team or the project team,

22  because that's the type of work they're

23  handling.

24  Q.          Okay.  Do you know the term "line

JEFFREY S. DENNER

34

1   cases"?

2   A.        Yes, sir.

3   Q.        Okay.  Do you recall a period of time

4   at State Farm when attorneys billed on line

5   cases to a flat-fee program?

6   A.        Yes, sir.

7   Q.        And do you also recall a period of

8   time at State Farm when attorneys billed

9   individual SIU cases under what was a modified

10  flat-fee program?

11  A.        Yes, sir.

12  Q.        And do you ever recall billing on

13  investigations, multi-claim investigations,

14  projects or affirmative litigation moving to a

15  flat-fee program?

16  A.        Whoa, I've got to think about that for

17  a moment.  Do you mind?

18  Q.        Sure.  Take your time.

19  A.        I know there was some discussion

20  towards the end of my State Farm career about

21  having SIU work moved to a flat -- to a

22  flat-SIU-fee program.  I don't know if it was

23  ever implemented or not before I left or if I'm

24  remembering it because I remember talking to

JEFFREY S. DENNER

35

1   ex-co-workers after I left.

2           I do remember something about, you

3   know, specific attorneys being able to bill

4   outside the normal two channels, meaning one

5   channel being line -- line work, the next being

6   SIU-fee work, the third being project or MCIU

7   work.

8   Q.      Okay.

9   A.      But I don't know if it was actually

10  ever implemented or not.

11  Q.      Sure.  If I could back up for a

12  second.  You said that you thought that maybe

13  there was potential that it might change.

14          During the period of time that you

15  worked in SIU at State Farm, do you ever recall

16  a period of time where the attorneys did not

17  bill in the multi-claim investigation, slash,

18  project, slash, affirmative litigation on an

19  hourly basis?

20  A.      No, the MCIU work, slash, project work

21  was billed on an hourly basis.

22  Q.      Okay.  Mr. Baratta has submitted

23  another written question.  And I don't have the

24  number, but I should be able to find it for you.

1               It says:  If counsel submitted bills

2     to you in connection with a medical provider

3     investigation at their RICO-investigation-hourly

4     rate, would that indicate that the multi-claim

5     investigation they were assisting with was an

6     investigation into suspected RICO activity?

7               And your response was:  Possibly.

8     Counsel decides if RICO applies, not the

9     investigator.

10               It looks like 8?

11     A.          May I read that question to myself?

12     Q.          Sure.  Absolutely.

13     A.          Thank you.

14               Okay.  I've read it.

15     Q.          Do you know what RICO stands for?

16     A.          Racketeering Influenced and Corrupt

17     Organizations Act.

18     Q.          Did you ever tell counsel to look for

19     RICO activity?

20     A.          Never.  That's -- counsel advises us

21     what statutes apply, what legal precedents

22     apply, what laws apply, what -- what doesn't

23     apply, and we have no say whatsoever.

24     Q.          Do you know what it means if counsel

1    placed the words "RICO investigation hourly" at

2    the top of a bill?

3    A.        I assume to identify that they're

4    billing at a RICO-hourly rate, so people know

5    that it's being billed hourly.

6    Q.        Do you ever recall seeing that on any

7    bill?

8    A.        Yes.

9    Q.        What bill have you seen it on?

10   A.        I believe I've seen it on various

11   bills from various counsel.

12   Q.        Have you ever worked on a case in

13   which a RICO count was brought?

14   A.        Yes.

15   Q.        Do you remember the names -- well, and

16   I don't want to talk about projects or

17   multi-claim investigations, but any affirmative

18   litigation --

19   A.        Yes.

20   Q.        -- where a RICO case -- claim was

21   brought?

22   A.        Yes.

23   Q.        Which ones were known as a RICO claim,

24   if you recall?

1  A.          I believe a case named State Farm

2  versus Singer, et al. was a RICO case, I believe

3  a case titled State Farm versus -- I don't

4  remember all the defendants.  Sam Fishman, and

5  there were a bunch of other defendants, I

6  believe that was -- had a RICO count involved in

7  it.

8          State Farm had a case involving a

9  gentleman by the named of Michael Alston.  I

10  believe we had a RICO count, but then ended up

11  dismissing the RICO count.

12          I believe we had a case involving

13  State Farm versus Red Lion Medical Center,

14  et al. that had -- original complaint had a RICO

15  count.  Whether it stayed or not, I have no

16  recollection.

17          I think there were several others that

18  originally had RICOs.  Whether the RICOs stayed

19  in or were eventually removed either by argument

20  or voluntary rewriting of the complaint, I don't

21  know, but sometimes we plead RICO, sometimes we

22  don't.  That's something counsel advises us,

23  whether we're going to, whether we're not.

24  Q.          Okay.

JEFFREY S. DENNER

39

1    A.        I have no legal expertise in that

2    matter whatsoever.

3    Q.        Mr. Baratta submitted the written

4    question -- let me find it for you -- number 9:

5    Is the statute of limitations something SIU/MCIU

6    investigators are sensitive to when conducting a

7    multi-claim investigation?

8              And you responded:  Yes.  And you

9    further explained, if suit is to be filed, one

10   needs to know what the statute date is.

11             Tell me if you see that.  It's

12   number 8.

13   A.        No, it can't be number 8.

14                  MR. BARATTA:  No, it's

15             actually number --

16                  THE WITNESS:  Because we

17             just looked at 8.

18                  MR. CASTAGNA:  I'm sorry.

19                  MR. BARATTA:  -- 9 and 10.

20   BY MR. CASTAGNA:

21   Q.        Nine and 10?

22   A.        Nine and 10.  Okay.  Let's go to 9

23   first, please.  Is the statute of limitations

24   something that investigators are sensitive to?

JEFFREY S. DENNER

40

1    Yes.

2            Well, of course, I need to be

3    sensitive to what the statute date is.  I need

4    to know that if I'm conducting a multi-claim

5    investigation or a project investigation, and

6    one of the possible outcomes of it is potential

7    litigation, then I need to know if I have any

8    statutes that I need to worry about.

9            So I obviously need to be aware of

10   what my statutes are or are not.

11   Q.      And --

12   A.      And I would rely on counsel to advise

13   me of that.

14   Q.      Okay.

15   A.      I wouldn't decide what the statute

16   dates are.  Counsel would advise me of that.

17           Ten, why is the statute of limitations

18   something MCIU investigations are sensitive to?

19   Exactly what the answer says, because if you're

20   going to file suit, you need to know what the

21   last possible date is that you have; otherwise,

22   you don't have a case.

23   Q.      Okay.

24   A.      Just like in any affirmative action or

JEFFREY S. DENNER

41

1    any lawsuit.

2    Q.       All right.  Let's go on to the next

3    one.  Mr. Baratta also submitted the written

4    question -- let me see if I can find it before I

5    start asking you questions, so you can maybe

6    read along.  I think it's 11.  Yes.

7              So if you conducted a review of

8    multi-claims concerning -- of a medical provider

9    in which you also retained counsel to assist in

10   2011, dash, 2012, would you have created any

11   kind of reports concerning the review being

12   conducted?

13             And you responded:  Yes.

14             Now, Mr. Baratta followed that

15   question up with:  What reports would you have

16   created, and why?

17             And you responded:  Possibly a report

18   summarizing results of the claims review,

19   possibly an initial report, an inventory of

20   claims reviewed.

21             So looking at the scenario that

22   Mr. Baratta outlined in his question, your

23   response doesn't appear to be definitive, as you

24   used the word "possibly."  Would you agree with

JEFFREY S. DENNER

42

1   my understanding that your answer is not

2   definitive?

3   A.          Possibly means possibly.

4   Q.          Okay.  Is it possible you would not

5   prepare a report summarizing the results of the

6   claim review?

7   A.          Well, I would have -- I would have

8   prepared something, just not sure what I would

9   have prepared.

10  Q.          Okay.

11  A.          That's what that means.

12  Q.          So your understanding is you would

13  have prepared something, but not necessarily a

14  report?

15  A.          Correct.  If a -- when I use the term

16  "report," we had at that time, 2011, 2012, we

17  had what we called formal reports, which were

18  standardized reports that had a complete outline

19  to them that we were supposed to follow.

20              I may not have completed one of those

21  standardized reports that had a complete

22  outline, but I would have prepared something

23  that I could have referenced back to.

24              And I would have had to prepared some

JEFFREY S. DENNER

43

1    type of an inventory of some kind, even if it's

2    just a list on a piece of paper of the claims I

3    reviewed; otherwise, later in life, how would I

4    know what claims I reviewed?  Because I don't

5    want to duplicate the effort, and I don't want

6    anybody else on my team to duplicate effort

7    later in life.

8              We were very big on that, not

9    duplicating each other's work.  It's a waste of

10   time.

11   Q.        So let me give you a different

12   scenario than the one that Mr. Baratta, I guess,

13   outlined.  So let's look at this scenario.

14             So while meeting with your counsel,

15   not associated with that -- with anything at

16   this point in time, you're meeting with counsel

17   for something completely different.

18   A.        Okay.

19   Q.        And an attorney brings to your

20   attention an issue that they saw relating to

21   certain medical records that the attorney

22   reviewed while defending a State Farm insured.

23   A.        In any particular --

24   Q.        In a particular --

1    A.          Unfortunately, I have to clarify.  You

2    mean in a particular claim, not a series of

3    claims?

4    Q.          Exactly, in any particular claim.

5    A.          Okay.

6    Q.          You then ask the attorney to review

7    several files that counsel had at their office

8    to see if the issue was seen in those files as

9    well.

10               You also then decide to look at a few

11   recent files.  And, in doing so, you determined

12   that those files -- well, I'm sorry.  You

13   determined that this was not seen in those more

14   recent files and determined that it wasn't an

15   ongoing issue that was brought to your

16   attention, and, as a result, you did nothing

17   further but paid for your attorney's time.

18               So under those circumstances that I

19   just gave you that scenario, would you have

20   prepared an initial report?

21   A.          Probably not.

22   Q.          Would you have prepared any type of

23   document summarizing your lack of findings?

24   A.          I would have prepared something to

1  indicate which files my attorney reviewed and

2  which files I reviewed.

3  Q.        Would you have prepared an inventory

4  of the claims reviewed?

5  A.        Just a list.  I don't -- the word

6  "inventory" is such a -- from a claim

7  individual's standpoint, the word "inventory" is

8  a bad word to use.  Inventory refers to files

9  that -- claims that someone has assigned to them

10  and is working.

11          So when you say, to a claims

12  professional, inventory, you're actually

13  referring to something that's been assigned to

14  somebody or something that's pending or

15  something that someone's working on.

16          So to say to someone such as myself

17  claim inventory, that refers to something else.

18  Q.        Right.

19  A.        I wouldn't have prepared an inventory

20  saying I'm working on those files, because I'm

21  not working on them.

22  Q.        Right.

23  A.        But I would have prepared a -- for

24  lack of a better term, not meaning derogatory, a

JEFFREY S. DENNER

46

1  list, a document, something that just says

2  reviewed the following files.

3  Q.        Uh-huh.

4  A.        Just so there's no duplication of

5  effort later.  That's the only reason.

6  Q.        Right.  Would it surprise you if one

7  of your colleagues who would have done -- who

8  would have worked on the same scenario that I

9  just identified did not prepare a list?

10  A.        I can't speak for my colleagues.

11  Everybody's different.

12  Q.        Okay.  There was another question that

13  Mr. Baratta submitted, and let's see if I can

14  find the question.  It's number 37, at the

15  top -- there you go:

16            In your experience at State Farm, was

17  finding medical provider projects something

18  State Farm expected its SIU/MCIU investigators

19  to do?

20            And you responded:  Yes.

21            My first question is, what did you

22  understand Mr. -- Mr. Baratta's question to

23  mean?

24  A.        I expected that to mean was the MCIU

47

1    team put in place to look for and ferret out

2    medical provider fraud.

3              And my answer was yeah.  That was what

4    I was hired to do.

5    Q.        Did State Farm expect you to make up

6    facts supporting medical provider projects?

7    A.        No.

8    Q.        Did State Farm expect you to

9    manufacture evidence to support a medical

10   provider project?

11   A.        No.

12   Q.        Mr. Baratta also submitted the written

13   question -- let's see if I can find it on here.

14   I think it's 38:  Is the job performance of an

15   SIU/MCIU investigator -- investigator evaluated

16   in part based on how many medical provider

17   projects they conduct?

18             And you responded:  Yes.

19             Can you explain how job performance is

20   tied to how many provider projects that you

21   conduct?

22   A.        Well, the -- part of my -- not all,

23   part of my evaluation when I would sit down with

24   management was, how much work am I doing, how

1    many cases am I handling, what's the quality of

2    those cases, what's the quality of the work that

3    I'm doing, the feedback that my boss gets from

4    the people I interact with, meaning people in my

5    own team, team managers in the line, other team

6    managers in SIU, they would never say it, but

7    I'm assuming defense counsel as well.

8              So part of it was the workload, since

9    that's what we did for a living, then, yes, of

10   course it was, project.  The more work you do,

11   the more -- the busier you are.

12   Q.        You stated to Mr. Baratta's written

13   questions that you did not participate in any

14   multi-claim investigation or project concerning

15   Eastern Approach or Aquatic Therapy of

16   Chinatown.  Is that an accurate answer?

17   A.        That was very accurate.

18   Q.        And you also stated that you did not

19   participate in any meetings in which any

20   multi-claim investigation or project into

21   Eastern Approach or Aquatic Therapy was

22   discussed.  Was that an accurate answer?

23   A.        Yes, it was.

24   Q.        And you stated to Mr. Baratta's

1   written questions that you knew nothing about

2   the accusations made by State Farm against

3   Eastern Approach and Aquatic Therapy.  Was that

4   an accurate answer?

5   A.        I don't know what the accusations are.

6   Q.        Since you provided your written

7   responses to Mr. Baratta, have you acquired any

8   additional information or any information at all

9   relating to Eastern Approach, Aquatic Therapy,

10  Dr. Wang, Dr. Stavropolskiy into this litigation

11  or any investigation into defendant's

12  activities?

13  A.        None.

14  Q.        Have you ever had communications with

15  any of the defendants?

16  A.        Ever?

17  Q.        That you recall.

18  A.        I'm asking for a clarification.

19  Q.        Yes, ever.

20  A.        Dr. Stavropolskiy.

21  Q.        And when would you have spoken to

22  Dr. Stavropolskiy?

23  A.        (No response.)

24  Q.        Let me ask you a different question.

JEFFREY S. DENNER

```
 1                    MR. BARATTA:  Well, can we
 2           get an answer to that one?
 3                    MR. CASTAGNA:  No, I want to
 4           ask a different question.
 5    BY MR. CASTAGNA:
 6    Q.        When you spoke to Dr. Stavropolskiy,
 7    was it in relation to work at either Eastern
 8    Approach or Aquatic Therapy?
 9    A.        No.
10    Q.        Was he working somewhere else at the
11    time?
12    A.        Yes.
13                    MR. CASTAGNA:  I'll turn you
14           over to Mr. Baratta to ask some
15           questions.
16                    THE WITNESS:  Do you mind if
17           I take a quick break and use the
18           restroom?
19                    MR. CASTAGNA:  Absolutely.
20                    (At this time, a brief
21           recess was taken.)
22    BY MR. BARATTA:
23    Q.        Mr. Denner, I want to follow up on
24    that last bit of testimony that you gave about
```

JEFFREY S. DENNER

1   some prior interaction you had with

2   Dr. Stavropolskiy.  What were you referring to?

3   A.          I remember that I met

4   Dr. Stavropolskiy years ago.

5   Q.          In what context?

6   A.          At a clinic in Northeast Philadelphia.

7   Q.          Were you conducting an investigation?

8   A.          Yes, sir.

9   Q.          On behalf of State Farm?

10  A.          Yes, sir.

11  Q.          Into the treatment provided by

12  Dr. Stavropolskiy?

13  A.          Yes, sir.

14  Q.          And was there a project?

15  A.          Yes, sir.

16  Q.          What was the name of the project?

17  A.          I have no idea.

18  Q.          What was the name of the facility?

19  A.          I have no idea.

20  Q.          It was in Northeast Philadelphia, you

21  said?

22  A.          Yes, sir.

23  Q.          Was it called Rejuvenation?

24  A.          Dr. -- or Dr.  Mr. Baratta, I've got

JEFFREY S. DENNER

1   to be honest with you.  I really -- I might be

2   able to rack my brain about it for a little

3   while and come up with an answer, but sitting

4   here right now, I do not remember the name of

5   the clinic.  I just remember Dr. Stavropolskiy.

6           It was a very unusual name, so I

7   remember the name.

8   Q.        And did you actually speak directly

9   with Dr. Stavropolskiy in the course of your

10  investigation?

11  A.        Yes.

12  Q.        And in a deposition?  In an interview?

13  How did you do it?

14  A.        Once on the telephone, that I

15  remember, briefly, and once at the clinic.

