# THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY** | : | CIVIL ACTION |
| | : | |
| | : | No. 2:15-cv-05929 |
| vs. | : | |
| | : | JURY TRIAL |
| | : | DEMANDED |
| **LEONARD STAVROPOLSKIY, P.T., D.C., Et. al.** | : | |
| | : | |

| | | |
|---|---|---|
| **EASTERN APPROACH REHABILITATION, LLC and AQUATIC THERAPY OF CHINATOWN, INC.** | : | CIVIL ACTION |
| | : | |
| | : | No. 2:16-cv-01374 |
| vs. | : | |
| | : | JURY TRIAL |
| | : | DEMANDED |
| **STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et. al.** | : | |

## MOTION BY THE MEDICAL PARTIES FOR SANCTIONS AGAINST THE STATE FARM PARTIES AND ITS COUNSEL

Dr. Leonard Stavropolskiy, Dr. Joseph Wang, Aquatic Therapy of Chinatown, and Eastern Approach Rehabilitation (collectively the "Medical Parties"), by and through their counsel, hereby submit the following Motion for Sanctions, and in support thereof aver as follows:

1. On May 29, 2018, the Court Ordered State Farm to produce by June 11 "Rule 26(a)(2)(B)(i-vi) Disclosures concerning the 'consulting medical expert' referenced in State Farm's letter" to the Court dated March 22, 2018. A copy of the Court's Order is attached as Exhibit "A."

2. On June 15, 2018, State Farm produced more than 2,000 pages of material, included amongst which were an expert report authored by Michael Frustaci, DC dated September 2, 2014, as well as invoices from Dr. Frustaci addressed to counsel for State Farm

totaling $21,900.00 for work performed from June 23, 2014 through September 2, 2014. A copy of Dr. Frustaci's September 2, 2014 report and invoices is attached as Exhibit "B".

3. Dr. Frustaci was in this fashion revealed for the first time to have been the "consulting expert" referred to by counsel in its letter to the Court of March 22, 2018, in which letter counsel described Dr. Frustaci as the expert who "unraveled and explained" to State Farm the fraud alleged in its lawsuit filed on October 31, 2015.

4. Dr. Frustaci, however, authored a second expert report in this case which was disclosed by State Farm on October 31, 2017 and Dr. Frustaci was thus identified as an expert who State Farm would seek to have testify at trial. A copy of Dr. Frustaci's second expert report is attached as Exhibit "C".

5. Without knowledge of his earlier expert report, work, or payments, the Medical Parties deposed Dr. Frustaci in his capacity as a testifying expert on January 11, 2018. A copy of Dr. Frustaci's deposition is attached as Exhibit "D".

6. In his deposition, Dr. Frustaci, with the active interference and assistance of State Farm's counsel, repeatedly testified untruthfully in order to conceal from the Medical Parties the work he had performed and report he had provided to State Farm and its counsel in 2014.

7. There is no good faith explanation nor justification for Dr. Frustaci's and counsel's repeated and intentional deceit throughout discovery and at his deposition concerning his extensive expert involvement in this case, and sanctions are warranted.

I. **DR. FRUSTACI AND COUNSEL REPEATEDLY MISLED THE MEDICAL PARTIES ABOUT THE SCOPE OF MATERIALS CONSIDERED AND OPINIONS OFFERED BY DR. FRUSTACI IN THIS CASE**

8. Upon receiving the report of Dr. Frustaci disclosed by State Farm on October 31, 2017,

the Medical Parties served Dr. Frustaci with a subpoena to produce documents, which subpoena is attached hereto as Exhibit "E".

9. Through State Farm's counsel, Dr. Frustaci provided a written response to each document request made in the subpoena. Dr. Frustaci's response to the subpoena is attached as Exhibit "F".

10. Request Number 5 in the subpoena sought "All Documents you considered in forming the opinions you will express in this action."

11. State Farm's response was as follows:

**"All documents, in Dr. Frustaci's possession, considered by him in forming his opinions have been identified in his October 31, 2017 report and are in the possession of the Defendants.** These documents include the final report of Dr. Michael Schneider, the Amended Complaint, the deposition transcripts of Drs. Joseph Wang, Leonard Stavropolskiy, and Yun Sun Yang, the Writepad program, marketing/advertising materials provided by Addison Health Services, and the chiropractic records of the patients identified in Exhibit "B"."