16  Q.        And why were you at the clinic?

17  A.        Conducting an investigation.

18  Q.        Do you remember what the suspicion of

19  fraud was in that project?

20                  MR. CASTAGNA:  Object to the

21          form of the question.

22                  You can answer.

23                  THE WITNESS:  I'm not

24          100 percent sure, but I can recollect

JEFFREY S. DENNER

53

```
 1              to the best of my ability, if you
 2              would like.
 3   BY MR. BARATTA:
 4   Q.      Please.
 5   A.      I believe it was performing billing
 6   for services not rendered.
 7   Q.      And was Dr. Stavropolskiy suspected to
 8   be billing for services not rendered?
 9                   MR. CASTAGNA:  Objection to
10              the form of the question.
11                   THE WITNESS:  Is it okay to
12              answer?
13   BY MR. BARATTA:
14   Q.      Yes.
15   A.      I don't know if it was
16   Dr. Stavropolskiy or the clinic itself.
17   Q.      But it was a clinic that
18   Dr. Stavropolskiy worked at?
19   A.      Yes.
20                   MR. CASTAGNA:  Objection to
21              the form of the question.
22   BY MR. BARATTA:
23   Q.      And did you create reports in
24   connection with that project?
```

JEFFREY S. DENNER

54

```
 1   A.        Some kind of report.  I don't know
 2   what.
 3   Q.        Who was your supervisor at that time?
 4   A.        David Murphy.
 5   Q.        And was there a litigation that was
 6   filed?
 7   A.        No.
 8   Q.        Was counsel associated with that
 9   project?
10   A.        I believe there was.
11   Q.        Do you know who it was?
12   A.        I don't know the name of the attorney.
13   Q.        Okay.  Do you know the name of the
14   firm?
15   A.        I believe it was Britt, Hankins
16   Schaible & Moughan.
17   Q.        Was Jim Moughan involved?
18   A.        I couldn't tell you, sir.  There were
19   a lot of attorneys in that firm back then that
20   were handling cases.
21   Q.        Did you --
22   A.        Mr. Schaible, Mr. Moughan, Mr. Wall.
23   Q.        Sorry.  Did you conduct surveillance
24   in that project?
```

JEFFREY S. DENNER

```
 1   A.         I have no way of knowing that sitting
 2   here today.
 3   Q.         Well, if we -- if you conducted
 4   surveillance, would there be reports associated
 5   with it?
 6   A.         Yes.
 7   Q.         And would you have done it yourself,
 8   or would you have hired someone else to do it?
 9   A.         No, we would have hired an outside
10   source.
11   Q.         And who would you have hired,
12   generally?
13   A.         Back then, the only people that we
14   were using was a gentleman by the name of Marty
15   Lyons, L-Y-O-N-S, who, I believe, has been out
16   of business for many, many years.
17   Q.         And do you know, was -- was there any
18   sort of settlement reached with the doctors in
19   that project?
20   A.         No recollection.
21   Q.         Were there depositions taken?
22   A.         Again --
23                         MR. CASTAGNA:  Objection to
24              the form.  I object to the form of
```

JEFFREY S. DENNER

```
 1              that question.
 2                     You can answer.
 3                     THE WITNESS:  I don't even
 4              know if there was litigation filed.
 5              To the best of my recollection, there
 6              was no litigation filed.
 7                     So whether there was
 8              depositions in underlying cases, I
 9              don't know, but I would doubt there
10              would had been formal depositions of
11              the actual providers in relation to
12              the case because I don't recollect any
13              affirmative action being filed.
14  BY MR. BARATTA:
15  Q.         Are depositions in underlying cases
16  used to help conduct projects?
17                     MR. CASTAGNA:  Objection to
18              the form of the question.
19                     THE WITNESS:  We -- as part
20              of conduct -- as part of investigating
21              individual files, we might do
22              depositions of plaintiffs, depositions
23              of witnesses, depositions of doctors
24              that do treatment on those plaintiffs
```

JEFFREY S. DENNER

1           or insureds or witnesses involved,

2           yes.

3    BY MR. BARATTA:

4    Q.       But as you're doing them in the files,

5    are they also geared or in any way focused on

6    helping gain information which is helpful to the

7    overall project?

8                    MR. CASTAGNA:  Objection to

9           the form of the question.

10                   THE WITNESS:  It might be

11          helpful in the long run to the project

12          if it's about the same provider.  I

13          mean, it might have -- we might be

14          able to eventually use it in the

15          project file or the -- or MCIU

16          investigation, whatever you want to

17          call it.

18                   Again, we're -- we talked

19          before about using things

20          interchangeably, but the focus of the

21          deposition would be that particular

22          case, and the facts asked would be

23          about that particular case.

24   BY MR. BARATTA:

JEFFREY S. DENNER

1 Q.  In the projects in which

2 Dr. Stavropolskiy worked at the facility that

3 you investigated, was there a project file

4 opened?

5      MR. CASTAGNA:  Objection to

6    the form of the question.

7      THE WITNESS:  I believe

8    there would have been.

9 BY MR. BARATTA:

10 Q.  And was there a lead file in that

11 case?

12 A.  Back then I don't believe lead files

13 even existed.

14 Q.  What materials would have been in the

15 project file back then?

16 A.  Any reports that would have been

17 created for management, if investigation was

18 conducted regarding surveillance, there would be

19 copies of whatever surveillance reports were

20 turned over to us.

21    If a surveillance disc containing

22 photographs or footage was sent to State Farm,

23 then a copy of that would have been placed in

24 the file.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JEFFREY S. DENNER

59

1           If any outside source was used to

2    conduct background information, you know,

3    general background information, where did

4    somebody get their license, how long had they

5    been practicing, name of employees, any generic

6    background, if a report had been produced or

7    requested, that would be in the file.

8           If any statements were obtained during

9    the course of the investigation, statements of

10   insureds, claimants, witnesses, employees,

11   ex-employees, whoever that statement would be

12   of, copies of that statement would actually be

13   contained within the file.

14          Back then, we actually used an outside

15   source.  We would take the statement, send the

16   tape out to be transcribed.  Transcribed report

17   would come back, and then it would be placed in

18   the file.

19   Q.      Did you take a statement from

20   Dr. Stavropolskiy?

21   A.      To my recollection, not that I recall,

22   no.

23   Q.      When you went to the clinic, did you

24   make a report of your -- strike that.

JEFFREY S. DENNER

60

```
1              Did you do a clinic inspection?
2                    MR. CASTAGNA:  Objection to
3              the form of the -- excuse me --
4              question.
5                    THE WITNESS:  I don't -- I
6              don't know how to even answer that
7              question.  It was at the clinic, I
8              remember that.  Did I walk around the
9              clinic?  I'm sure I did.
10                   Would you consider that a
11             clinic inspection?  I don't know if I
12             would consider that or not.  I mean,
13             we're talking 15 years ago maybe, ten
14             years ago, more.  I don't know.  I
15             don't know if that's considered a
16             clinic inspection or not when you show
17             up and introduce yourself and ask if
18             you could speak to the doctor.
19   BY MR. BARATTA:
20   Q.      Why would you do that?
21   A.      Back then, that was protocol.  Things
22   are different over time.  Just what we do when I
23   first left was completely different from what we
24   did two years before I left, which was
```

JEFFREY S. DENNER

61

1    completely different from what I did ten years

2    ago, which was absolutely different from what I

3    did 15 years ago.

4    Q.        But --

5    A.        So things change over time.

6    Q.        When you were doing this investigation

7    at the facility where Dr. Stavropolskiy worked,

8    it was part of the protocol to go to the clinic

9    and actually talk to the doctor?

10   A.        Yes, it --

11                   MR. CASTAGNA:  Objection to

12           the --

13                   THE WITNESS:  -- was.

14                   MR. CASTAGNA:  -- form of

15           the question.

16   BY MR. BARATTA:

17   Q.        Was that something that State Farm

18   directed you to do, or was that something you

19   felt was just a good investigative technique?

20                   MR. CASTAGNA:  Objection to

21           the form of the question.

22                   THE WITNESS:  I don't know

23           whose decision it was.  It was just

24           standard procedure for the people in

JEFFREY S. DENNER

```
1              my unit, when we had an investigation,
2              to go to the clinic.
3   BY MR. BARATTA:
4   Q.       And did --
5   A.       And whether --
6   Q.       I'm sorry.
7   A.       Whether we as a collective group
8   decided that was good investigative technique or
9   whether management said we would like you to do
10  this, I have no recollection.
11  Q.       And did that investigative technique
12  change?
13  A.       Over time, yes.
14  Q.       When?
15  A.       I have no idea.
16  Q.       Do you know why?
17  A.       No.
18  Q.       Was it -- did you find it to be a
19  valuable source of information to actually go to
20  the clinic and talk to the doctor?
21  A.       Personally?
22  Q.       Yeah.
23  A.       I did.
24  Q.       Why?
```

```
 1    A.          Because I found that if you're -- talk
 2    to people and ask questions, you get answers.
 3    Q.          Makes sense.  Do you know why
 4    State Farm stopped having you do that?
 5    A.          No idea.
 6    Q.          Go back to some of the other things
 7    that you had said.  You said that you had been
 8    called as an expert witness at various times?
 9    A.          Yes, sir.
10    Q.          In what?
11    A.          (No response.)
12    Q.          Expert in what?
13    A.          Insurance, claim handling.
14    Q.          And in what context have you been
15    called as an expert?
16    A.          I've been called as a witness on
17    behalf of the Federal Government to testify at
18    trial, criminal trial of individuals; I've been
19    called as a witness to testify at grand juries
20    on behalf of the government; I've been asked to
21    testify in Delaware County on behalf of the
22    District Attorney's Office; I've been asked to
23    testify at grand juries in Pennsylvania on
24    behalf of the State Attorney General's Office
```

JEFFREY S. DENNER

64

```
1    regarding insurance matters.

2    Q.         Those are all criminal cases?

3    A.         No -- well, wait a minute.  Yes.  And

4    I've also testified in civil cases.

5    Q.         As an expert?

6    A.         Well, as State Farm's designee.

7    Whether State Farm is going to say I was their

8    expert or not, you would have to ask State Farm.

9    I was held up as State Farm's witness to testify

10   on behalf of State Farm.

11   Q.         Do you remember the names of any of

12   the criminal cases that you actually testified

13   in in federal court?

14   A.         United States Government versus

15   Michael Alston.

16   Q.         A-L-S-T-O-N?

17   A.         Yes.  As far as the ones in Delaware

18   County, I can't remember, and as far as grand

19   juries, I'm not --

20   Q.         Well, don't tell me that.

21   A.         -- going to discuss any grand juries

22   at this time.

23   Q.         The case against Michael Alston, was

24   that in the Eastern District of Pennsylvania?
```

JEFFREY S. DENNER

65

1   A.        I believe it was.  And I don't know it

2   was captioned United States versus Michael

3   Alston.  I just know he was a defendant.

4   Q.        I think that was one of the cases you

5   mentioned was a RICO case when you had testified

6   earlier?

7   A.        I said I thought we had applied RICO.

8   I couldn't remember.

9   Q.        Was there a lawsuit filed by

10  State Farm against Mr. Alston as well?

11  A.        I believe there was.

12  Q.        And was that a federal case?

13  A.        I don't remember if we filed that in

14  federal court or if we filed that in

15  Philadelphia Court of Common Pleas.

16  Q.        You said that there was a procedure to

17  get claims to law enforcement?

18  A.        Yes, sir.

19  Q.        What is that procedure or what was

20  that procedure?

21  A.        What was the time frame you're talking

22  about?  Because that procedure changed over

23  time.

24  Q.        If we can, let's talk 2010, 2011,

```
 1    2012.
 2                    MR. CASTAGNA:  Object to the
 3            form of the question.
 4                    THE WITNESS:  You were
 5            required to sit and discuss the file
 6            with your management to make sure that
 7            your management agrees that it is a
 8            file that should go to law
 9            enforcement.
10                    You're then required to fill
11            out a law enforcement referral form,
12            which is a form created by State Farm.
13                    You were then required to
14            contact the National Insurance Crime
15            Bureau, NICB, advise NICB that you
16            have a file that you would like to be
17            referred to law enforcement.  NICB
18            would then send you a request to
19            obtain a copy of that file.
20                    You would then have to file
21            a photocopy, all contents of the file.
22            Then you would send the law
23            enforcement referral form, which would
24            identify why the case was being
```

JEFFREY S. DENNER

67

1           referred and where you wanted the case

2           to be referred to, which law

3           enforcement agency, what the subject

4           matter was.

5                   And you would then take that

6           form and the photocopies and send them

7           off to NICB with their request forms,

8           so that they know why it's coming in,

9           and then they would take care of

10          getting it to the appropriate law

11          enforcement authorities through

12          whatever channels they use, and that's

13          only after you received your

14          management's approval to do so.

15  BY MR. BARATTA:

16  Q.      And what was your training with

17  respect to when a claim should be referred to

18  law enforcement?

19                  MR. CASTAGNA:  I'm going to

20          object to the form of the question.

21                  THE WITNESS:  There was

22          really no formal training as to when

23          one should and when one shouldn't.

24                  It was more or less if you

JEFFREY S. DENNER

68

```
1          knew that there was an outside
2          investigation that involved law
3          enforcement because you received
4          notice from NICB or a law enforcement
5          update saying we're looking for files,
6          anybody has one, we'd like it, then
7          you knew that they would be interested
8          in this file.
9                  So you would say, Hey, I
10         have one.  I'll have to get it through
11         the proper channels.
12                 Maybe there was one that you
13         just had ironclad information.  Maybe
14         somebody confessed to a jump-in or
15         maybe somebody confessed to going out
16         and staging an automobile accident.
17                 And you would say to your
18         boss, Hey, this is, you know, a good
19         one to refer to District Attorney's
20         Office.  We now have two recorded
21         statements where these individuals
22         confessed that their cousin put them
23         up to staging an accident.
24                 Or their cousin or whoever
```

```
1               said, you know, I had an accident the
2               other night.  Nobody was in the car.
3               Do you want to pretend you were in it?
4                       And these people could prove
5               that they were in Ocean City,
6               New Jersey during the time of the
7               accident.  So we have ironclad
8               evidence that, you know, this is an
9               absolute fraud.
10                      This would be a really good
11              case to refer to law enforcement.  Get
12              your manager to agree and go through
13              all the proper channels.
14                      Everybody was different.
15              There was no this absolutely goes to
16              law enforcement, this doesn't.
17                      I would not refer cases to
18              law enforcement unless I was in my own
19              mind 100 percent convinced it was a
20              fraudulent case.
21   BY MR. BARATTA:
22   Q.      What if you were 100 percent convinced
23   that a medical provider in a case in a claim was
24   providing fraudulent medical care?  Wouldn't
```

JEFFREY S. DENNER

70

1    that be something that should be referred to law

2    enforcement?

3                    MR. CASTAGNA:  Object --

4                    THE WITNESS:  It might be.

5                    MR. CASTAGNA:  Object to the

6            form of the question.  I'm sorry.  I

7            didn't hear your question -- I mean,

8            I'm sorry, I didn't hear your answer.

9                    THE WITNESS:  It might be.

10   BY MR. BARATTA:

11   Q.      Why wouldn't it be?

12   A.      Well --

13                   MR. CASTAGNA:  Objection to

14           the form of the question.

15                   THE WITNESS:  -- you would

16           need evidence that that particular

17           file had evidence of insurance fraud

18           in it.

19                   Law enforcement deals with

20           criminal activity, and the burden of

21           proof in criminal is totally different

22           from the burden of proof in civil.