12. Exhibit "B" to Dr. Frustaci's Response to subpoena contained a list of 20 patient files of the Medical Parties.

13. Request Number 10 in the subpoena sought "All Documents created by you in connection with your work in this action, excluding any draft reports or draft disclosures protected from disclosure by Federal Rule of Civil Procedure 26(b)(4)(B) and (C)."

14. State Farm's response to this request was "See Dr. Frustaci's expert report which has previously been produced to Defendants." The report referred to was Dr. Frustaci's October 31, 2017 report.

15. Both of these responses were false. As has now been revealed, sometime before September 2, 2014, Dr. Frustaci reviewed at least 50 patient files of the Medical Parties, as well as depositions taken of Dr. Wang and Dr. Stavropolskiy by counsel for State

Farm in underlying cases from 2010 to 2014.

16. Dr. Frustaci also authored a 6-page report dated September 2, 2014 to which he signed his name and in which he offered sweeping opinions to within a reasonable degree of chiropractic certainty that the Medical Parties had engaged in fraudulent conduct.

17. Dr. Frustaci was paid approximately $22,000 for his work in 2014 as an expert in this case.

18. It was without the knowledge of any of Dr. Frustaci's extensive work reviewing documents, his expressed opinions, nor his payments, that the Medical Parties deposed him on January 11, 2018.

19. Throughout his deposition, Dr. Frustaci provided deliberately deceptive answers in order to avoid revealing his 2014 work, opinions, and payments.

20. Counsel for State Farm repeatedly objected and instructed Dr. Frustaci not to answer questions which counsel for State Farm identified as "outside the scope" of Dr. Frustaci's October 31, 2017 report.

21. Now that Dr. Frustaci's full work has been revealed, it is apparent that counsel for State Farm and Dr. Frustaci conspired to conceal his earlier expert work by responding to questions and objecting to questions in a manner designed to avoid disclosure and without asserting any privilege which might tip off the Medical Parties to Dr. Frustaci's earlier expert work in the case.

22. Objections and statements made by State Farms counsel expose that State Farm and its witness secretly created a fictional distinction which categorized some of Dr. Frustaci's work and reports as that of a "consultant" and others as that of a "testifying" expert.

23. However, counsel for State Farm never identified to opposing counsel (or the Court) that

information was being withheld on the basis of the privilege which might attach to the work of a consulting expert.

24. Rather, Mr. Castagna objected throughout the deposition that questions were "beyond the scope" of Dr. Frustaci's October 31, 2017 report and instructed Dr. Frustaci not to answer on that basis. Examples of counsel for State Farm's tactic in this regard are found at pages 35-36:

**MR. CASTAGNA: I'm going to object that this is outside the scope of his report. I'm going to instruct the witness not to answer with respect to this because it has nothing to do with his opinion in this case.**

**MR. BARATTA: I think it has to do with his qualification and his bias.**

**MR. CASTAGNA: Well, I disagree with that.**

**MR. BARATTA: Okay. So you're instructing him not to answer?**

**MR. CASTAGNA: Yes.**

And pages 88-89:

**Q. What is a predetermined recipe of treatment?**

**MR. CASTAGNA: I'm going to object that it's outside the scope of his notice. He's not going to answer that question. I'm sorry, outside the scope of his report and outside the scope of his opinions in this case, and it's not something that's going to be advanced by him in this case. So how can it possibly be relevant to this case?**

**MR. BARATTA: He's someone that you're purporting to provide to the jury as an expert in fraud.**

**MR. CASTAGNA: In WritePad.**

**MR. BARATTA: No, you can't limit it to the kind of fraud, and I'm not limited to evaluating his overall expertise. He's someone you hired who's an expert in fraud to review multiple files in this case. I'm entitled to know the background of his education and experience and capabilities and find out what he saw in these files.**

**MR. CASTAGNA: But that's not his opinion, Andy. I'm sorry if I'm cutting you off because I didn't mean to cut you off. Are you finished?**

MR. BARATTA: Yes.

MR. CASTAGNA: That's not his opinion in this case. Have you read his report?

MR. BARATTA: I have.

MR. CASTAGNA: Okay. Well, that's not his opinion.

MR. BARATTA: Is your contention for the record that I am limited to asking him about his opinion in this case in a fact deposition?