23           And law enforcement in the past has

24           always made it clear to insurance

JEFFREY S. DENNER

71

```
1              companies, you know, if you suspect
2              something, that's one thing, but we
3              don't want 10,000 cases across our
4              desk.
5                   We have very limited
6              resources.  And every time you think
7              something might be wrong in a file,
8              law enforcement can't just start
9              investigating.
10                  But if you have hard
11             evidence of fraud, sure, we would like
12             to take a look at the file, but if you
13             have, well, I'm really sure he did or
14             didn't get all the treatment, that's
15             just not -- that doesn't meet anywhere
16             near close to the burden of proof in a
17             criminal case.  That's not the kind of
18             thing that a law enforcement officer
19             can even investigate.
20                  But if somebody says, Hey, I
21             know I wasn't in the car, I was in
22             Ocean City, New Jersey that day, I can
23             prove it, that's clear -- clear case
24             of insurance fraud.  So that's why I
```

JEFFREY S. DENNER

72

```
 1              said it all depends what the
 2              circumstances are in the file.
 3   BY MR. BARATTA:
 4   Q.        Well, in a project where you're doing
 5   a multi-claim investigation of a medical
 6   provider --
 7   A.        Uh-huh.
 8   Q.        -- and you say -- say you reached the
 9   conclusion that all of the treatment being
10   rendered at this medical provider is fraudulent
11   because it's being rendered pursuant to, say, a
12   predetermined treatment protocol, and you were
13   100 percent convinced that that was happening,
14   would you then refer those files to law
15   enforcement?
16                   MR. CASTAGNA:  I'm going to
17           object to the form of --
18                   THE WITNESS:  Possibly.
19                   MR. CASTAGNA:  -- the
20           question.
21   BY MR. BARATTA:
22   Q.        Would there be any reason not to?
23                   MR. CASTAGNA:  Objection to
24           the form of the question.
```

JEFFREY S. DENNER

73

```
 1                    THE WITNESS:  Again, my past
 2           experience shows me that law
 3           enforcement argues that their burden
 4           of proof in a criminal case is totally
 5           different than the civil burden of
 6           wrongdoing.
 7                    So what we've -- an
 8           insurance company might feel civilly
 9           is inappropriate treatment or
10           inappropriate billing, inappropriate
11           documentation for the codes being used
12           may not be clear and convincing
13           evidence of a criminal act.
14                    I'm not a lawyer.  I don't
15           know what the difference is.  That's
16           why I said possibly.
17                    That might be something I
18           would want to sit down with an NICB
19           agent who has a lot more experience in
20           dealing with law enforcement and say
21           is this something law enforcement
22           would or wouldn't be interested in.
23   BY MR. BARATTA:
24   Q.      Is a report or was a report to the
```

JEFFREY S. DENNER

74

```
1    NICB only made in order to make a report to law
2    enforcement?
3    A.        No.
4    Q.        So what other circumstances would you
5    make a report to the NICB of a claim or a number
6    of claims?
7                      MR. CASTAGNA:  Objection to
8              the form of the question.
9                      THE WITNESS:  You would fill
10             out the law enforcement form only if
11             you were sending a specific file to
12             law enforcement.
13                     You could refer cases, an
14             individual case, a series of cases,
15             multiple claims to NICB anytime that
16             you believed that it was evidence of
17             fraud.
18   BY MR. BARATTA:
19   Q.        And would you do that?
20   A.        Yes.
21   Q.        And --
22   A.        Would I, meaning Jeff?
23   Q.        Yes, you, Jeff.
24   A.        Yes, I would do that.
```

JEFFREY S. DENNER

75

1  Q.        And was that -- was it your

2  understanding that that's what State Farm

3  expected you to do?

4  A.        State Farm expected us to refer cases

5  that State -- that the investigator and the

6  management thought were appropriate to send to

7  NICB to NICB.

8  Q.        The ones that were appropriate to send

9  to NICB were the ones where you suspected fraud?

10                   MR. CASTAGNA:  Objection to

11          the form of the question.

12                   THE WITNESS:  Yes.

13  BY MR. BARATTA:

14  Q.        So you didn't have to have that

15  ironclad, beyond-a-reasonable-doubt belief?  You

16  just had to have a suspicion of fraud, and that

17  was a basis to refer it to the NICB?

18  A.        Well --

19                   MR. CASTAGNA:  Objection to

20          the form --

21                   THE WITNESS:  -- not

22          suspicion.

23                   MR. CASTAGNA:  -- of the

24          question.

JEFFREY S. DENNER

76

1                    THE WITNESS:  You actually

2           had to have evidence into your file of

3           fraud, just like you wouldn't send it

4           to counsel and ask if there's -- well,

5           strike that.

6                    You wouldn't expect counsel

7           to say let's file affirmative action

8           simply based on suspicion.  There

9           would have to be evidence of whatever

10          counsel says we're filing for.

11                   There's all different things

12          I've seen in complaints.  Not all of

13          them are the same.  They're never

14          cookie cutter.  One case involves, you

15          know, X, Y and Z, the next case

16          involved A, B, C, the next case

17          involved A, X, Y.

18                   Each case is different.

19          Each case is on the facts and the

20          burden of the case, but there's always

21          evidence to support whatever the

22          allegations are in the complaint.

23                   Same thing to NICB.  If

24          you're going to refer a series of 10,

```
1              15, 20, 30, 50 files to NICB, there
2              needs to be evidence in those files of
3              what you're alleging when you send it
4              to NICB, not just I think it's there.
5              You need to conduct an investigation.
6                      And that investigation,
7              whether it be statements,
8              surveillance, review of files,
9              interviews with patients, interviews
10             with ex-employees, whatever your
11             investigation is, needs to be
12             evidence, and you need to get all that
13             evidence to NICB as well.
14                     NICB doesn't just want a
15             whole bunch of files with somebody
16             saying I think there's something here.
17             They want to see the evidence.
18   BY MR. BARATTA:
19   Q.        Did you ever have a project
20   involving -- against a medical provider where
21   you had a lot of files that you had looked at
22   and had formed a very strong belief that there
23   was fraud being committed by the medical
24   provider, and you thought you had evidence of it
```

JEFFREY S. DENNER

```
 1   in the files, would you send those files during
 2   the course of the project to the NICB?
 3                   MR. CASTAGNA:  Objection to
 4           the form of the question.
 5                   THE WITNESS:  I'm confused,
 6           because it sounded like you said would
 7           you, have you.  Would you and have you
 8           are two different things.
 9   BY MR. BARATTA:
10   Q.      Would you?
11   A.      Would I?
12   Q.      Yes.
13                   MR. CASTAGNA:  Objection to
14           the form.
15                   THE WITNESS:  Would I?  Yes.
16   BY MR. BARATTA:
17   Q.      And is there any reason during the
18   course of the project not to send files that you
19   believe fraud was occurring in to the NICB?
20                   MR. CASTAGNA:  Objection to
21           the form of the question.
22                   THE WITNESS:  I can't answer
23           that.  Every investigation is totally
24           different.  So I'm going to have to
```

```
1              say it all depends on -- on the
2              particular case, and I would have to
3              see what my case is, what the evidence
4              in my case is, how many files are
5              involved.  I can't just speculate on a
6              what-if case.
7    BY MR. BARATTA:
8    Q.        Mr. Castagna asked you about whether
9    anyone had ever made a false accusation of
10   fraud.
11             Have you ever in your lifetime read or
12   heard about someone having been convicted of a
13   crime they didn't commit?
14   A.        Sure.
15                  MR. CASTAGNA:  Objection to
16             the form of the question.
17   BY MR. BARATTA:
18   Q.        And in any of those circumstances do
19   you think the police officers who made the
20   arrest actually believed they had the right guy?
21                  MR. CASTAGNA:  Objection to
22             the form of the question.
23                  THE WITNESS:  I'm sure they
24             believed it.
```

1  BY MR. BARATTA:

2  Q.        Okay.  And so you think it's possible

3  for an investigator to form a wrong conclusion

4  that might lead to a bad conviction?

5                    MR. CASTAGNA:  Objection.

6            Relevance.  Calls for speculation.

7                    THE WITNESS:  I'm -- I guess

8            that's possible, sure.

9  BY MR. BARATTA:

10  Q.        Mr. Castagna asked you whether there

11  was ever any monetary award or reward for

12  working on multi-claim investigations, and you

13  said you would have a hard time answering those

14  questions.  Why?

15  A.        Because our salary structure and our

16  reimbursement structure on how we received pay

17  raises has varied over time.

18                And I was a 25-year employee at

19  State Farm.  So to answer that question, you

20  would have to tell me when you're talking about.

21  Q.        Well, was there ever a time that any

22  part of the calculus was work that you had done

23  on multi-claim investigations?

24                    MR. CASTAGNA:  Objection to

JEFFREY S. DENNER

```
 1              the form of the question.
 2                      THE WITNESS:  I believe so,
 3          yes.
 4   BY MR. CASTAGNA:
 5   Q.      And do you know what the calculus was?
 6                      MR. CASTAGNA:  Objection to
 7          the form --
 8                      THE WITNESS:  I have no
 9          idea --
10                      MR. CASTAGNA:  -- of the
11          question.
12                      THE WITNESS:  -- how
13          management came up with the calculus.
14   BY MR. BARATTA:
15   Q.      And was there any -- strike that.
16   We'll come back to that.
17              You said that there were times you had
18   conducted investigations where you found that
19   there had been no fraud committed by the medical
20   provider; right?
21                      MR. CASTAGNA:  Objection to
22          the form.
23                      THE WITNESS:  I said there
24          were times I conducted investigations
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

```
 1              that I thought my investigation
 2              wouldn't warrant a further referral
 3              because I didn't think there was
 4              any -- I didn't think there was enough
 5              evidence or anything really there to
 6              warrant anything further to look at or
 7              any referrals or any law enforcement
 8              or any referrals to an attorney.
 9              Maybe there were some anomalies here,
10              anomalies there, but, other than that,
11              nothing.
12  BY MR. BARATTA:
13  Q.      The first time you and I met was
14  because I served you with a subpoena in the
15  Lugiano case.  Do you recall that?
16                  MR. CASTAGNA:  Objection.
17              Relevance.
18                  THE WITNESS:  Yes, you came
19              to my home.
20  BY MR. BARATTA:
21  Q.      And had you conducted an investigation
22  involving Dr. Darren Lugiano at some point?
23                  MR. CASTAGNA:  Objection --
24                  THE WITNESS:  I
```

JEFFREY S. DENNER

83

```
 1              had conducted investigation --
 2                      MR. CASTAGNA:  I just want
 3              to place an objection, Jeff --
 4                      THE WITNESS:  What's that?
 5                      MR. CASTAGNA:  I just want
 6              to put an objection --
 7                      THE WITNESS:  Sure.  Go
 8              ahead.
 9                      MR. CASTAGNA:  Objection to
10              the form of the question.  Objection
11              to relevance.
12                      You can answer.
13                      THE WITNESS:  I conducted an
14              investigation regarding a doctor that
15              was treating patients at a Dr. Lugiano
16              clinic.
17  BY MR. BARATTA:
18  Q.      Okay.  And in the course of that
19  investigation, did you come to believe that
20  there was no fraud occurring at the Lugiano
21  clinic that you were investigating?
22                      MR. CASTAGNA:  Objection to
23              the form of the question.  Also
24              objection to relevance.
```

```
 1                    THE WITNESS:  I came to the
 2            conclusion that there was not enough
 3            evidence for me to continue going
 4            forward.  And when I was asked to
 5            consider whether we should or
 6            shouldn't go forward, and I was trying
 7            to decide what we should or shouldn't
 8            do, the doctor passed away.
 9  BY MR. BARATTA:
10  Q.      Did you discover or observe any
11  evidence of fraud being perpetrated by
12  Dr. Lugiano or at the clinic itself?
13                    MR. CASTAGNA:  Object to the
14            form of the question.  Also object to
15            relevance.
16                    THE WITNESS:  No.
17  BY MR. BARATTA:
18  Q.      And did you conduct surveillance of
19  that -- in that project?
20  A.      I did.
21                    MR. CASTAGNA:  Objection to
22            the form of the question.  Objection
23            to relevance.
24  BY MR. BARATTA:
```

JEFFREY S. DENNER

85

1    Q.        And did you create reports and other

2    documents related to that investigation?

3                        MR. CASTAGNA:  Objection to

4               the form of the question.  Objection

5               to relevance.

6                        THE WITNESS:  I did.

7    BY MR. BARATTA:

8    Q.        Are you aware that State Farm later

9    sued Dr. Lugiano for fraud?

10                       MR. CASTAGNA:  Objection to

11              the form of the question.  Objection

12              to relevance.

13                       THE WITNESS:  You served me

14              on a subpoena, so I assume there was.

15   BY MR. BARATTA:

16   Q.        And do you know who conducted any

17   further investigation after you had finished

18   your earlier investigation concerning

19   Dr. Lugiano?

20                       MR. CASTAGNA:  Objection to

21              the form of the question.  Objection

22              to relevance.

23                       THE WITNESS:  I was led to

24              believe that it was Doug Babin, and I

JEFFREY S. DENNER

```
1              don't know if others in the unit

2              assisted him or not.  I have no idea.

3    BY MR. BARATTA:

4    Q.        Do you know who the attorneys were who

5    filed the lawsuit against Dr. Lugiano?

6                   MR. CASTAGNA:  Objection to

7              the form of the question.

8                   THE WITNESS:  Who

9              actually --

10                  MR. CASTAGNA:  Objection to

11             relevance.

12                  THE WITNESS:  -- filed the

13             lawsuit?

14   BY MR. BARATTA:

15   Q.        Yes.

16   A.        No, no idea.

17   Q.        Did you speak to Mr. Castagna when I

18   served you with a subpoena in the Lugiano case?

19                  MR. CASTAGNA:  Objection to

20             the form of the question.

21                  THE WITNESS:  I did.

22                  MR. CASTAGNA:  Objection to

23             relevance.

24   BY MR. BARATTA:
```

1   Q.        And what did he say?

2   A.        He told me to hold on and wait, not to

3   show up, that he would contact you to find out

4   what it was all about.

5   Q.        Did you tell Mr. Castagna that you had

6   conducted an earlier investigation connected to

7   Dr. Lugiano?

8                      MR. CASTAGNA:  Objection to

9              the form of the question.

10                     THE WITNESS:  I told

11             him that --

12                     MR. CASTAGNA:  Objection to

13             relevance.

14                     THE WITNESS:  -- I may have

15             records somewhere that might have

16             something that might have Lugiano's

17             name in it.

18  BY MR. BARATTA:

19  Q.        You said in response to some questions

20  that Mr. Castagna asked you about RICO and --

21  and RICO appearing on a bill, that counsel

22  decides whether RICO applies; right?

23  A.        Correct.

24  Q.        So if counsel has put on its bill the

1    word "RICO," would you take that to mean that

2    counsel has decided that RICO applies?

3                      MR. CASTAGNA:  Objection to

4              the form of the question.  Also calls

5              for --

6                      THE WITNESS:  I have no

7              idea --

8                      MR. CASTAGNA:  --

9              speculation.

10                     THE WITNESS:  -- what

11             counsel means, what -- you would have

12             to ask counsel what counsel means.  I

13             don't know what their thought process

14             is about -- I don't -- if they think

15             RICO applies in a particular case,

16             they'll put it in writing to me.

17             They'll say, you know, RICO applies

18             and this is why.

19                     Now, why they would put it

20             on a bill, I -- that's something you

21             would have to ask counsel why it's on

22             a bill.  I only know when they put it

23             in writing, RICO applies for a couple

24             of reasons, and then they give the

JEFFREY S. DENNER

89

```
1              specific reasons why RICO applied in
2              an affirmative action.
3    BY MR. BARATTA:
4    Q.        One of the RICO cases that you
5    identified that you could recall was against Sam
6    Fishman?
7    A.        I said I think State Farm -- part of
8    that case involved a RICO.
9    Q.        And do you recall what the allegations
10   were against Sam Fishman?
11                    MR. CASTAGNA:  Objection.
12                    THE WITNESS:  Well, again --
13                    MR. CASTAGNA:  Let me just
14            object.  Objection to the form of the
15            question.  Objection to relevance.
16                    You can answer the question.
17                    THE WITNESS:  I said
18            Mr. Fishman and others, and I believe
19            it was billing for services not
20            rendered, staged accidents, falsifying
21            medical records, and other things.
22            There was a litany of things that were
23            alleged.
24   BY MR. BARATTA:
```

JEFFREY S. DENNER

1   Q.        Do you know who the counsel was

2   connected to that RICO matter involving Sam

3   Fishman?

4                    MR. CASTAGNA:  Objection to

5            the form of the question.

6                    THE WITNESS:  I believe

7            there were a lot of different people

8            involved.

9   BY MR. BARATTA:

10  Q.        Was Goldberg, Miller & Rubin one of

11  them?

12                   MR. CASTAGNA:  Objection to

13           the form of the question.

14                   THE WITNESS:  I believe so.

15  BY MR. BARATTA:

16  Q.        What specifically did you talk to

17  Mr. Castagna about this morning before the

18  deposition?

19                   MR. CASTAGNA:  I'm going to

20           object.  Asked and answered.

21                   THE WITNESS:  To let him

22           know that you had came to my house and

23           served me with a subpoena in that

24           other case, wanted to let him know

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

JEFFREY S. DENNER

91

1           that you had reached out to me via

2           telephone several times, wanted to let

3           him know that I sent you a paper

4           document that said something at the

5           top saying MCIU or SIU dashboard, I

6           wanted to let him know that I sent you

7           these answers.

8                    And I also was honest and

9           told him that I met with you Tuesday,

10          because you called me and said now

11          that it's going to be formal and I'm

12          actually going to have a chance to ask

13          you questions under oath for the first

14          time, would you agree to finally sit

15          down and meet with me face-to-face and

16          talk with me, and I said sure, since

17          I'm going to have to meet you anyway.

18                   And then he said -- you

19          know, he asked me questions about, you

20          know, State Farm, and do you recollect

21          things about your past.  And I'm like,

22          things have changed so much since when

23          I worked there.

24                   He asked me just some

1           generic questions about, you know, my

2           employment, nothing specific.  Oh, he

3           asked me about this case, if I knew

4           anything, if I had any documents, if I

5           had ever been to any meetings that he

6           needed to be aware of, if I reviewed

7           anything that he should be aware of.

8                     I told him I had absolutely

9           no knowledge.  I even told him that as

10          far as some of the defendants go, I

11          didn't even know who one of the

12          defendants even was, never even heard

13          of them before.

14   BY MR. BARATTA:

15   Q.       Did you tell Mr. Castagna about your

16   prior investigation involving Dr. Stavropolskiy?

17   A.       No.

18   Q.       At some point Mr. Ed Bradley or Jim

19   Moughan called you in connection with this case?

20   A.       Yeah, I think you told me -- you asked

21   me that the other day, and I think I told you

22   that Mr. Bradley asked me if I ever got a

23   subpoena, would I just let him know.

24                    So that was really the conversation I

1    had with Mr. Bradley, was -- I don't -- I think

2    Mr. Moughan may have been in the room with him,

3    but that was it.

4              Ed Bradley and I really didn't discuss

5    the case in any way, shape or form.  I just told

6    him if I ever did get a subpoena, I would place

7    a phone call to him and let him know.

8              And then I think he said, you know

9    what, make sure you just let Rich know, meaning

10   Mr. Castagna.  And then I did -- after I got

11   served, I did let Mr. Castagna know that I was

12   served.

13             But I never discussed anything with Ed

14   Bradley regarding this case, never discussed

15   anything with Mr. Moughan regarding this case,

16   and I never discussed anything with Rich

17   Castagna involved in this case either, or

18   anybody at Mr. Goldberg's firm involved in this

19   case, if there is anybody.

20   Q.        You indicated that what you were hired

21   to do at State Farm was ferret out medical

22   provider fraud.  Was -- were the other people in

23   your unit also similarly focused?

24                       MR. CASTAGNA:  Objection to

JEFFREY S. DENNER

94