MR. CASTAGNA: You're not allowed to go outside of his opinion to some other opinions that are not something that he's going to opine upon.

MR. BARATTA: So you're instructing him not to answer.

MR. CASTAGNA: Yeah. He's not going to opine upon that area.

25. These objections and instructions to the witness by Mr. Castagna were a theme which he repeated over and over again. *See*, e.g., pages 36, 49, 64, 74, 75, 76, 78, 79, 90, 91, 95, 96, 124, 163, 183, 227, 228.

26. For his part, Dr. Frustaci followed Mr. Castagna's direction and repeatedly testified untruthfully in order to conceal his prior expert work, opinions, and payments.

27. Dr. Frustaci's boldest lie concerned the amount of money he had been paid by State Farm for his work, found at page 64 of the transcript:

Q. How much have you been paid by State Farm total including this case?

A. Over the years?

Q. Yes.

A. $150,000 maybe. Between 100 and 150.

Q. And that's from <u>2015 to the present</u>.

A. Correct.

Q. Actually is it June 2015 or October of 2015?

**A. June.**

**Q. How much have you been paid total so far in this case?**

**A. Plus or minus 20, <u>20 to 25,000</u>. Less expense – minus expenses, but.**

28. This testimony contained multiple lies. First, we now know that Dr. Frustaci was paid $22,000 in <u>2014</u> for his work in this case. Second, we now know that when that $22,000 is added to the amounts actually disclosed by State Farm to have been paid in connection with his 2017 report, the total paid to Dr. Frustaci for his work in this case so far is at least $53,850.00.

29. Being off by more than 50% in describing the total amount paid cannot be described as anything other than deliberately deceitful.

### A. <u>Dr. Frustaci Repeatedly Offered Testimony Intentionally Designed to Conceal the Existence of His September 2, 2014 Report and The Work and Payments Associated Therewith</u>

30. Dr. Frustaci's untruthfulness was not confined to his payments. He repeatedly answered questions, often with the direct assistance of counsel for State Farm, in a manner intentionally designed to conceal his prior expert report, payments, and work.

31. It is only as a result of the Court's Order of May 29, 2018 that we now know Dr. Frustaci was paid tens of thousands of dollars from June to September of 2014 to review at least 50 patient files of the Medical Parties, as well as multiple deposition transcripts of testimony taken by State Farm's counsel prior to June of 2014 in underlying cases. (We still do not know which charts Dr. Frustaci was given nor which specific deposition transcripts he was provided).

32. On September 2, 2014 Dr. Frustaci issued a 6-page expert report opining to within a reasonable degree of chiropractic certainty that the records he reviewed reflected "gross

deviations from the standards of care" and that the Medical Parties were "willful participants in a scheme to deliver unreasonable and unnecessary treatments in a concerted effort to maximize billing."

33. When comparing this reality to the testimony offered by Dr. Frustaci, his and counsel's deceptive intention to actively conceal all aspects of Dr. Frustaci's prior expert work in 2014 is unquestionable (the page number in parentheses indicates the page of the transcript of attached as Ex. "D" on which the testimony appears):

- Q. What's your area of expertise in this case, Doctor?

    A. **I was retained to look at the WritePad program.** (Pg. 76)

- Q. Is it your opinion that my clients have committed fraud through the use of the WritePad program?

    A. **I only looked at 20 files out of, I believe, 400. So for me to look at -- for me to give you an opinion of what I think, just like an insurance would ask me what, I'll say what's the universe, I would say I need to see 20 percent of files to do that. Now, from what I understand what Dr. Schneider said and everything else of what he saw and all of the files is true, then that answer, I believe, is yes. But for me to tell you that, I would need to see with my own eyes exactly the files, which I haven't done. I just saw a small sampling.** (Pg. 77)

- Q. Was there -- when were you officially retained for the first time in this case?

    A. **December of 2015.** (Pg. 95)

- Q. How many -- you said that you reviewed twenty patient files of my clients in this case?

    A. **Correct.** (Pg. 98)

- Q. You said that Dr. Schneider reviewed 400 or more charts in your understanding, right?

    A. **Just looking at his report, yes.**

    Q. And you reviewed twenty.

    A. **Correct. Well, I didn't review them. I looked over them for my purposes of**

**this, of this analysis.** (Pg. 102)

- Q. No. Why is twenty enough for you to make the conclusions that you are making if twenty isn't enough to make conclusions about the treatment.