```
 1              the form of the question.
 2                   THE WITNESS:  First off, I
 3              don't think I ever used the word
 4              "ferret out," but --
 5   BY MR. BARATTA:
 6   Q.        The transcript will speak for itself,
 7   but --
 8   A.        Okay.
 9   Q.        -- what was your job with respect to
10   medical provider fraud?
11                   MR. CASTAGNA:  Objection to
12              the form of the question.
13                   THE WITNESS:  To investigate
14              claims where potential fraud may
15              exist, to determine whether or not
16              there was or wasn't fraud being
17              conducted by medical providers in or
18              around Philadelphia metropolitan area.
19              And then when I worked for Michael
20              Knox, it was the same exact thing, but
21              it was Northern Jersey and New York.
22   BY MR. BARATTA:
23   Q.        And did Mr. Costanzo in 2010, '11, '12
24   have the same job you had?
```

1  A.        Yes.

2  Q.        Did he have the same supervisor in

3  that time frame?

4  A.        Yes.

5  Q.        And was it Mr. Bowles and

6  Mr. Acornley?

7  A.        Yeah, I think that's about the time

8  Mr. Bowles retired, actually, and

9  Mr. Acornley -- John and I worked for

10  Mr. Bowles, and Bryan Acornley had a different

11  team.

12        And then when Austin Bowles retired,

13  everybody went under Bryan Acornley, and Bryan

14  Acornley just absorbed both teams and became a

15  team manager for everyone.

16  Q.        How many multi-claim investigations of

17  medical providers would you say you've

18  participated in?

19                    MR. CASTAGNA:  Objection.

20            Asked and answered.

21                    THE WITNESS:  I answered

22            that already.  Over my 20-some-year

23            career, too many for me to recollect.

24  BY MR. BARATTA:

1   Q.        How many formal projects involving

2   medical providers have you been involved with?

3   A.        I use the term "MCIU investigation"

4   and "formal project" to be the same.  To me

5   they're -- as we discussed before, could be one

6   of those words that's interchangeable, so the

7   answer would be the same.

8   Q.        Do you know if Mr. Costanzo used those

9   terms the same way?

10  A.        I don't know.  You would have to ask

11  John.

12  Q.        How many -- however many multi-claim

13  investigations and/or medical provider projects

14  there have been, what percentage of those --

15  strike that.  Bad question.

16            Of the multi-claim investigations and

17  projects that you've participated in, what

18  percentage would you estimate involved medical

19  providers?

20                      MR. CASTAGNA:  Objection to

21            the form of the question.

22                      THE WITNESS:  Me personally?

23  BY MR. BARATTA:

24  Q.        Yeah.

JEFFREY S. DENNER

97

```
1    A.        98 percent.

2    Q.        And --

3    A.        Maybe 95 percent.

4    Q.        And do you think that percentage would

5    be similar for Mr. Costanzo and Mr. Babin and

6    the others in your unit?

7                        MR. CASTAGNA:  Objection to

8                the form of the question.  Calls for

9                speculation.

10                       THE WITNESS:  No.

11   BY MR. BARATTA:

12   Q.        Why?

13   A.        My past experience has shown me that

14   Mr. Babin was involved quite a number of times

15   with investigations involving strictly property

16   damage claims or body shop claims that he was

17   asked to assist on.

18            So I would say that most of us dealt

19   primarily with investigations that centered

20   around medical of some type, whereas Mr. Babin

21   might have a little bit more experience dealing

22   with some body shop, glass-issue claims, other

23   types of claims besides just medical.

24   Q.        So other than Mr. Babin, when you say
```

JEFFREY S. DENNER

98

```
1    the rest of us, do you include Mr. Costanzo in

2    that group?

3    A.        Yes.

4                    MR. CASTAGNA:  Objection to

5             the form of the question.

6                    THE WITNESS:  I'm sorry.

7             I'll slow down with regard to my

8             answer.

9                    MR. CASTAGNA:  That's okay.

10            I think she's getting it.

11                   THE WITNESS:  Okay.  I'm so

12            sorry.  I know not to speak two at a

13            time.

14   BY MR. BARATTA:

15   Q.        What were some of the ways that you

16   would identify doctors to investigate?

17   A.        My gosh.

18                   MR. CASTAGNA:  I'm sorry.

19            Could I have that read back?

20                   (At this time, the court

21            reporter read back from the record, as

22            requested.)

23                   MR. CASTAGNA:  Object to the

24            form of the question.
```

JEFFREY S. DENNER

```
 1                    You can answer the question.
 2                    THE WITNESS:  Gosh, a whole
 3            litany of possibilities.  There is no
 4            one or two or even three things
 5            written in stone.  There's a whole
 6            litany of possibilities on how you
 7            would get a referral to look at a
 8            particular medical center or a
 9            particular medical provider or a
10            particular group of people.
11   BY MR. BARATTA:
12   Q.      Was there any competition amongst the
13   MCIU/SIU investigators to be the guy doing the
14   most projects or the most investigations?
15                    MR. CASTAGNA:  Object to the
16            form of the question.
17                    THE WITNESS:  Might be with
18            some people.  Personally, I didn't
19            care.
20   BY MR. BARATTA:
21   Q.      Who were the people that you think
22   might have had that feeling?
23   A.      Oh, I don't know.
24                    MR. CASTAGNA:  Objection.
```

JEFFREY S. DENNER

100

```
1                    THE WITNESS:  You would have
2           to ask them that.  I didn't care who
3           did or didn't have the most.
4    BY MR. BARATTA:
5    Q.          You indicated there were lots of
6    different law firms that you had hired over the
7    years.  Were there specific law firms that were
8    used in connection with medical provider
9    projects?
10   A.          Yes, sir.
11   Q.          And which ones were those?
12   A.          Britt, Hankins, Schaible & Moughan,
13   that then became Britt, Hankins & Moughan;
14   Bennett, Bricklin & Saltzburg; and Goldberg,
15   Miller & Rubin.
16   Q.          Any others?
17   A.          There might be some on the peripheral
18   here and there, but primarily they were the
19   three main firms that handled affirmative
20   litigation projects.  To assist on claim files
21   in projects, we at times would use Lee Rosenau
22   at Dion, Rosenau.  Catherine --
23   Q.          Harrington?
24   A.          -- Harrington at times would be used.
```

1    They handled individual files.

2            Out in the counties, if we had to have

3    a county attorney, John Barr's office would be

4    used.  Fred Smith, before he retired, out in

5    Norristown could be used.

6            Years and years and years ago, before

7    passing away, there was -- apologize -- Martin

8    Corr, Sean Corr.  But handling affirmative

9    litigation was pretty much related to the three

10   firms I mentioned originally.

11   Q.      So if you had a multi-claim

12   investigation which you thought might go to

13   affirmative litigation at some point in the

14   future, would you limit yourself to bringing in

15   Goldberg, Miller & Rubin or Britt, Hankins &

16   Moughan or Bennett, Bricklin & Saltzburg to

17   assist you?

18   A.      Well, you --

19               MR. CASTAGNA:  Objection to

20            the form of the question.

21               THE WITNESS:  You could

22            bring in anybody originally.  When I

23            say "originally," when you thought you

24            needed counsel to assist you on

JEFFREY S. DENNER

102

1        underlying files and to assist you

2        with collecting evidence, you could

3        bring in anybody that was approved to

4        do SIU work.

5                But when you thought I

6        needed somebody to handle or when you

7        said to your boss, Hey, you know, we

8        may or may not be going the route of

9        affirmative litigation, I'm getting

10       some evidence here, you absolutely had

11       to then redirect it to one of those

12       three firms.

13               Or maybe at the beginning,

14       you could just pick one of those three

15       firms.  That's always an option, too.

16       But if I was using -- I happened to

17       personally like Lee Rosenau.  I just

18       liked his tenacity and his tactics at

19       lower court levels, you know, so I

20       used Mr. Rosenau an awful lot for

21       underlying cases.

22               But then as evidence went

23       on, for instance, in the case Singer

24       versus -- State Farm Insurance versus

```
 1                 Maurice Singer, I had to tell
 2                 Mr. Rosenau that he could no longer
 3                 handle cases because I was referring
 4                 it to Ed Bradley to handle the
 5                 possibility of affirmative action, and
 6                 Mr. Bradley would let me know whether
 7                 or not there would or wouldn't be
 8                 affirmative action, so...
 9     BY MR. BARATTA:
10     Q.     Once that shift is made, is there an
11     effort to have all new underlying claims sent to
12     that office?
13     A.     Well, that's --
14                 MR. CASTAGNA:  Objection to
15                 the form of the question.
16                 THE WITNESS:  That's a
17                 decision that is then made with the
18                 lead investigator, counsel and
19                 management.
20                 That is -- unfortunately, it
21                 all depends, all depends on how many
22                 cases are involved, how much
23                 litigations there's going to be, how
24                 large is the scope of the affirmative
```

JEFFREY S. DENNER

104

```
1            action, how many underlying cases are

2            still left.

3                  So that's a cost analysis

4            that needs to be done on each case to

5            figure out how it's going to be

6            handled.

7  BY MR. BARATTA:

8  Q.      Did you ever bring Goldberg, Miller &

9  Rubin in on a project that you were handling?

10 A.      Yes.

11                MR. CASTAGNA:  Object to the

12           form --

13 BY MR. BARATTA:

14 Q.      How many?

15                MR. CASTAGNA:  -- of the

16           question.

17                THE WITNESS:  I, over the

18           years, have used Goldberg, Miller &

19           Rubin many, many, many times on

20           underlying cases as well as on

21           projects.

22 BY MR. BARATTA:

23 Q.      And which lawyers in particular at

24 Goldberg, Miller & Rubin have you dealt with on
```

```
 1   projects?

 2   A.        On projects?  Cy Goldberg, Rich, Matt,

 3   Lori Miller has at times sat in, I think

 4   Kristine Meindl has sat in at times to handle

 5   either depositions or to handle things with me.

 6             As far as the actual affirmative

 7   litigation, the only people that have ever

 8   consulted with me to give me advice or to

 9   prepare reports have either been Cy Goldberg or

10   Matt, under the direction of Rich Castagna.

11   Q.        How about Warren Holland?

12   A.        No, I personally have never used

13   Warren.  That's just because that's, you know --

14   he just didn't get involved in my cases.

15   Q.        Do you know if Goldberg, Miller &

16   Rubin does project work for any other insurance

17   companies?

18   A.        I have no idea.  None of my business.

19   Q.        When you would do surveillance, would

20   you need to get a manager's approval to do

21   surveillance?

22   A.        When?

23   Q.        Between 2010 and 2013.

24   A.        Yes.
```

JEFFREY S. DENNER

106

```
1                    MR. CASTAGNA:  I'm sorry.  I
2          need to take a break.
3                    MR. BARATTA:  Go ahead.
4                    (At this time, a brief
5          recess was taken.)
6    BY MR. BARATTA:
7    Q.        So the last question was about
8    surveillance.  And you said between 2010 and
9    2013, in order to do surveillance, you had to
10   get manager approval; right?
11   A.        Yes, sir.
12   Q.        And how would you do that?
13   A.        Sat down with your manager, explained
14   why you wanted to do surveillance, asked.  And
15   if it's granted, yes; if it's not, no.
16   Q.        Would there be a written submission of
17   some kind?
18   A.        Generally, no, not with me anyway.  I
19   would sit down in person, because -- or manager
20   would want to know specifics on why you wanted
21   surveillance, what type of surveillance.  They
22   want details.  It's easier to explain that kind
23   of stuff in person than to sit and try to type
24   it all out.
```

JEFFREY S. DENNER

1   Q.        And was Mr. Acornley someone you would

2   do that with?

3   A.        Yes.

4   Q.        And between 2010 and 2013, if

5   Mr. Acornley was the supervisor, is it your

6   understanding that if surveillance was desired

7   on a project, Mr. Acornley would have to approve

8   it?

9   A.        That was my understanding, yeah.  You

10  couldn't just start ordering surveillance on

11  your own.

12  Q.        And would the approval be just verbal,

13  or would there be a writing associated with it?

14  A.        All depends.  That's -- I can't tell

15  you guaranteed it would be put in the file.  I

16  would document, Personally discussed with

17  management, received approval for surveillance,

18  contacted, then I'd name whoever I contacted for

19  surveillance, surveillance to begin on, and then

20  I'd give the date.

21            So I would document in my lead file

22  how and where, when I was going to do

23  surveillance and who I hired.

24  Q.        Did you ever get turned down by

108

1  Mr. Acornley to conduct surveillance?

2  A.        Would I ever get turned down?  I don't

3  think Mr. Acornley ever turned me down.

4  Mr. Bowles did once.

5  Q.        Why?

6  A.        He wanted to see more information.  He

7  was like, get me a little more facts, a little

8  more information and come back to me.  And I

9  said okay.

10 Q.        Was there some specific reason that

11 you would seek surveillance?

12                    MR. CASTAGNA:  Objection to

13            the form of the question.

14                    THE WITNESS:  Sir, would you

15            please be more -- please be more

16            specific on surveillance of whom or

17            what?

18 BY MR. BARATTA:

19 Q.        Well, we're talking about medical

20 providers, and let's say you're doing a medical

21 provider investigation.

22 A.        Okay.

23 Q.        What are some of the reasons you would

24 want surveillance of a medical provider?

```
 1                    MR. CASTAGNA:  Objection to
 2            the form of the question.
 3                    THE WITNESS:  Surveillance
 4            of a medical provider to see how many
 5            patients are coming and going in the
 6            course of a day, to make sure that the
 7            doctor actually is showing up to the
 8            medical center to work, to verify how
 9            long the patients are in the medical
10            center, to verify that the patients
11            are actually showing up to the medical
12            center.
13                    And then you would compare
14            that information at a later date with
15            claim files when medical bills were
16            submitted.
17   BY MR. BARATTA:
18   Q.       Does there have to be some reason to
19   suspect that some of those things aren't
20   happening before you'll seek surveillance?
21   A.       Sure.
22                    MR. CASTAGNA:  Objection to
23            the form of the question.
24   BY MR. BARATTA:
```

JEFFREY S. DENNER

110

```
1    Q.       And with respect to medical provider

2    investigations, do they get started because

3    there's some suspicion of possible wrongdoing by

4    the medical provider?

5                    MR. CASTAGNA:  Objection to

6              the form of the question.

7                    THE WITNESS:  That's a tough

8              one to answer.  The way I can say it

9              is, an investigation gets started

10             because there's some wrongdoing, not

11             necessarily always because the

12             provider is doing some wrongdoing.

13                   I personally have started

14             investigations because of staged

15             accident rings, group of individuals

16             showing up in the same files over and

17             over and over, or a group of

18             individuals from the same two

19             neighborhoods always showing up in

20             opposite cars of each other over and

21             over and over all around the city.