    **A. This is the way that the notes are being taken at this office. I'm making that assumption based on what Dr. Schneider is writing and had communications with him as well. So if this is the way the notes are being taken, if this is what's being seen, I read his report and this is a sampling, then I feel very confident and very comfortable with my opinions as stated in my report.**

    Q. Okay. So, then, can you also say with confidence that Dr. Schneider's conclusions about what exists in all of the files exist in all of the files?

    **A. Well, I think I'm not going to speak for Dr. Schneider in that regard because I don't know what he, you know, what he -- I'm not going to speak for him and say I would have a one-to-one or not one-to-one in that regard. I think there's a -- you asked before about why I was only given twenty, and I would think in terms of cost containment and everything, why have redundancy, you know, why would you do that. So, I mean, look, they asked me one specific thing, look at one particular area, and that was reasonable to me.** (Pg. 104-105)

- Q. Did you ever ask for more files?

    **A. No.**

    Q. Why not?

    **A. Because my purposes in the very limited focus and opinion of my report in this matter, I didn't need them.**

    Q. Did the files that you reviewed exhibit all of the things Dr. Schneider said all of the files exhibit?

    MR. CASTAGNA: I'm sorry, can I hear that back?
    (The court reporter read back as requested.)
    MR. CASTAGNA: If you know the answer, you can answer it.

    **THE WITNESS: As I sit here right now, I don't know if there's one or two or three out liars [sic] of one little thing, not a hundred percent, there possibly could be, but not enough to change my opinion, no.**

    BY MR. BARATTA:
    Q. For the most part, what you viewed in the twenty files that you looked at you believe exhibited the things Dr. Schneider says are exhibited by all of the files.

**A. I'm looking at how the language changed --**

MR. CASTAGNA: Objection to the form of the question.

**THE WITNESS: -- how the findings rolled over, not what the findings were necessarily, that's a separate issue, but whether or not they rolled over repeatedly, virtually all the time, and whether in those cases, in those -- as the finding rolled over the language changed. That's it. That's all I looked at. Yes, that changed there, changed there, changed there. So that was it. It wasn't anything beyond that. That's the scope of what I looked at.** (Pg. 106-107)

- Q. How many files did you see a predetermined recipe of treatment?

  **A. I don't recall if it was twenty or eighteen or nineteen. I don't recall.**

  Q. But --

  **A. I didn't keep a record of that. I wasn't focused on that.** (Pg. 110)[1]

- Q. Well, did you, in your review of the files in this case, did you find any initial examination finding that were contradictory that couldn't --

  **A. Yes, I did note a few but, again, it wasn't my focus.**

  Q. Which ones did you note?

  **A. It wasn't my focus, so it's months ago, and I don't recall.**

  Q. Did you make a written note of it?

  **A. No.** (Pg. 129)

- Q. What evidence have you seen that the doctors did not actually do the exams and actually make the findings of moderate fixation on the three dates identified in paragraph 71?

  **A. I did not look for any evidence of that. I did not look for it in the first place. I'm not -- I'm only interested in how the records are portrayed from day to day, visit to visit. That's my focus.** (Pg. 135)

---

[1] As reflected by the transcript, it was at this point that counsel for State Farm objected again on the basis that the question was "outside the scope" of Dr. Frustaci's report and then threatened to leave with Dr. Frustaci unless an additional $1500 check was handed to Dr. Frustaci *at that moment in time* to cover any additional time which might be spent in the deposition. Counsel refused to allow Dr. Frustaci to answer any additional questions until a check was handed over. *See* Ex. "D", pg. 110-120. Given what we now know, it appears that this absurd demand was an attempt to manufacture a reason to end the deposition and avoid further questioning which might expose Dr. Frustaci's earlier report.

- Q. So the things that you list in your report are things that you personally observed in the files.

  **A. I saw examples of the changes in verbiage in the twenty files that I looked at, yes.** (Pg. 152)

- Q. Could you say to a reasonable degree of medical professional certainty that these patterns you have identified exist in the records of my clients without considering Dr. Schneider's opinion or the amended complaint?

  MR. CASTAGNA: I'm going to object. When you say patterns, you're talking about the patterns identified in his report?

  MR. BARATTA: Yes.

  THE WITNESS: That they exist in the other 380 that I didn't see?