22                   And then when you begin to

23             look at the files, if the same medical

24             center suddenly shows up in all of the
```

1          claims, you have to say to yourself

2          that's, you know, unusual.  Be unusual

3          enough for all of these people to

4          constantly have accidents with each

5          other, but what's the likelihood that

6          in every single accident, they all end

7          up at the same clinic?

8                    Then you might say to

9          yourself, is the clinic aware that all

10         these people somehow know each other,

11         or is the clinic involved?  And then

12         you might want to broaden your

13         investigation not just on the

14         individuals, but also of the clinic or

15         the clinic owner or an employee of the

16         clinic.

17                    It doesn't necessarily mean

18         the doctor has any knowledge.  Maybe

19         it's the front office person.  Maybe

20         it's a therapist in the clinic.  I

21         mean, you have to keep an open mind

22         when you're conducting investigations.

23         The last thing you want to do is make

24         assumptions, and then set out to prove

JEFFREY S. DENNER

112

```
1            your assumptions.
2                    You keep an open mind and
3            you let the facts and you let the
4            evidence guide the investigation.  You
5            don't make an assumption and then set
6            out to prove your assumption.
7    BY MR. BARATTA:
8    Q.      Do you think everybody in the unit
9    abided by that principle?
10                   MR. CASTAGNA:  Objection to
11           the form of the question.  Also calls
12           for speculation.
13                   THE WITNESS:  I don't know
14           if everybody handled their
15           investigations the way I handled my
16           investigations.
17                   I can tell you that's the
18           way I was trained.  That's the way
19           Dave Murphy, when I first started with
20           him 20-some years ago, insisted upon
21           it.  He was a great teacher.
22                   I had the benefit of going
23           to some training schools or training
24           classes, I guess you would call it,
```

```
1                    early on in my career with outside
2                    agencies, not State Farm, and that's
3                    the way they trained me, so that's the
4                    way that I stuck with it.
5    BY MR. BARATTA:
6    Q.        Is it fair to say that every
7    multi-claim investigation or project that you
8    were involved in began based on some suspicion
9    of wrongdoing?
10                   MR. CASTAGNA:  Objection to
11            the form --
12                   THE WITNESS:  Yes.
13                   MR. CASTAGNA:  -- of the
14            question.
15   BY MR. BARATTA:
16   Q.        I asked you in the written questions
17   that Mr. Castagna marked about lists that are
18   maintained by the SIU on ongoing projects.  And
19   they're in -- it's questions 42 to 46, I
20   believe -- actually, that's wrong.
21            It should be the very last page of the
22   same.
23   A.        Okay.  I'm there, sir.
24   Q.        And then question number 42 was:  Did
```

JEFFREY S. DENNER

1    the SIU/MCIU maintain written lists or

2    spreadsheets of the medical provider projects it

3    was conducting?

4              And your answer was:  Yes.

5              Correct?

6    A.       Yes.

7    Q.       And then the next question was:  When

8    were such lists maintained and who maintained

9    them and what information was contained on the

10   lists?

11             And is the answer that you wrote there

12   accurate?

13   A.       May I read that answer first?

14   Q.       Please.

15   A.       Do I read it out loud or read it to

16   myself?

17   Q.       You can read it to yourself.

18   A.       Thank you.

19             Yes, that's accurate.

20   Q.       Did the projects identified on the

21   project lists always concern medical providers?

22                   MR. CASTAGNA:  Objection to

23             the form of the question.

24                   THE WITNESS:  No.

1    BY MR. BARATTA:

2    Q.        What else besides medical providers

3    would be on the project lists?

4    A.        If there was -- there was -- I believe

5    at one point there was an investigation

6    involving a glass company, so there was a glass

7    claim on the list.

8              At one point there was an

9    investigation involving several body shops, so

10   there were body shops on the list.  At one point

11   there was a tow company, so there was a tow

12   company, I believe, on the list.  There was an

13   X-ray company, but I guess you would call that a

14   medical provider.

15             It would be whoever -- it would be

16   whatever we decided to name the project.

17   Sometimes the projects were named for the name

18   of the clinic.  Sometimes the projects were

19   named for the owner of the clinic.  Sometimes

20   the projects were named for the doctor at the

21   clinic, if he happened to be the owner.

22             The name really wasn't important.  It

23   was just a way to identify a project.  That

24   didn't necessarily mean that's who an

JEFFREY S. DENNER

116

1   affirmative action may or may not be filed

2   against and if one's ever going to be filed.  It

3   was just a way of identifying that's the

4   project.

5   Q.       And who maintained the list?

6                    MR. CASTAGNA:  Object to the

7           form of the question.

8                    THE WITNESS:  That's the

9           part where I said it all depends on

10          the time frame.

11  BY MR. BARATTA:

12  Q.       Okay.  Let's say -- well, I wasn't

13  clear on the time frame that you actually went

14  into SIU when it was named something else

15  originally --

16  A.       Okay.

17  Q.       -- but were you in SI -- was it called

18  SIU by 2000, by the year 2000?

19                   MR. CASTAGNA:  Objection to

20          the form of the question.

21                   THE WITNESS:  By the year

22          2000?  I think by the year 2000, it

23          was called SIU.

24  BY MR. BARATTA:

JEFFREY S. DENNER

117

1   Q.       From 2000 until the time that you left

2   State Farm, in other words -- you're no longer

3   employed by State Farm; right?

4   A.       That is correct.

5   Q.       When did you leave State Farm?

6   A.       August of 2015.

7   Q.       So from 2000 to August of 2015, were

8   you in the SIU?

9   A.       Yes, sir.

10   Q.       And were you conducting investigations

11   in projects involving medical providers

12   throughout that time?

13               MR. CASTAGNA:  Objection to

14         the form of the --

15               THE WITNESS:  Yes, sir.

16               MR. CASTAGNA:  -- question.

17   BY MR. BARATTA:

18   Q.       Throughout that entire period of time,

19   was -- in your experience, was there always a

20   list maintained of ongoing medical provider

21   projects?

22               MR. CASTAGNA:  Objection to

23         the form of the question.

24               THE WITNESS:  I hate to use

JEFFREY S. DENNER

118

1          the word "list."  I always referred to
2          it as inventory.  It was just a way of
3          tracking -- it was just a way for
4          claim reps and management to keep
5          track of inventory, what are you
6          working on, how many files, projects
7          claims are you handling, so that
8          management and upper management knew
9          what you were working on, so they knew
10         who was busy, who wasn't.  So if
11         something new came in, who do you
12         assign that to.
13                   You know, you had --
14         management had to know what people
15         were working on and what projects or
16         files or cases were closing and what
17         weren't, so when something new came to
18         our team, who had time to handle it.
19                   So you're not making lists
20         to track people.  You're making an
21         inventory sheet to say, Hey, Jeff, you
22         can handle this, or, John, you can
23         handle this, or, Mario, you can handle
24         this.  That was the whole point of it.

1           So I always referred to it as an

2           inventory.

3    BY MR. BARATTA:

4    Q.           And referring to it as an inventory

5    from 2000 until the time that you left in 2015,

6    was there always an inventory of projects

7    maintained?

8    A.           There was always an inventory of some

9    kind.  Whether it was in the same format or not,

10   no.  The format would change, you know, what it

11   looked like would change, but somehow, some way,

12   whether it was the unit secretary, whether it

13   was the team manager, somebody always had an

14   understanding of what each claim rep's inventory

15   was, how many active projects there were, who

16   the projects were assigned to, what they were

17   working on, how many claim files there were, how

18   many claim files each claim rep had, et cetera,

19   yes.

20           They had to; otherwise, State Farm

21   doesn't know what you're doing on a daily basis.

22   Q.           And in your answer to number 43, you

23   refer to it as an inventory sheet?  Is that --

24   A.           Yes, for lack of a better term.  It

1   may not had been a sheet.  It may not had been

2   one page.

3   Q.        Okay.  But did everyone have a copy of

4   it in the unit?

5   A.        I didn't keep a copy of it.

6   Q.        How do you know it existed?

7   A.        Because we would see it routinely at

8   staff meetings, because we would routinely go

9   over it at staff meetings.

10  Q.        Who would have it at the meeting?

11  A.        Management would divvy it out.

12  Q.        So was that Mr. Acornley?

13  A.        Mr. Bowles, Mr. Acornley, Mr. Murphy.

14  I mean, I had one dating back to my days with

15  Mr. Murphy.

16  Q.        And how often would those kind of

17  meetings occur?

18  A.        No rhyme or reason.  I'm sure

19  State Farm would have liked them to occur more.

20  We were very busy people and we were very --

21  unfortunately, we were not individuals that sat

22  in an office behind a desk every day.

23            And we all lived in different areas

24  and we all worked in different areas of the

**JEFFREY S. DENNER**

121

1    region, so it wasn't always easy to get

2    everybody into an office for a meeting.

3              So sometimes we could have two

4    meetings or three meetings in one month,

5    sometimes we could go six weeks without having a

6    meeting.  I mean, there was really no rhyme or

7    reason to it.

8              Sometimes we would get a memo that

9    would say we have not had a staff meeting in a

10   while, I really need everybody to get in here

11   next Thursday.  And then next Thursday, we would

12   all show up to the office for a 10:00 a.m.

13   meeting.

14             There was no guarantee you're having a

15   meeting every week or every two weeks or every

16   three weeks.

17   Q.        Is it fair to say, though, that you

18   had those kinds of meetings several times a

19   year?

20   A.        Oh, gosh, yes.

21                  MR. CASTAGNA:  Objection to

22             the form of the question.

23                  THE WITNESS:  Yes, more than

24             several times a year.

JEFFREY S. DENNER

122

```
1   BY MR. BARATTA:

2   Q.        Several times a quarter?

3   A.        Yes.

4                   MR. CASTAGNA:  Objection to

5             the form of the question.

6   BY MR. BARATTA:

7   Q.        And would it be Mr. Acornley or

8   Mr. Bowles who would have called those meetings?

9                   MR. CASTAGNA:  Objection to

10            the form of the question.

11                  THE WITNESS:  Yeah, either

12            one of them or jointly, or sometimes

13            it was one of them, sometimes they

14            hold joint meetings together, Bryan's

15            team and Austin's team together in one

16            room.

17                  Sometimes Austin did just

18            his team, sometimes Bryan did just his

19            team.  And then when Austin retired,

20            it was just Bryan, so everybody showed

21            up when just Bryan did it.

22                  Same thing when Mr. Murphy

23            was there.  When Mr. Murphy was there

24            and Mr. Acornley wasn't, it was
```

JEFFREY S. DENNER

123

```
 1              Mr. Murphy and Mr. Bowles.  So
 2              sometimes it was just Mr. Murphy
 3              having his team and just Mr. Bowles
 4              having his team, and sometimes they
 5              had a joint meeting.
 6    BY MR. BARATTA:
 7    Q.        And when Mr. Acornley was in those
 8    meetings either with Mr. Bowles or by himself,
 9    did he have a copy of the inventory sheet?
10    A.        Yes.
11                   MR. CASTAGNA:  Objection to
12              the form of the question.
13    BY MR. BARATTA:
14    Q.        And would he go over the inventory
15    sheet with everyone?
16                   MR. CASTAGNA:  Objection to
17              the form of the question.
18                   THE WITNESS:  Sometimes, and
19              sometimes we would be so busy because
20              there were other things that were more
21              pressing that maybe we wouldn't get to
22              the inventory sheet that day, but he
23              would try to, but, you know, if there
24              were more important things at
```

JEFFREY S. DENNER

124

```
1              State Farm -- things are always
2              changing at State Farm.  So if there
3              were more important things to discuss,
4              he would not get to it.
5    BY MR. BARATTA:
6    Q.        Other than the inventory sheets, were
7    there any other kind of sheets or lists or
8    inventories maintained within the MCIU?
9                    MR. CASTAGNA:  Objection to
10             the form of the question.
11                   THE WITNESS:  Well, we --
12             anytime we did reviews, we would keep
13             an inventory sheet.
14   BY MR. BARATTA:
15   Q.        Reviews of what?
16   A.        If we had a litigation, let's say,
17   against a specific provider, we might -- I can
18   remember, for instance, we had a rather lengthy
19   litigation against a provider named Dr. Singer,
20   who I was in charge of, who had multiple clinics
21   spread throughout the city.
22             So during that litigation, we would
23   produce a sheet that listed all of the claim
24   numbers where that provider or providers were
```

JEFFREY S. DENNER

125

1  involved, and those claims would have to be

2  looked at.

3  Q.        When you were doing the investigation

4  that involved Dr. Stavropolskiy and the clinic

5  in the Northeast, would that clinic have

6  appeared on an inventory sheet?

7                    MR. CASTAGNA:  Objection.

8              He hasn't testified that he had any

9              investigation into Dr. Stavropolskiy.

10                   THE WITNESS:  Yeah, I don't

11             know.  That was really a long time

12             ago.  I don't know if we did that or

13             didn't do that back then.  I have no

14             idea.

15 BY MR. BARATTA:

16 Q.        Were there ever any effort within the

17 SIU or MCIU to focus on specific attorneys?

18                   MR. CASTAGNA:  Objection to

19             the form of the question.

20                   THE WITNESS:  Occasionally

21             we would review files that went to

22             specific law firms.

23 BY MR. BARATTA:

24 Q.        Plaintiffs' law firms?

JEFFREY S. DENNER

126

```
 1   A.        Yes, sir.

 2   Q.        Can you think of any lawyers in

 3   particular or law firms in particular?

 4                   MR. CASTAGNA:  Don't

 5              identify anyone.

 6                   MR. BARATTA:  What's that?

 7                   MR. CASTAGNA:  He's not

 8              going to identify any investigation --

 9                   MR. BARATTA:  Are you

10              instructing him not to answer?

11                   MR. CASTAGNA:  No, I'm

12              pointing out the fact, we'll make it

13              clear, pointing out the fact that you

14              already asked for State Farm to

15              identify prior investigations that are

16              listed on these inventories or lists.

17                   The court has already told

18              you you're not entitled to it, and now

19              you're trying to ask the witness for

20              that, or at least that's what it

21              sounds like you're trying to do.

22                   MR. BARATTA:  This is

23              something entirely new.  You've never

24              identified in discovery what he's
```

JEFFREY S. DENNER

1           talking about.
2                   MR. CASTAGNA:  What's that?
3                   MR. BARATTA:  This new focus
4           on lawyers that you've never
5           identified.
6                   MR. CASTAGNA:  I've never
7           identified that?  Why would I identify
8           that?  Why --
9                   MR. BARATTA:  I don't know
10          why you and I need to have this
11          discussion.
12                  MR. CASTAGNA:  Well, he's
13          not going to testify to it, and if you
14          want to insist on going down that
15          road, we'll just call the judge, and
16          you can explain to the judge why
17          that's relevant to the case.
18                  MR. BARATTA:  Do you
19          represent this witness?
20                  MR. CASTAGNA:  You heard
21          what I said.
22                  MR. BARATTA:  Mr. --
23                  MR. CASTAGNA:  I'm going to
24          move for a protective order if you

JEFFREY S. DENNER

128

```
1              move into that line of questioning,
2              and we can call the judge and we'll
3              just have a conference with the judge.
4   BY MR. BARATTA:
5   Q.      Was Sam Fishman ever a lawyer on any
6   lists that you were using within SIU or MCIU to
7   direct investigations?
8              MR. CASTAGNA:  You can
9              answer that question.
10             THE WITNESS:  Yes.
11  BY MR. BARATTA:
12  Q.      When was this?
13  A.      In the past.
14  Q.      How long ago?
15  A.      I couldn't -- that, honestly, I can't.
16  Before I retired, but I -- years before I
17  retired, let's say that.
18             So when I say "years before I
19  retired," I don't know if I'm talking eight,
20  ten, six.  There's no way for me to, like,
21  narrow that one down for you.  When I say years
22  ago, I mean years ago.
23  Q.      So in the time frame that you've
24  identified, 2006 to 2010, you believe that there
```