  BY MR. BARATTA:
  Q. Yes.

  **A. Well, how would I -- I would never do that.**

  Q. So the answer is no, you couldn't.

  **A. No. No. I couldn't -- I could never sign my name to something like that without seeing a lot more or all of the records.** (Pg. 183-184)

- Q. The third bullet point. "Initial examination records of patients contain a high degree of multiple common findings that is inconsistent with authentic clinical practice expectations." Is that your opinion?

  **A. In the twenty I saw it is.** (Pg. 192)

- Q. Did the patients get better?

  **A. I didn't study the end results, but that's -- I didn't study the time frames. I didn't look at that in that respect in the these cases. I didn't look at those.** (Pg. 195)

- Q. Do you respect Dr. Wang?

  A. I disagree with records that I'm seeing here as authentic, that's all I'm saying. That's the -- and to the extent that this WritePad program was used, that's my thing. I think you've seen my report in the Metropolitan case. As you can see, when I see 511 files and I review them, I have pretty clear language

about the records. <u>I didn't review enough to give you that type of language or opinion in that.</u> (Pg. 197)

- Q. Is it your opinion that my clients committed fraud?

    A. <u>Having looked at what I looked at, the limited number of files</u>, and the use of the WritePad program, that would be a preliminary conclusion that they would have to say no, no, here's some extraneous circumstances or you look at the other 380 or something like that. But based on that, <u>because that's all they gave me to look at</u>, these -- my opinion, those individuals, that when I saw these exams, the individuals were not injured in that way to that extent with those findings. There would be not --it's not consistent with what I would expect. (Pg. 198)

- Q. Well, can you just tell me succinctly what your issue in this case is?

    A. <u>The WritePad program.</u>

    MR. CASTAGNA: He just told you what the issue was 17 times.

    THE WITNESS: The WritePad program. The use of the rollover button and the randomization, <u>that's it.</u> (Pg. 213-214)

- Q. Are you -- is it your opinion that the doctors did not actually do the exams and make the findings indicated?

    A. Some of the findings I questioned when I saw them. <u>I did not study them entirely</u>, but some of the findings I questioned how they could have been done. I don't recall the specifics. <u>It was not the focus of my review.</u> So if you show me the specific report or a specific file, I can perhaps answer that but, yes, I guess that's... (Pg. 224-225)

- Q. Which notes did you review did not accurately portray what the patient said?

    A. <u>I did not -- I would not know that. I did not look at that.</u> I looked at the changes in it, the verbiage changes rather than actually except for what is written here, and for me to know exactly what a patient said on any given day, I don't know. (Pg. 254-255)

- Q. Would you be able to offer an opinion to the jury in this case based on the twenty files that you reviewed and say they apply to all of the files?

    A. No, I wouldn't do that. I said that earlier. <u>I would need to see twenty percent of the files to have a preliminary opinion, and to have arrived at a conclusion where I would sign my name to a report, I would need to see all of them.</u> That's what I said. I said that hours ago. (Pg. 291-292)

- Q. Can you offer an opinion on fraud in this case without Dr. Schneider and his opinions?

    A. **I would never have done that. I would need to see 400 files.** (Pg. 293)

34. This last answer by Dr. Frustaci was perhaps his most deceitful. Not only would he offer an opinion on fraud in this case after reviewing less than 400 files, he actually did offer specific and unambiguous opinions on fraud, and he did so having looked at only 50 (unidentified) charts.

## II. THERE IS NO JUSTIFICATION FOR DR. FRUSTACI AND COUNSEL'S DELIBERATE DECEIT AS NO CLAIM OF PRIVILEGE WAS MADE

35. There is obviously no justification for a witness to lie under oath, nor is there any justification for a lawyer to deliberately facilitate his client offering untruthful testimony.

36. One can only assume that State Farm somehow rationalized its duplicity under a secret, disingenuous, and legally unjustifiable premise that Dr. Frustaci's earlier expert work could be concealed under a claim that his work as a consulting expert is forever privileged and can thus be somehow "testified around".

37. But even this faulty justification fails on its face as counsel for State Farm repeatedly objected and instructed Dr. Frustaci not to answer certain questions not on the basis of privilege, but rather on the basis that information was "outside the scope" of Dr. Frustaci's October 31, 2017 report.