```
 1   was some SIU or MCIU focus on Sam Fishman?
 2   A.        Well, it could have been --
 3                   MR. CASTAGNA:  Objection to
 4             the form of the question.
 5                   THE WITNESS:  It could have
 6             been 2005.  That's why I said I'm
 7             not -- I don't want you to say it was
 8             between 2006 and 2010.  I don't know.
 9   BY MR. BARATTA:
10   Q.        Was it before 2010?
11   A.        I can't -- I don't -- we were involved
12   in very -- I hate to say the word, but it was a
13   heated, contentious type of litigation with a
14   whole bunch of people.
15             And, yes, we were looking for files,
16   we were looking for accident, specific types of
17   accidents.  And, yes, Mr. Fishman's office was
18   involved, so we were looking at claims that went
19   to his office.
20             What the exact time frame was of that
21   litigation -- that litigation went on for years,
22   years, and then there were branch-off
23   litigations from it.  I don't know what the time
24   frame was that we said let's look at his office
```

1    to see if we could find some of those claims or

2    claims that fit the profile.

3              I don't -- I would be so bad if I said

4    to you, Hey, it was 2009, and it turned out it

5    was 2002.  I would be like, wow, man, was I off.

6    That's why I said I don't want to give you a

7    year.  I would really screw you up if I did

8    that.

9    Q.       What was the profile of claims that

10   you were looking at in connection with

11   Mr. Fishman?

12                   MR. CASTAGNA:  I'm going to

13             object to the form of the question.

14                   THE WITNESS:  I wasn't the

15             claim handler handling the Sam Fishman

16             litigation, so I don't know.  You

17             would have to ask the guys handling

18             that litigation.  There were two,

19             three, four guys handling that.  I was

20             not one of them.

21   BY MR. BARATTA:

22   Q.       Who were those two or three, four

23   guys?

24                   MR. CASTAGNA:  Objection to

1          the form of the question.

2                    You can answer.

3                    THE WITNESS:  Doug Babin was

4          one of them.  I think Doug was the

5          lead investigator -- no -- yeah, I

6          think Doug was.

7                    There was a guy that left

8          the company.  God, I forget his name

9          now.  The guy left the company, went

10         on to another company, he was

11         involved.  Adam Godoy was involved.

12         God, we're talking --

13                   Did you remember Adam's

14         name?

15                   I think there was one or two

16         others that had their hand -- when I

17         say "hand," just kind of helping out.

18                   Who was looking at the

19         first-party files, who was looking at

20         third-party, who was looking at the

21         provider, who was looking at attorney

22         lists, meaning that printout, I

23         couldn't tell you.

24    BY MR. BARATTA:

JEFFREY S. DENNER

132

1    Q.        There was an actual printout of an
2    attorney list?
3    A.        For Sam Fishman, you know, his name or
4    his firm's tax ID number, however it was done,
5    and files, claim numbers.
6    Q.        Was Mr. Costanzo one of the people
7    involved?
8    A.        I don't know, but I don't think so.  I
9    mean, I'm going to have to say I don't know, but
10   in hindsight, if I had to take an educated
11   guess, my educated guess is going to tell me
12   that John was not.
13   Q.        The printed list that had
14   Mr. Fishman's name on it, did it have other
15   attorneys' names on it?
16   A.        No, Sam Fishman's list -- and I call
17   it list for lack of a better term of not knowing
18   what else to call it.  That's why I hate using
19   the term "list," because people think it means
20   something that it's -- it's not.
21             It would say -- it would be like tax
22   ID number belonging to Sam Fishman, to say
23   here's a tax ID number that shows all these
24   claims are currently somehow associated with

133

1    that tax ID number.

2              And then you would have to go look at

3    the claim and say why is it associated with that

4    tax ID number.

5    Q.        So --

6    A.        Because you don't even know why.  Our

7    computer just says somehow someone's associated

8    with it.

9    Q.        So the mere connection of a claim to

10   Mr. Fishman was a reason for SIU to go look at

11   the claim?

12   A.        Yes, during that litigation, yes.

13   Q.        And who were the attorneys

14   representing State Farm in that litigation?  Do

15   you know?

16   A.        Oh, my God, there were a bunch of

17   people that were involved, people in corporate,

18   people, I think, in Chicago, I think

19   Mr. Goldberg's firm was involved, I think

20   Mr. Bradley somehow was involved, I think there

21   was a firm somewhere else in -- one in Chicago

22   that was involved.  I don't know them all.

23              And it was -- I think Mr. Fishman had

24   attorneys.  Other people involved had attorneys.

1   Like I said, it was a very -- it ended up not

2   being a simplified case.  It ended up being a

3   very broad spectrum.

4           You were involved, I think, for

5   Mr. Fishman.

6   Q.        Not for Mr. Fishman.

7   A.        Okay.  See, that's that I mean.  I

8   don't even know.  I wasn't involved.  It was

9   just a very large case that went on for years.

10  Q.        What was the outcome of it?  Do you

11  know?

12  A.        I have no idea.  It was all sealed.

13  And I didn't work on it, thank God.  I don't

14  even know all the parties.

15  Q.        Was the investigation that you

16  conducted in the Northeast where

17  Dr. Stavropolskiy worked previously, do you know

18  if Jeffrey Sorkin was connected to that

19  facility?

20  A.        That name rings a bell, but only

21  because I heard the name before, not because I

22  remember ever investigating anything to do with

23  a Jeffrey Sorkin before, no.

24  Q.        Do you know who Pat Parr is?

1    A.          My old boss?

2    Q.          Your old boss?

3    A.          Well, my -- okay.  My boss's boss.

4    She was a superior to me.

5    Q.          Who was your boss that she was the

6    boss of?

7    A.          Austin Bowles and Bryan Acornley.

8    Q.          Did Mr. Acornley, do you know,

9    communicate with Ms. Parr about projects?

10   A.          Sure, yes.

11   Q.          How do you know?

12   A.          I sat in on conference calls with

13   Bryan and Pat Parr on the other end of the

14   phone.  I met with Pat Parr when she would fly

15   in and have meetings with us.

16              Bryan would come into meetings and

17   say, I just got off the phone with Pat, I'm

18   giving you an update, or he would send emails

19   out saying, Here's the latest update from Pat.

20              Sometimes he would forward things

21   saying, Look what just came across my desk, and

22   it would be from Pat.  She was a very nice

23   person.

24   Q.          Was there any written communication

JEFFREY S. DENNER

136

1    that Mr. Acornley would regularly have with

2    Ms. Parr that you were aware of?

3                        MR. CASTAGNA:  Objection to

4            the form of the question.

5                        THE WITNESS:  Confusing

6            question.  I apologize.

7    BY MR. BARATTA:

8    Q.        As far as you know, did he have any

9    regular reporting requirements to her about what

10   was going on in the unit?

11   A.        Oh, I don't know what his reporting

12   requirements to her were, whether they were

13   daily, weekly, monthly.  I have no idea.

14   Q.        Would you characterize Ms. Parr as

15   having been actively involved in what was going

16   on in your unit?

17                        MR. CASTAGNA:  Objection to

18           the form of the question.

19                        THE WITNESS:  I didn't --

20                        MR. CASTAGNA:  You can

21           answer.

22                        THE WITNESS:  I didn't speak

23           to her on a day-to-day basis, but if

24           you're asking me do I believe she knew

```
 1              what we were doing and did she have an
 2              idea on what our unit did on on an
 3              active quarterly, semiannually
 4              annually basis, yes, she made it very
 5              clear she did in the meetings she held
 6              with us, along with on phone
 7              conversations.
 8  BY MR. BARATTA:
 9  Q.         And she was in that role during the
10  time that Mr. Bowles was still in the company?
11  A.         I think he was either on his way out
12  and she was on her way in, or he had just left
13  and she came in.  So Mr. Bowles was there, it
14  either was a very short time, or he was just out
15  the door and she was on her way in.
16              So I would say the person that had the
17  most communication or all the communication with
18  her would had been Bryan Acornley, not Austin.
19  Q.         And was she still in that role when
20  you left the company?
21  A.         Wow, that's tough for me to remember,
22  and only because when I left the company, we
23  were in the process of a State Farm
24  restructuring, and they were literally moving
```

JEFFREY S. DENNER

1   everybody around.

2           I believe that right before I left

3   with the company, I got a new -- new sectional

4   manager.

5   Q.        Who was that?

6   A.        I don't even know the gentleman's

7   name.  It was a gentleman.

8   Q.        Was he based in Concordville?

9   A.        No -- oh, yes, yes, yes, he was.

10  Q.        Who was it?  You don't remember his

11  name?

12  A.        I don't.  I apologize.  But the last

13  person I had conversations with about my job or

14  the last person I had conversations with

15  regarding projects or memos or reports that I

16  would file would had been her.

17  Q.        Would you ever file reports directly

18  to her?

19  A.        Never.

20  Q.        Did you ever draft a project

21  recommendation memo?

22  A.        Several.

23  Q.        And was there -- did you draft those

24  on your own, or did you draft those with the

JEFFREY S. DENNER

```
 1   assistance of counsel?
 2   A.       Both.
 3                    MR. CASTAGNA:  Objection to
 4           the form of the question.
 5   BY MR. BARATTA:
 6   Q.       Did you ever draft one with the
 7   assistance of Goldberg, Miller & Rubin?
 8   A.       I don't know.  I can't remember the
 9   last one I drafted before I left.  I don't
10   remember who my attorney was.
11   Q.       You mean State Farm's attorney?
12   A.       State Farm -- yes, when I say "my
13   attorney," I mean the attorney that I hired on
14   behalf of State Farm, yes, sir.
15   Q.       You've mentioned lead files in a
16   couple of answers.  What is a lead file?
17   A.       Simply a file in a project or MCIU
18   investigation, whichever you prefer to call it,
19   that is designated for the purposes of keeping
20   track of your investigation, your outside
21   resources, your reporting to management, your
22   expenses, so that they can be paid, so that
23   things aren't haphazardly scattered in ten
24   different claim files, which is the way things
```

1   at times were done in the past.

2          You would have to try to collect all

3   the different files and put them together to say

4   here is everything.  Corporate was like, you

5   know, that's ridiculous.  You've got things

6   scattered in ten different claims.  We have a

7   very hard time seeing what's going on here.

8          Put it all in one file so we can see

9   what's going on, we can track what's going on.

10  Then we can see what you're paying, what you're

11  not paying, so we had a designee.  That's known

12  as a lead file.

13  Q.      And did that instruction come from

14  your direct managers or from some people above

15  them?

16  A.      They came from somebody higher up.

17  They just passed the word down.

18  Q.      And who was it that passed the word

19  that you needed to start using lead files?

20  A.      Bryan Acornley, because he -- he told

21  us he was told.

22  Q.      And did he tell you who told him?

23  A.      People above him.

24  Q.      Do you know when that was that you

JEFFREY S. DENNER

141

1    started using lead files?

2    A.        I don't remember the date, no, sir.

3    Q.        Did you ever open any lead files?

4    A.        Yes, sir.

5    Q.        How many?

6    A.        Half a dozen, possibly, give or take.

7    Q.        And when you opened a lead file, was

8    it always because you had begun an

9    investigation?

10                    MR. CASTAGNA:  Objection to

11             the form of the question.

12                    THE WITNESS:  I opened a

13             lead file because I was investigating

14             something other than just one

15             individual claim.  Maybe it was two

16             claims, maybe it was three claims,

17             maybe it was four claims.

18                    But corporate didn't like

19             four different bills paid under four

20             different files.  They wanted one bill

21             paid and designated to one file.  In

22             order to do that, you needed to

23             designate one of those files as the

24             lead file.  So, therefore, you would

JEFFREY S. DENNER

142

```
1              designate one claim as a lead file.
2                       But, yes, you were
3              investigating something; otherwise,
4              you didn't have -- if you didn't have
5              an investigation, you didn't have a
6              file.
7   BY MR. BARATTA:
8   Q.         You said earlier that you've engaged
9   in so many investigations over the years that
10  you couldn't put a number on it; correct?
11  A.         Correct, 20-some years.
12  Q.         But you said you only opened a half a
13  dozen or so lead files?
14                      MR. CASTAGNA:  Objection to
15              the form of the question.
16                      THE WITNESS:  You asked me
17              right before I left, did you open any?
18  BY MR. BARATTA:
19  Q.         No, I'm -- I'm sorry if I limited it,
20  but in all of your time at State Farm, how many
21  lead files would you say you opened?
22  A.         That I can't answer.  I apologize.  I
23  thought you meant in the time frame before I
24  left, did I open any lead files.  So I apologize
```

JEFFREY S. DENNER

143

1    if I misconstrued your question.

2    Q.        So what time frame were you operating

3    under --

4                        MR. CASTAGNA:  Objection.

5    BY MR. BARATTA:

6    Q.        -- when you opened up a half dozen --

7    A.        I would say --

8                        MR. CASTAGNA:  Objection to

9              the form of the question.

10                       THE WITNESS:  I was thinking

11             the year or two before I left.

12   BY MR. BARATTA:

13   Q.        So in the year or two before you left,

14   you opened up a half dozen, but prior to that,

15   you had opened up many more?

16                       MR. CASTAGNA:  Objection to

17             the form of the question.

18                       THE WITNESS:  I had probably

19             opened up more than that, yes, but I

20             don't remember the time frame when we

21             started opening lead files.

22                       I know in the past, years

23             ago, meaning from the time I started

24             with Mr. Murphy, even past 2000, even

JEFFREY S. DENNER

144

1              past that, we didn't have lead files.

2              We didn't have to designate a lead

3              file and say here's the lead file for

4              every single case.

5    BY MR. BARATTA:

6    Q.        So that process started when

7    Mr. Acornley communicated it to you?

8                   MR. CASTAGNA:  Objection to

9              the form of the question.

10                  THE WITNESS:  Well, it could

11             have started before that.

12   BY MR. BARATTA:

13   Q.        Well, when you said earlier it was

14   Mr. Acornley who said we've been told we need to

15   start using lead files, what were you referring

16   to?

17   A.        That --

18                  MR. CASTAGNA:  Objection to

19             the form of the question.

20                  THE WITNESS:  -- from this

21             point forward, you don't have an

22             option.  You must use a lead file for

23             every -- I mean, there might be times,

24             just for my own edification, that, you

```
1              know what, I'm just going to put
2              everything under one file, but there
3              came a point, I guess maybe somebody
4              at corporate saw, hey, some guys are
5              using lead files, some aren't, there
6              came a point in time where somebody --
7              when I say "corporate," maybe it
8              wasn't corporate.  Somebody higher up
9              than Bryan said we like this concept
10             of designating a lead file for a
11             project.
12                     Maybe they saw it in another
13             region or zone.  I have no knowledge.
14             But from this point forward,
15             investigators will not have an option.
16             Everybody will pick a lead file and
17             designate it, mark it, identify it.
18             And that's what happened.
19   BY MR. BARATTA:
20   Q.        When opening a new project or any
21   multi-claim investigation?
22   A.        Any --
23                     MR. CASTAGNA:  Objection to
24             the form of the question.
```

JEFFREY S. DENNER

146

```
 1                    THE WITNESS:  -- multi-claim
 2           investigation.
 3   BY MR. BARATTA:
 4   Q.      And was that communication made before
 5   or after Mr. Bowles retired?
 6                    MR. CASTAGNA:  Objection to
 7           the form of the question.
 8                    THE WITNESS:  I can't answer
 9           that.  I don't even remember when
10           Mr. Bowles retired.
11   BY MR. BARATTA:
12   Q.      If Mr. Acornley was the one who
13   communicated it to you, does that tell you it
14   was after Mr. Bowles retired?
15   A.      No --
16                    MR. CASTAGNA:  Objection to
17           the form.
18                    THE WITNESS:  -- because I
19           told you Mr. Bowles and Mr. Acornley
20           many times conducted joint meetings.
21           So there were many times, even though
22           I was working for Austin Bowles, I was
23           sitting in a meeting Bryan Acornley
24           was conducting.
```

JEFFREY S. DENNER

147