38. The only conceivable reason for counsel to have objected on the basis of "scope" rather than assert that some aspect of Dr. Frustaci's work was privileged was to avoid revealing that there was a report being withheld under a claim of privilege in the first place.

39. It bears noting of course that counsel's instructions not to answer in the absence of asserting privilege as the basis for doing so would have been improper under any

circumstance.

> In any event, under Rule 30, instructions not to answer are limited to those situations where counsel is protecting a privilege, enforcing a court-imposed limitation, or preparing to present a protective motion. "A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer." Defense counsel was not engaged in any practice permitted under Rule 30 when she gave instructions not to answer questions.

Plaisted v. Geisinger Med. Ctr., 210 F.R.D. 527, 534 (M.D. Pa. 2002)(internal citations omitted).

40. Instead of asserting privilege, which would have revealed his prior expert work in this case, counsel and Dr. Frustaci obviously chose to secretly and disingenuously "divide" Dr. Frustaci's expert work into categories of that performed as a consultant and that performed as a testifying expert. However, there was no basis in law (or common sense) to permit such a secret differentiation.

41. "Commonly in litigation involving complex and specialized areas-such as computer forensics-a witness will perform dual roles, one as testifying expert, and one as consulting expert. Information exclusively considered by such an expert in his or her capacity as consulting expert does not fall under Rule 26(a)(2)(B). **A court should only give force to this differentiation of roles if it is convinced that the information considered for consulting expert purposes was not also considered pursuant to the expert's testifying function**. The normal discovery and privilege rules govern when materials considered by an expert exclusively in that individual's capacity as a consulting specialist must be disclosed to an opposing party. Bro-Tech Corp. v. Thermax, Inc., No. 2008 WL 724627, at *2 (E.D. Pa. Mar. 17, 2008)(emphasis added).

42. At no time did State Farm identify Dr. Frustaci as a consulting witness, nor did it ever at

any time seek the Court's ruling on whether the information he considered for consulting purposes was not also considered pursuant to his testifying function.

43. Instead, State Farm secretly concealed Dr. Frustaci's consulting work altogether and then assisted him in testifying in a manner which was deliberately untruthful in order to maintain the secret. It was only as the result of the Medical Parties' extensive summary judgment and discovery motion practice that State Farm was forced by the Court to reveal Dr. Frustaci's earlier expert work at all, more than 5 months after his deposition.

44. In Ansell Healthcare Prod. LLC v. Reckitt Benckiser LLC, 2017 WL 6328149, at *2 (D. Del. Dec. 11, 2017), the District Court analyzed the argument State Farm no doubt will offer in response to this motion as justification for its conduct and found it unavailing. The Court first detailed the circumstances in which privilege might apply in a "dual hat" expert situation:

**In cases involving a "dual hat" expert, privilege applies "only [to] those materials generated or considered uniquely in the expert's role as consultant."** *S.E.C. v. Reyes,* **2007 WL 963400 at *1 (N.D. Cal. Mar. 30, 2007). The party resisting disclosure of the documents must demonstrate that "the information considered for consulting expert purposes was not also considered pursuant to the expert's testifying function."** *Bro–Tech,* **2008 WL 724627 at *2;** *In re Air Crash at Dubrovnik, Croatia on April 3, 1996,* **2001 WL 777433 at *4 ("the party seeking to compel the production of documents should not have to rely on the resisting party's representation that the documents were not considered by the expert in forming his opinion."). In other words, "a clear distinction must be made between documents the expert considered in his role as a consultant and those he considered in his role as a testifying expert."** *Oklahoma v. Tyson Foods,* **2009 WL 1578937 at *5. "[I]f the subject matter of the materials sought to be protected relates to the facts and opinions the expert expresses in his report, a court should order disclosure when there is at least an ambiguity as to whether the materials informed the expert's opinion."** *Robocast v. Apple, Inc.,* **2013 WL 12155813 at *3 (D. Del. Sept. 18, 2013);** *Yeda,* **292 F.R.D. at 108;** *B.C.F. Oil Refining, Inc. v. Consolidated Edison Co. of N.Y., Inc.,* **171 F.R.D. 57, 62 (S.D.N.Y. 1997) ("any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking discovery."). When "the subject matter [in the material at issue] directly relates to an opinion in the expert's report, there will be an ambiguity."** *See, e.g., Robocast,* **2013 WL 12155813 at *3;** *Yeda,* **292 F.R.D. at 109;** *Reyes,* **2007**

WL 963400 at *2; *Air Crash*, 2001 WL 777433 at *3.