```
1   BY MR. BARATTA:
2   Q.       How would you pick the file to be
3   designated as the lead file?
4                   MR. CASTAGNA:  Objection to
5           the form of the question.
6   BY MR. BARATTA:
7   Q.       Was it random?  I mean, how would you
8   get --
9   A.       Yeah.
10                  MR. CASTAGNA:  Objection to
11          the form of the question.
12                  THE WITNESS:  My
13          understanding, my understanding, I
14          could be wrong, there were no
15          parameters.  It had to be a file
16          that -- that was associated with the
17          investigation that was still open.
18                  And you would say, okay,
19          this file's open, associated with the
20          investigation, so we will tag it as
21          the lead file and we will keep it open
22          throughout the entire investigation,
23          but it wouldn't matter which one I
24          picked.
```

JEFFREY S. DENNER

148

1    BY MR. BARATTA:

2    Q.        And when an investigation was over,

3    what would happen to the lead file?

4    A.        We would close it.

5                        MR. CASTAGNA:  Objection to

6              the form of the question.

7    BY MR. BARATTA:

8    Q.        Why?

9    A.        No need for it.  Anytime you're done

10   with the file, there's no further need for the

11   file, the claim is concluded or the

12   investigation is concluded, you close the file.

13   Q.        Is that because you don't want to have

14   open files hanging around for no reason?

15                       MR. CASTAGNA:  Objection to

16             the form of the question.

17                       THE WITNESS:  It's policy at

18             State Farm.

19   BY MR. BARATTA:

20   Q.        What's the policy?

21   A.        When a file is concluded, whether it

22   be the investigation, whether it be the claim's

23   paid, but when you conclude a claim, part of the

24   investigation is you document everything that

1   needs to be documented, fill out all the forms

2   and appropriate clicks for whatever

3   documentation purposes or statistical purposes

4   need to be done, and then you close the file.

5   Q.        Did you have any expense authority

6   with respect to multi-claim investigations?

7   A.        Yes.

8                   MR. CASTAGNA:  Objection to

9             the form of the question.

10  BY MR. BARATTA:

11  Q.        Was it a dollar figure?

12  A.        Yes.

13  Q.        What was it?

14  A.        Again, unfortunately, that's a what

15  and when question.  It changed over time because

16  things were -- I know that sounds horrible, and

17  I hate to do that to you, sir, but there was a

18  time frame a year or two before I left, probably

19  two years, maybe even three years before I left,

20  up until my understanding is even six months or

21  so after I left that things were in just

22  constant motion at State Farm, meaning they were

23  literally changing sometimes between the 1st of

24  the month and the 30th of the month, they

JEFFREY S. DENNER

150

1   changed.

2              So for you to say what was your

3   expense authority, at one point the expense

4   authority they gave to SIU investigators was

5   minimal, like, extremely minimal, not even

6   enough for me to pay a surveillance report.

7              We were all up in arms.  And I

8   specifically remember all of us going to Bryan

9   and saying that this is asinine.  Do you realize

10  how many requests you're going to get on a

11  weekly basis, because I can't pay a single bill.

12             And if we couldn't pay a bill, that

13  means we had to send a request authority to our

14  manager, who then had to approve it, who then

15  had to send it back to us so that we could then

16  send it to the person that we were designating

17  to pay a bill.

18             And we were like, so if you multiply

19  all the guys you have, multiply all the bills

20  that hit my desk every day, you're not going to

21  have time to breathe.

22             And he was like, yeah, I haven't even

23  thought of that.  So he had to get ahold of

24  somebody that said you got raise this authority.

151

1   So the authority, I think, ended up going to

2   15,000.

3   Q.        And when was that?  Do you know?

4   A.        I don't know.

5   Q.        Was it --

6   A.        That, I believe, was the maximum

7   authority when I left.  And we keep talking

8   about -- just for clarification, for the record,

9   we keep talking about time frame.

10          I think it's probably better if the

11   record reflect that I left in August of 2015,

12   however, I stopped working at State Farm

13   November of 2014.

14          I did not do any work or perform any

15   work after November 2nd, 2014 for State Farm

16   Insurance, and then I officially retired on, I

17   believe, October -- August 28th of 2015.

18          So let the record reflect, when I say

19   during my time frame, I'm really referring up

20   until November 2nd of 2014, because that's the

21   last day I was actually in a State Farm office

22   working.

23   Q.        Okay.  Thank you for telling me that.

24                    MR. BARATTA:  Let's mark

**JEFFREY S. DENNER**

152

1          this as 2.

2                    (Auto Claim File Print File

3          History Information marked for

4          identification as Exhibit Denner-2.)

5                    (At this time, a discussion

6          was held off the record.)

7    BY MR. BARATTA:

8    Q.       What's in front of you, Mr. Denner, is

9    Denner-2, and this is a portion of the Eastern

10   Approach, Aquatic Therapy lead file, okay --

11                   MR. CASTAGNA:  Objection to

12         the form of the question.

13   BY MR. BARATTA:

14   Q.       -- to just orient you to it.  And I

15   want -- you'll see at the bottom of the pages a

16   Bates stamp number.  See where it says,

17   "Confidential produced"?

18   A.       Yes, sir.

19   Q.       At the end, there's a six-digit

20   number?

21   A.       Yes, that's Easter number, and then it

22   has a number after that.

23   Q.       Right.  I'm going to refer to Bates --

24   that's a Bates number.

JEFFREY S. DENNER

153

```
 1   A.         Yes.

 2   Q.         So I would like you to go to 255972.

 3   A.         Yes, sir.

 4   Q.         And I want to direct you to the top of

 5   the page, January 26, 2012, entry by David

 6   Dormer?

 7   A.         Yes, sir.

 8   Q.         Who's David Dormer?

 9   A.         A claim representative at State Farm

10   Insurance.

11   Q.         Was he in the SIU?

12   A.         Dave Dormer?  No, he was medical, MPC

13   rep.

14   Q.         Not in the SIU?

15   A.         I'm trying to remember if Dave had

16   ended up coming to SIU or not.  I don't remember

17   if Dave ended up coming to SIU or not.  I think

18   back in 2012, Dave was just a medical claim rep,

19   MPC.

20   Q.         Well, the notes he makes is:  Reopened

21   and reassigned to myself for lead file handling.

22              Did he have, as an MPC rep, the

23   ability to open lead files?

24   A.         I don't know.
```

JEFFREY S. DENNER

154

1  Q.        If you look at the entry, if you go

2  to --

3  A.        You know, yeah, Dave did come to SIU,

4  I thought, but I don't remember when.

5  Q.        Okay.  If you can't remember --

6  A.        I can't remember.  I'm sorry.

7  Q.        If you go to the previous page,

8  255971, at the very bottom, entry is

9  January 31st, 2012, by David Dormer, and that

10  entry continues onto the next page.

11  A.        Uh-huh.

12  Q.        And it says:  Paid GM&R invoice in the

13  amount of $432?

14  A.        Yeah, that's --

15                    MR. CASTAGNA:  Objection to

16            the form of the question.

17                    THE WITNESS:  Paid Goldberg,

18            Miller & Rubin invoice, that's what

19            that means to me, a $432 bill, and

20            then dropped same to file.

21                    We're electronic, so after

22            he paid the invoice, he's going to

23            have the image put into the file.

24  BY MR. BARATTA:

JEFFREY S. DENNER

155

1    Q.        And then if you go to the previous

2    page, 255971, he makes another entry on

3    February 27th, 2012:  Paid GM&R invoice in the

4    amount of $1,174.50.  Dropped same to file?

5    A.        Same thing, paid Goldberg, Miller &

6    Rubin invoice.

7                        MR. CASTAGNA:  Same

8              objection.

9                        THE WITNESS:  Designates the

10             amount that he's paying, and then he's

11             going to place the invoice into the

12             file.

13   BY MR. BARATTA:

14   Q.        Do those entries by David Dormer,

15   opening a lead file and then paying GM&R

16   invoices, tell you anything about this file?

17   A.        It tells me that for Dave Dormer, it's

18   a lead file for him, and that he's paying

19   invoices associated with it.

20   Q.        And would those invoices be for work

21   associated with the lead file?

22                       MR. CASTAGNA:  Objection to

23             the form of the question.

24                       THE WITNESS:  Could have

1                been.  Appear to indicate.

2    BY MR. BARATTA:

3    Q.        Now, on -- if you go on 255971, a

4    little bit higher up, on March 26, 2012,

5    Mr. Dormer makes a note:  Reviewed on cal,

6    C-A-L, period, lead file.

7    A.        Whoa, where are we?

8    Q.        March 26, 2012.  It's --

9    A.        Oh, okay.  I see it.  All right.

10   Q.        Reviewed on calendar, lead file?

11   A.        Uh-huh.

12   Q.        What --

13   A.        That means -- it doesn't say -- yeah,

14   it says reviewed.  Okay.  I thought it said

15   received.  It says reviewed on calendar, meaning

16   an electronic calendar popped up, because we

17   would set calendars for ourselves.

18                So an electronic calendar popped up,

19   and he's stating that my lead file popped up on

20   calendar, and he reviewed it, meaning he looked

21   at the file.  And when you look at a file, you

22   look -- do just that, look at it.  Is there

23   anything I have to do today?

24   Q.        Does the fact that he didn't close the

1  file indicate that it was still a lead file and

2  was to remain open?

3                    MR. CASTAGNA:  Objection to

4           the form of the question.

5                    THE WITNESS:  The fact that

6           he didn't close it indicates that it's

7           still open.

8  BY MR. BARATTA:

9  Q.      If there was no investigation going on

10  in connection with a lead file, would there be

11  any reason to keep the lead file open?

12                   MR. CASTAGNA:  Objection to

13          the --

14                   THE WITNESS:  Maybe he

15          had --

16                   MR. CASTAGNA:  -- form.

17          Calls for speculation.

18                   THE WITNESS:  -- a bill.

19          Maybe he had a statement he was

20          waiting for.  Maybe there was a

21          document that was still at bay.

22                   There's a lot of reasons a

23          file can remain open -- you're waiting

24          for something to come in still,

JEFFREY S. DENNER

158

1         somebody owes you something still,

2         somebody says they're going to be

3         submitting something to the file that

4         you still have yet to receive.

5                  How do I say this politely?

6         It was -- I'll be frank about it.  It

7         was a pain in the ass at State Farm to

8         reopen an electronic file if you knew

9         you were getting documents.

10                 Now, if the file opened

11        years later, that's a different story,

12        but you certainly didn't want to close

13        a file simply to reopen the file 30

14        days later.

15                 So, you know, Goldberg,

16        Miller & Rubin had another bill that

17        they were going to submit or, you

18        know, they -- he was paying bills for

19        something, maybe Goldberg, Miller &

20        Rubin was mailing him something, and

21        he said, Hey, you know, I need to mail

22        the bill -- or to the file, I paid

23        your bill.

24                 He's not going to simply

```
 1              close the file, and then 30 days later
 2              get their documents and have to
 3              reattach it, so, sure, it might be
 4              open.
 5    BY MR. BARATTA:
 6    Q.        Go to the next note, almost two months
 7    later, May 17th, 2012.  John Costanzo makes an
 8    entry:  Extended expense authority to $15,000.
 9              Do you see that?
10    A.        Yes, because people such as Dave
11    Dormer, when we had a limited expense authority,
12    that's what I told you before about limited
13    expense authority, and unless somebody like an
14    SIU rep or a manager increased the authority,
15    then bills couldn't be paid.
16              So let's say the authority was set at
17    2,500, and 2,000 had already been paid or 2,100
18    had already been paid.  Then the next bill
19    would -- comes in.  Better not exceed that three
20    or $400, or it just physically can't be paid.
21              So John would have to raise the
22    authority to make sure that incoming bills could
23    be paid.  That's what John's doing here.
24    Q.        So would you -- would he have done
```

JEFFREY S. DENNER

160

1   that?

2   A.        That's what he just did.

3   Q.        Would he have done that, though, if

4   there was no more bills expected?

5                   MR. CASTAGNA:  Objection to

6                   the form of the question.  Calls for

7                   speculation.

8                   THE WITNESS:  Yeah, you

9                   would have to ask John, but I'm

10                  assuming the answer would be yes, he's

11                  expecting something; otherwise, we

12                  have closed the file.

13  BY MR. BARATTA:

14  Q.        Did you ever make a note like that:

15  Extended expense authority to $1,500?

16  A.        Many times.

17  Q.        And did you ever do it in a lead file?

18  A.        Many times.

19  Q.        Did you ever do it in a lead file that

20  there was no more investigation occurring in?

21                  MR. CASTAGNA:  Objection to

22                  the form of the question.

23                  THE WITNESS:  Not that I can

24                  think of.

JEFFREY S. DENNER

161

```
 1   BY MR. BARATTA:
 2   Q.        Would there be any reason to extend
 3   expense authority in a lead file that there was
 4   nothing happening in and there was nothing
 5   expected to happen in?
 6                      MR. CASTAGNA:  Objection to
 7            the form of the question.
 8                      THE WITNESS:  Are you
 9            telling me I didn't expect to have a
10            miscellaneous bill come in or
11            anything?
12   BY MR. BARATTA:
13   Q.        I'm telling you that if there was a
14   lead file that got accidentally by mistake left
15   open because everyone else just forgot to close
16   it, would there be any reason to make a note
17   extending expense authority to $15,000 in that
18   file?
19                      MR. CASTAGNA:  Objection to
20            the form of the question.
21                      THE WITNESS:  Not that I can
22            think of.
23   BY MR. BARATTA:
24   Q.        Can you think of an instance where a
```

```
1    lead file just got accidentally left open?
2                    MR. CASTAGNA:  Objection to
3            the form of the question.
4                    THE WITNESS:  I'm sure
5            things accidentally happen all the
6            time at big insurance companies, but
7            when you notice something's
8            accidentally open, you close it when
9            you figure it out.
10                   But I'm sure somebody's
11           going to find files after I left that
12           I accidentally left open and shouldn't
13           have.
14   BY MR. BARATTA:
15   Q.      Well, in those files --
16   A.      But I can't think of any that I did.
17   I hopefully closed the ones I was supposed to
18   close.
19   Q.      Let's say you accidentally left a file
20   opened before you left.  Would you expect
21   someone like David Dormer to have reviewed it
22   twice and John Costanzo to have extended expense
23   authority in it, not realizing that it should
24   have been closed?
```

JEFFREY S. DENNER

163

```
1                    MR. CASTAGNA:  Objection to

2          the form of the question.  Calls for

3          speculation.

4                    I can't tell you not to

5          answer.

6                    THE WITNESS:  I don't know

7          what -- I don't know what was in their

8          thought process when they were going

9          through this file.  I don't have the

10         objectability to know what they were

11         thinking.

12                   They obviously were going

13         through this whole file, they saw this

14         whole file, they saw other things

15         going on.  They knew this file --

16         obviously, they've got several pages

17         worth of documentation in it.  It's

18         not just one note.  They clearly have

19         seen this file multiple times.

20                   So I don't want to say why

21         they did or didn't close it.  They

22         must have had a reason they did or

23         didn't close it.

24                   I can't think of why they
```

```
1              did or why they didn't, but I'm not
2              going to speculate as to it was a
3              mistake, it wasn't a mistake, they
4              were waiting for a bill that never
5              showed or, you know, he should have
6              made authority 2,500, not 15,000.  I
7              don't know.
8    BY MR. BARATTA:
9    Q.       But looking at those entries, does it
10   appear to you that this was an active open lead
11   file during that time frame?
12                   MR. CASTAGNA:  Objection.
13           Calls for speculation.
14                   THE WITNESS:  It is open.
15           It says this.
16   BY MR. BARATTA:
17   Q.       What do you mean, it says this?  It
18   says it's active and open?
19                   MR. CASTAGNA:  Objection to
20           the form.  Calls for speculation.
21                   THE WITNESS:  Well, it's
22           active because it's still popping up
23           on a diary system, so you know it's an
24           active file.  It's still in the
```

JEFFREY S. DENNER

165

1             inventory system, so, therefore, it's

2             not closed or moved from the claim

3             inventory.

4                     Therefore, every time they

5             rediary it, they have to physically

6             put a new date.  The system doesn't

7             put dates in automatically.  They have

8             to put a date in.  They have to click

9             on a date and rediary it.

10   BY MR. BARATTA:

11   Q.      If you go --

12   A.      So they're clicking on a date to

13   rediary the file and telling it to pop up again

14   for them.

15   Q.      And would anybody make a note to

16   rediary a file that should be closed?

17                     MR. CASTAGNA:  Objection.

18             Calls for speculation.

19                     THE WITNESS:  Again, I can't

20             answer for somebody else.  I wouldn't

21             rediary a file that I never wanted to

22             see again.  I don't know why John or

23             Dave would or why both of them would.

24             That's something you need to ask Dave,

JEFFREY S. DENNER

166

```
1              I guess.
2    BY MR. BARATTA:
3    Q.        Go to the next -- previous page,
4    255970.  And at the bottom of that page should
5    be an entry on July 25th, 2012, by Mr. Acornley,
6    at the very bottom?
7    A.        July 25th, 2012, at 8:45 a.m. in the
8    morning, correct, management.
9    Q.        And it says:  Category:  Management,
10   investigation?
11   A.        Yes.
12   Q.        If you turn the page, at the very top
13   of the next page is the actual entry that he
14   made, which is capital OAR-SIU?
15   A.        Uh-huh.
16   Q.        Reviewed, rediary, January 24th, 2013,
17   do you see that?
18   A.        Yes.  See, that's exactly what I was
19   talking about.  Mr. Acornley is saying that he
20   opened the file, reviewed it, and he is setting
21   himself a diary to rereview this again, on
22   January 24th, 2013, that he physically opens up
23   the calendar, goes to the calendar, clicks to
24   set his name and to tell the computer to find
```

JEFFREY S. DENNER

167

1    this file again and bring it back into his queue

2    on January 24, 2013.

3              The computer doesn't know how to do

4    anything without him; otherwise, it would just

5    sit in the queue forever.  So he's telling it to

6    get out of my queue, I've reviewed it, and I

7    would like to see it again on January 24th.

8    Q.       Did Mr. Acornley ever do open

9    assignment reviews on lead files that you were

10   handling?

11                  MR. CASTAGNA:  Objection to

12            the form of the question.

13                  THE WITNESS:  Sure.  That's

14            what OAR stands for.

15   BY MR. BARATTA:

16   Q.       And was it your experience that

17   Mr. Acornley was diligent in those reviews and

18   would actually open the files and look at them?

19                  MR. CASTAGNA:  Objection to

20            the form of the question.  Also calls

21            for speculation.

22                  THE WITNESS:  I can't assume

23            what Mr. Acornley did or didn't do.  I

24            didn't sit behind him and look over