45. The Court in <u>Ansell</u> went on to explain why no distinction could credibly be made in the expert's work to justify concealing any aspect of it:

> **The argument that the differing scope of information Mr. Hansen considered in his two roles clearly distinguishes those roles is similarly unavailing. The products and patents at issue in this case were included in the calculations Mr. Hansen performed or provided feedback on in his consulting role. Additionally, there is considerable overlap in the facts and data generally relevant to settlement analysis and damages analysis. Analyses related to settlement and damages generally include computation of a reasonable royalty using data such as the parties' market shares, sales revenues, and licensing history, among other things. Mr. Hansen considered all of these sorts of data in his testifying expert report, and the documents at issue also contain this information and additional economic information relevant to settlement and damages analyses, such as profit margins. That Mr. Hansen considered information in his consulting role beyond that which he considered in his testifying role does not establish a clear distinction. Since the information considered by Mr. Hansen for his consulting role included United States sales data and other information relevant to the current case, it is difficult, if not impossible, to believe that it did not inform the opinions in his testifying expert report concerning damages. Accordingly, Plaintiff must produce the documents it exchanged with Mr. Hansen in his consulting role.**

<u>Id</u>. At *3.

46. Not only was there "overlap" between the materials considered by Dr. Frustaci in authoring his two reports, the materials were for all intents and purposes *identical* – patient charts and deposition transcripts of the doctors.

47. Just as in <u>Ansell</u>, it is difficult, if not impossible, to believe that the 50 medical charts and depositions he reviewed in 2014 did not inform the opinions he offered in his October 31, 2017 report. It is equally difficult, if not impossible, to believe that State Farm's counsel had any doubt that it did.

48. Equally disingenuous would be any suggestion by State Farm that Dr. Frustaci did not "consider" his earlier review of documents in authoring his second report: "[I]f an expert reviews a document, he has "considered" it, under Rule 26, whether or not he relies on it

in preparing his report." In re Puig, Inc., 398 B.R. 69, 72 (Bankr. S.D. Fla. 2008).

49. Any good faith review of the law would have revealed to State Farm that its concealment and deception surrounding Dr. Frustaci's earlier expert work was totally inappropriate once he was identified as a testifying expert:

> **"A majority of courts take the view that once a litigation consultant also becomes a testifying expert, all materials considered by the expert in the formation of his testimony are discoverable regardless of whether these same materials were also considered by the expert in his role as a litigation consultant.** *See S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 257 F.R.D. 607, 614 (E.D. Cal. 2009); *see also In re Pioneer Hi–Bred Int'l, Inc.*, 238 F.3d 1370, 1375 (Fed. Cir. 2001) ("any disclosure to a testifying expert in connection with his testimony assumes that privileged or protected material will be made public"); *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 717 (6th Cir. 2006) ("[W]e now join the 'overwhelming majority' of courts ... in holding that Rule 26 creates a bright-line rule mandating disclosure of all documents, including attorney opinion work product, given to testifying experts"); *Elm Grove Coal Co. v. Dir., O.W.C.P.*, 480 F.3d 278, 302, n.24 (4th Cir. 2007) (adopting the view that a testifying expert's draft reports under Rule 26 and attorney-expert communications are not entitled to protection under the work—product doctrine); *Johnson v. Gmeinder*, 191 F.R.D. 638, 646 (D. Kan. 2000) (noting that cases interpreting the Advisory Committee Note to Fed. R. Civ. P. 26(a)(2)(B) have held that the "amended rule unambiguously provide[s] a 'bright-line' rule in favor of production of *any information* which the expert considers.")."

Tampa Bay Water v. HDR Eng'g, Inc., 2010 WL11507792, at *2 (M.D. Fla. Oct. 15, 2010).

50. State Farm's duplicity surrounding Dr. Frustaci was not limited to its incomplete disclosures and untruthful deposition tactics. State Farm also misled the Court.

51. In response to the motion to compel what we now know to be Dr. Frustaci's report, State Farm averred to the Court that the consultant in question was "non-testifying" and argued implicitly to the Court that their consulting expert would not be testifying at trial because Dr. Schneider would be their testifying expert. See pg. 14 of Document No. 110, State Farm's Response to the Motion to Compel of the Medical Parties

("Defendants now create a pretextual argument premised on their confusion over the fact that State Farm's consulting expert was not their testifying expert, Dr. Schneider.").

52. State Farm also averred to the Court that "neither the consulting expert's report nor his opinions, nor any other facts, have been disclosed or injected into this case, other than to rebut Defendants' false assertions that one did not exist." Id., pg. 19. This is not true, of course. Dr. Frustaci and his opinions have been directly injected into this case by identifying him as a testifying expert.

53. In short, State Farm did to the Court what it did to the Medical Parties: Pretended as if Dr. Frustaci the consultant was a *different human being* than Dr. Frustaci the testifying expert.

**Sanctions Are Warranted**

54. "A federal court has the authority to, and must not avoid the responsibility for, monitoring the conduct of all litigants and attorneys who come before it. The court's obligation is to protect not only litigants who may suffer from abusive litigation practices of their adversaries, but also to promote the proper function of a fair and effective judicial system which, while it is adversarial, need not also be callous, uncivil, sneaky or booby-trapped. When it becomes so, the courts must act decisively." Derzack v. Cty. of Allegheny, Pa., 173 F.R.D. 400, 411 (W.D. Pa. 1996), aff'd sub nom. Derzack v. Cty. of Allegheny Children & Youth Servs., 118 F.3d 1575 (3d Cir. 1997)(internal citations omitted).

55. Potential sanctions for violation of Fed.R.Civ.P. 26(a)(2)(B) may be severe given that "[n]othing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion." Fitz, Inc. v. Ralph Wilson Plastics Co., 184

F.R.D. 532, 536 (D.N.J. 1999).

56. Rule 37(c)(1), Fed.R.Civ.P., providing for the imposition of mandatory sanctions upon failure to comply with Rule 26, states:

> **If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:**
> **(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;**
> **(B) may inform the jury of the party's failure; and**
> **(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).**

57. As a threshold matter, the Third Circuit has recently reiterated that "a showing of willful deception" justifies the exclusion of expert testimony. Lamb v. Montgomery Twp., 2018 WL 2094513, at *2 (3d Cir. May 7, 2018), *citing* In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791-92 (3d Cir. 1994).

58. Moreover, failure to comply with Rule 26 regarding expert witnesses is only harmless when there is no prejudice to the party entitled to disclosure. Nguyen v. IBP Inc., 162 F.R.D. 675, 680 (D.Kan.1995)).

59. The Medical Parties have suffered severe prejudice as the result of State Farm and Dr. Frustaci's deliberately deceptive conduct. First, and most obviously, the Medical Parties paid Dr. Frustaci $2,500 for his time, paid $1,575.00 for the transcription of his testimony, and $928.44 for the videographer.

60. The Medical Parties paid their counsel for 25 hours of time preparing for and then conducting the deposition at the rate of $350 per hour.

61. All of this expense, $13,753.44, does not include the roughly 20 additional hours of attorney time expended on filing the motion to compel Dr. Frustaci's report and this

motion for sanctions.

62. The Medical Parties were substantively prejudiced in that they were deprived of the opportunity to question Dr. Frustaci as to the full extent of his work on behalf of State Farm in this case and the true basis for the opinions he expressed. This prejudice is unfair in light of the fact that motions for summary judgment are already pending before the Court.

## III. **CONCLUSION**

63. In light of State Farm's inexcusable conduct in concealing Dr. Frustaci's earlier expert work, the manner in which Dr. Frustaci testified, and the active role counsel played in preventing Dr. Frustaci's true role in this case from being revealed at his deposition, it is respectfully requested that the sanctions listed in the accompanying Order be entered.

64. Alternatively, if the Court should determine that preclusion of Dr. Frustaci as an expert from testifying at trial is not warranted, it is respectfully requested that State Farm be required to immediately identify all materials provided to and/or relied upon Dr. Frustaci and that he be ordered to appear for deposition in the office of counsel for the Medical Parties to be re-deposed at the sole expense of State Farm.

RESPECTFULLY SUBMITTED,

ANDREW P. BARATTA, ESQUIRE

__APB2_____
Attorney for the Medical Parties
Attorney I.D. #82250
3500 Reading Way
Huntingdon Valley, PA  19006
(215) 914-2222

Date: 6/27/18