```
 1            his shoulder.  He -- this is something
 2            he would mark in my files.  He would
 3            use the same acronym, open assignment
 4            review, SIU.  Sometimes he would say
 5            reviewed, sometimes he would say
 6            reviewed, then put a comment after it,
 7            sometimes he wouldn't.
 8                     Sometimes he'd just say open
 9            the assignment, reviewed it, and then
10            he'd say, I'm going to look at it
11            again, Jeff, in three months, six
12            months.
13                     A lot of times for Bryan,
14            especially in initial assignments,
15            which is what you said this was, he
16            would say I'll see it again in six
17            months, because he would want to give
18            you six months to work on it.
19                     Sometimes he'd give you a
20            note and say do the following or come
21            talk to me or whatever.  I don't know.
22            But I can't tell you that's what he
23            did.  I never sat over his shoulder.
24     BY MR. BARATTA:
```

1  Q.       Would you expect that Mr. Acornley

2  would open a file, do an open assignment review,

3  make that entry, diary it for six months hence,

4  and not realize that the file should be closed

5  because there was nothing going on in the file?

6                    MR. CASTAGNA:  Objection to

7              the form of the question.  Also calls

8              for speculation.

9                    THE WITNESS:  I'm going to

10             ask you to rephrase it and slow it

11             down a little bit, because I really

12             got confused.

13  BY MR. BARATTA:

14  Q.       If Mr. Acornley has said that he --

15  this file was accidentally left open, that there

16  was nothing going on in it, and the OAR he did

17  was just a matter of course and was not

18  something he paid any attention to, does that

19  appear to you based on these entries that you

20  just looked at to be accurate testimony?

21                    MR. CASTAGNA:  Object to the

22             form of the question.  Calls for

23             speculation.

24                    THE WITNESS:  I -- I

JEFFREY S. DENNER

170

1           certainly can't tell you whether

2           Mr. Acornley's testimony is accurate,

3           inaccurate, confusing, not confusing.

4           Only he can tell you that.

5                   All I can tell you is

6           OAR-SIU reviewed is something that I

7           would routinely see by Bryan in my

8           files.

9                   Again, sometimes it would

10          just be OAR-SIU reviewed, meaning he

11          opened the initial assignment that I

12          sent him and he reviewed it.  Other

13          times he would say I opened the

14          initial assignment and reviewed it,

15          and then he would give me a little

16          blurb, do this, don't do this, talk to

17          so-and-so, come and see me.  Sometimes

18          there was, sometimes this was all it

19          said.

20                  And then, yes, there was

21          always a calendar date, because

22          there's a -- by -- by design of our

23          computers, you must physically put in

24          a calendar date.  If you click out of

JEFFREY S. DENNER

171

1           it, it simply goes right back into

2           your queue and comes right back to you

3           again.

4                Your only options are close

5           the file or assign it to a future date

6           or move it to a different claim rep

7           altogether, reassign it to another

8           person, which is an ordeal.  That's

9           actually hard to do.

10   BY MR. BARATTA:

11   Q.      In the time frame of 2010, '11, '12,

12   up until the time that you left in November of

13   2014, was there anything going on in the unit or

14   going on at State Farm that would have let a

15   particular investigation fall by the wayside or

16   be forgotten or be put on the back burner?

17                MR. CASTAGNA:  Objection to

18           the form of the question.

19                THE WITNESS:  We were always

20           busy, but I don't think anybody would

21           forget about an investigation.

22                I mean, I was always busy.

23           I had one of the largest inventories

24           in our unit for almost ten years

JEFFREY S. DENNER

172

1          straight, but I never forgot about an

2          investigation.  You know, you work and

3          you do what you can, you get to what

4          you can, you ask for assistance when

5          you can.

6                I don't know John

7          personally.  I only know him as a

8          co-worker and as a co-worker friend.

9          John is not the forgetful type.  I

10         don't think John just totally forgets

11         about his job.  He's very

12         conscientious, he's hard working, he's

13         smart.

14               John doesn't -- you know, he

15         might forget about a claim file.  I

16         mean, like I said, I'm sure I've done

17         that.  But I'm not going to ignore an

18         investigation that I'm supposed to be

19         doing.

20               My manager wouldn't let me

21         ignore an investigation, either.  I

22         mean, management has checks and

23         balances to keep.  They don't have

24         checks and balances on hundreds and

173

```
 1              hundreds of claims files we have.
 2              Those could slip through the cracks,
 3              but --
 4   BY MR. BARATTA:
 5   Q.          So based on your experience, if
 6   there's a lead file with repeated reviews,
 7   expense authority, OAR going on, to you, that
 8   appears to be an active investigation?
 9                  MR. CASTAGNA:  Objection to
10              the form of the question.
11                  THE WITNESS:  It appears
12              somebody documented the file that
13              there's an investigation.
14                  That's what I said.  I don't
15              know when John started his -- I don't
16              know anything about this case.  I
17              don't know when he started his
18              investigation in this case.
19                  I don't know if this is the
20              lead file for this case.  I have no
21              idea.  I don't even know if this case
22              has anything to do with this file,
23              with this investigation.  I don't know
24              anything about it.
```

JEFFREY S. DENNER

174

```
1    BY MR. BARATTA:

2    Q.        You said that you --

3    A.        I don't see any of the defendants

4    listed here anywhere.

5    Q.        You said that you had one of the

6    largest inventories in the unit --

7    A.        Yes.

8    Q.        -- correct?

9    A.        Because we had claim files as well as

10   projects or MCIU investigation, whatever it is

11   you all want to call them.

12   Q.        How would you know what was in anyone

13   else's inventory?

14                    MR. CASTAGNA:  Objection to

15             the form of the question.

16                    THE WITNESS:  Because we

17             would get that printout at meetings

18             that would show the names of projects

19             and who was assigned to projects, so

20             you could very easily see how many

21             projects you had, how many projects

22             other people had.

23                    We also had something called

24             an open claim inventory that would
```

1              show how many open claims.  It was

2              called an open claim count.  It would

3              show -- in the old days, it would show

4              how many open claims were assigned to

5              you, meaning this would count as one

6              claim opened and assigned to John, if

7              John was the claim handler.

8                        Then it became -- at some

9              point they decided that just because

10             it was a claim file, it wasn't fair,

11             because some claim files were more

12             interesting than others, so it became

13             a what's known as COL, cause of loss

14             count.

15                       So one file may be one file,

16             but there might be six causes of loss

17             that you're handling in that claim

18             file.  So then it became a cause of

19             loss count, so that it would -- State

20             Farm started totaling up the total of

21             the causes of loss that you were

22             handling.

23                       So that routinely came

24             out -- not routinely.  That came out

JEFFREY S. DENNER

176

```
 1                    every so often.  So you could look at
 2                    it and say, wow, I'm handling "X"
 3                    number of investigations, as well as
 4                    all these COLs, and this guy's
 5                    handling this, this guy's handling
 6                    this, so you could see.
 7                         Now, that doesn't
 8                    necessarily mean -- the argument there
 9                    is, yes, but some investigations are
10                    harder than others.  Some litigation
11                    is harder than others.  So that's what
12                    management had to do there, weighing
13                    and balancing act.
14      BY MR. BARATTA:
15      Q.    Would Robin Seeler participate in
16      those meetings with managers?
17                         MR. CASTAGNA:  Objection to
18                    the form of the question.
19                         THE WITNESS:  What do you
20                    mean, managers?
21      BY MR. BARATTA:
22      Q.    Well, the ones you would go over the
23      inventory sheets?
24                         MR. CASTAGNA:  Objection to
```

JEFFREY S. DENNER

177

```
1                the form of the question.
2                        THE WITNESS:  Almost always.
3                I don't want to say all the time, but
4                most of the time she would, yeah.
5     BY MR. BARATTA:
6     Q.        Was Robin Seeler the person who was
7     actually creating the inventory sheets?
8                        MR. CASTAGNA:  Objection to
9                the form of the question.
10                       THE WITNESS:  When Austin
11               was around, I think she did it for
12               Austin, because I know Austin would
13               say, if you have update on the sheet,
14               give it to Robin.  You want to take
15               something off the sheet, give it to
16               Robin.  If something needs to be
17               altered on the sheet, give it to
18               Robin.  Which would all indicate to me
19               Robin's doing it, not me.
20                       Bryan took care of his own
21               stuff.  Bryan was very computer
22               literate.  Bryan was also an I --
23               Bryan hated to delegate.  Bryan was
24               just -- he was a workaholic.  He did
```

JEFFREY S. DENNER

178

```
1              everything.  So I don't know if Robin

2              did it for Bryan or not, but if I had

3              to take an educated guess, I'd say

4              that Bryan took care of all his own

5              stuff.

6   BY MR. BARATTA:

7   Q.      So Bryan took care of his own

8   inventory sheet?

9   A.      I --

10                  MR. CASTAGNA:  Objection.

11                  THE WITNESS:  -- don't know

12             that.  I have no idea if Robin did it

13             or Bryan did it.  One of the two did.

14             I'm only assuming Bryan did it because

15             Bryan was a hands-on manager.  He

16             always did everything and always

17             volunteered to help everybody with

18             everything.  He just was always on top

19             of things.

20  BY MR. BARATTA:

21  Q.      Have you talked to any of your former

22  colleagues in the MCIU or SIU about the fact

23  that you were being deposed in this case?

24  A.      No --
```

```
1                     MR. CASTAGNA:  Objection to

2              the form of the question.

3                     THE WITNESS:  -- not one.

4              Didn't call them and nobody called me.

5                     MR. BARATTA:  I think that's

6              all I have.  Thank you, Mr. Denner.

7                     MR. CASTAGNA:  I have a

8              couple follow-ups.

9   BY MR. CASTAGNA:

10  Q.         Jeff, Mr. Baratta was asking you some

11  questions about surveillance.  Do you know if

12  surveillance was conducted with respect to

13  this -- the investigation into the defendants in

14  this case?

15  A.         I have no way of knowing that.

16  Q.         Do you have any idea why, if

17  surveillance was conducted, why it was

18  conducted?

19  A.         I don't even know what it was, so I

20  can't -- I don't know if it was, and, if it was,

21  I don't know why.

22  Q.         Okay.  Do you know the basis for any

23  decisions made regarding claims handling with

24  respect to any claims that involved either
```

JEFFREY S. DENNER

180

1   Eastern Approach or Aquatic Therapy, Dr. Wang or

2   Dr. Stavropolskiy?

3   A.          None whatsoever.

4   Q.          Do you handle -- do you recall

5   handling any claims that involved treatment at

6   either defendant facilities?

7   A.          To the best of my knowledge, I have

8   never even looked at a file, let alone handled a

9   file involving these doctors.

10  Q.          Do you know who represented the

11  insureds in those -- in any claims that involved

12  treatment by those providers?

13  A.          I have no idea.

14  Q.          Do you know why those law firms or

15  lawyers were selected?

16  A.          I have no idea.

17  Q.          Any involvement in the decision to

18  hire those attorneys?

19  A.          None whatsoever.

20  Q.          Do you recall a lawsuit that involved

21  a facility called Midtown Medical Center?

22  A.          Yes, that was the one I was referring

23  to previously when I said I remembered the name

24  Sam Fishman.

JEFFREY S. DENNER

181

```
1                I just said he was one person involved

2    in many, many other entities, individuals,

3    et cetera.  The case, we had it captioned as

4    Midtown.  That's what State Farm called it.

5    Q.        Do you know who Rob Tierney is?

6    A.        Rob Tierney?

7    Q.        Yes.

8    A.        Yes.

9    Q.        Who's Rob Tierney?

10   A.        Works at State Farm.

11   Q.        Is he the individual who replaced Pat

12   Parr as the section manager?

13   A.        Yes.

14   Q.        Do you know when Rob started at

15   State Farm, or, I should say, do you remember

16   when Rob replaced Pat?

17   A.        I don't.

18   Q.        Okay.  But was that before you left --

19   and, again, using that November 2nd, 2014 date,

20   did Rob start before November 2nd, 2014 in

21   replacement of Ms. Parr?

22   A.        He either replaced Pat relatively

23   quickly before that or right after that.  I

24   never actually got a chance to meet Rob and sit
```

JEFFREY S. DENNER

182

1    down and talk with him one-on-one because he was

2    my new boss, but I knew who he was.

3              It was kind of like they said, Hey,

4    everybody's being replaced, but everybody was

5    replaced on paper before they were replaced

6    physically.  So it was kind of around that time

7    frame.

8              So I knew Rob either was going to be

9    my boss and they were, like, just hold on,

10   you'll get a chance to meet him and sit down and

11   talk to him, or I left, and then they were like,

12   Oh, yeah, by the way, Rob's your boss, and I'm

13   like, oh, shoot.

14             So, no, I never actually got a chance

15   to sit one-on-one with Rob.

16   Q.        Okay.  Mr. Baratta was asking you

17   questions about lead files, and he was

18   specifically talking about a document that he's

19   marked as --

20                       MR. CASTAGNA:  Denner-2.

21   BY MR. CASTAGNA:

22   Q.        -- Denner-2.  Did you have any

23   involvement with respect to that lead file of

24   that claim?

JEFFREY S. DENNER

183

```
1    A.        Other than --

2    Q.        This is the one --

3    A.        Other than seeing this printout, I've

4    never even seen this claim.

5    Q.        Do you remember -- this might be

6    taxing your brain.  It probably is.

7    A.        All this is taxing me.

8    Q.        But at some point in time, State Farm

9    changed their -- I'm going to use that layman's

10   term, "computer system," from --

11   A.        CSR.

12   Q.        -- from CSR to ECS?

13   A.        Yep.

14   Q.        Do you remember approximately when

15   that happened?

16   A.        I couldn't tell you.  It was a

17   drawn-out process.  It was supposed to be quick,

18   and it never worked.  The first time we tried

19   it, it didn't work.

20   Q.        Did you keep track of your lead files

21   in any way other than if they came up on your

22   diary?

23   A.        Did I personally?

24   Q.        Yes, you personally.
```

JEFFREY S. DENNER

184

1    A.        Yes, I kept a list of my lead files.

2    Q.        So you kept a list?

3    A.        Yes, a list.

4    Q.        Do you know if anyone else kept a list

5    of their lead files?

6    A.        You would have to ask each person

7    individually.  I have no idea what they did or

8    didn't keep at their desk or their briefcases.

9    Q.        Do you remember a change as a result

10   of -- as a result of that computer changeover

11   from CSR --

12   A.        CSR to ECS.

13   Q.        -- to ECS, do you remember a change

14   where, after that changeover from CSR to ECS,

15   that you had to go into the files and actually

16   give authority to the claims processors?

17   A.        You had to open up every file

18   electronically and extend claim authority on

19   every file so that it could now be processed in

20   ECS, because until authority was actually typed

21   in and until a box was clicked saying who

22   authority was going to be given to, nobody had

23   authority.

24   Q.        So --

JEFFREY S. DENNER

1   A.          Because when the computer transitioned

2   overnight, you walked in the next day and

3   everything was ECS, all the authorities were now

4   blank.

5   Q.          Okay.

6   A.          Which meant nothing could be paid.

7                       MR. CASTAGNA:  I think

8               that's all the questions I have for

9               you, Mr. Denner, Jeff.  Now I'm

10              calling you Mr. Denner at the end.

11                      THE WITNESS:  That's fine.

12                      MR. BARATTA:  Just a couple.

13                      THE WITNESS:  Sure.

14  BY MR. BARATTA:

15  Q.          Why did you keep a list of your lead

16  files?

17  A.          I didn't want to lose them because of

18  all these changeovers and all these computer

19  things happening.

20              And State Farm had done this many

21  times in my career, and I realized that many

22  times in my career, things -- people are like,

23  we can't get into the system and the system

24  didn't transfer things right or things were

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

1    lost.

2              And as a -- what they used to call me,

3    an old-timer, as an old-timer, I realized that I

4    liked to keep things handy.

5              And I understand they wanted to be

6    paperless, but when you get computer glitches

7    and you can't get into a computer and nothing

8    seems to work, and people say, Well, now what do

9    we do, I'm like, Well, I got backup.

10   Q.        Whenever that changeover occurred,

11   which required some new expense authority to be

12   entered into a claim file --

13   A.        Yes.

14   Q.        -- when that happened, did you go into

15   all of your lead files and write a new authority

16   expense extender?

17   A.        I went into any file that was open and

18   granted authority to whatever I felt was

19   appropriate.

20   Q.        And did you go into any claim files or

21   lead files that were no longer active to do

22   that?

23   A.        No.

24                        MR. BARATTA:  That's all I

JEFFREY S. DENNER

1          have.

2                    MR. CASTAGNA:  No further

3          questions.  Thanks, Jeff.

4                    (Witness excused.)

5                    (Deposition concluded at

6          1:22 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T I O N

 2

 3              I, JENNIFER WEARNE, a Registered

 4    Professional Reporter and Notary Public, do

 5    hereby certify that the foregoing is a true and

 6    accurate transcript of the stenographic notes

 7    taken by me in the aforementioned matter.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21    DATE:

22                      _____

23                           JENNIFER WEARNE, RPR

24
```

JEFFREY S. DENNER

1                    DENNER-1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

JEFFREY S. DENNER

```
 1                        DENNER-2
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES